S95G1866. GREENE et al. v. HUNDLEY et al.
(468 SE2d 350)

SEARS, Justice.

We granted certiorari in order to determine whether OCGA § 9-9-13 (b) of the Georgia Arbitration Code provides the exclusive grounds for vacating an arbitration award, or whether an award may be vacated upon a reviewing court's determination that there is no evidence to support the award. Relying upon principles associated with the appellate review of judicial and administrative decisions, the Court of Appeals ruled that an arbitration award may be vacated if it is determined that no evidence supports it.[1] Our consideration of the Georgia Arbitration Code and the general purpose of arbitration leads us to conclude that an arbitration award may be vacated only if one or more of the four statutory grounds set forth in § 9-9-13 (b) is found to exist. We therefore reverse.

Appellees Hundley and Butt (hereafter "homeowners") entered into a contract with appellant Stephen C. Greene, in which Greene agreed to construct a residence for the homeowners. The contract stated that:

[a]ny controversy relating to the construction of the residence or any other matter arising out of the terms of this contract shall be settled by binding arbitration. The cost incurred and the fees of the arbitrators shall be assessed be-

---

[1] *Hundley v. Greene,* 218 Ga. App. 193 (461 SE2d 250) (1995).

tween the parties as determined by the arbitrators. A hearing shall be conducted pursuant to the Rules of the American Arbitration Association with regard to the Construction Industry Arbitration Rules. Notice of intention to arbitrate with the American Arbitration Association shall be sent by certified mail to the respective parties.

Disputes over the construction of the residence arose between the homeowners and Greene, and were submitted for arbitration before the Arbitration Tribunal of the American Arbitration Association, as required by the contract. At the arbitration proceeding, the parties agreed that all disputes regarding the construction of the residence should be arbitrated and ruled upon, including a determination of which party would be responsible for discharging certain liens that had been filed by non-party subcontractors who had performed work on the residence.

An extensive two-day hearing was held before the arbitrator, at which numerous witnesses testified and considerable documentary evidence was introduced, generating a transcript several hundred pages long. The arbitration award made findings in favor of both parties, and awarded $17,000 to the homeowners and $20,400 to Greene. The arbitration award did not set forth any findings of fact. The homeowners filed an application to vacate the arbitration award with the superior court, which denied the application and entered an order confirming the award. The superior court based its ruling upon its finding that the homeowners had failed to establish the existence of any of the four statutory grounds set forth in OCGA § 9-9-13 (b) for vacating an arbitration award. Thereafter, the homeowners appealed to the Court of Appeals.

In its ruling, the Court of Appeals recognized that arbitration awards are controlled exclusively by the Arbitration Code, but ruled that such awards are still subject to the judicial requirement that they be based upon findings of fact supported by the evidence of record. The appellate court noted that in ruling on a motion to vacate an arbitration award, a court may not weigh evidence that has already been considered by an arbitrator, but concluded that that rule applies only so long as "there [is] evidence to support the [award] in the first place."[2] In reaching that conclusion, the Court of Appeals reasoned that because the legislature made arbitration awards subject to limited judicial review, "arbitration is part of the 'judicial process.' "[3] The appellate court based its review of the award in this case upon: (1) case law allowing appellate reversal of "lower judicatory findings

---

[2] 218 Ga. App. at 195.
[3] Id. at 197.

. . . not supported by 'any evidence' "; (2) statutory authority granting appellate courts the authority to review and reverse administrative decisions that are clearly erroneous in light of the evidence of record; and (3) statutory authority that sets a "substantial error" standard for the superior court's certiorari review of " 'any inferior judicatory.' "[4] After finding that the arbitrator had not set forth findings of fact in support of the award, and that Greene had failed to establish on appeal that the award was supported by any evidence, the Court of Appeals ruled that the award was "completely irrational," and directed that it be vacated.[5]

1. The Georgia Arbitration Code[6] "shall apply to all disputes in which the parties thereto have agreed in writing to arbitrate and shall provide the exclusive means by which agreements to arbitrate can be enforced."[7] By its enactment, the Arbitration Code repealed common law arbitration in its entirety,[8] and it must, therefore, be strictly construed.[9]

The Arbitration Code sets forth four statutory grounds for vacating an arbitration award upon the application of a party subject to the award. The arbitration award shall be vacated if the court finds that the rights of the applying party

> were prejudiced by: (1) Corruption, fraud, or misconduct in procuring the award; (2) Partiality of an arbitrator appointed as a neutral; (3) An overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject matter submitted was not made; or (4) A failure to follow the procedure of this [Code], unless the party applying to vacate the award continued with the arbitration with notice of this failure and without objection.[10]

---

[4] Id. at 195.

[5] Notably, the Court of Appeals' ruling that the award was not supported by any evidence was not based upon its own review of the record. Rather, the court ruled that because Greene had not provided his own statement of facts to counter that put forth by the homeowners, but instead had argued that the court was not authorized to examine the sufficiency of the evidence in support of the award, Greene had consented to a decision by the court based upon the homeowners' factual assertions. 218 Ga. App. at 198 (citing to Court of Appeals Rule 27, "this court [will not] sift the record on behalf of a party to sustain that party's position."). As explained, infra at pp. 596-597, the Court of Appeals was not authorized to examine the sufficiency of the evidence in support of the award. Hence, we disregard the appellate court's conclusion that there was no evidence to support the award, and defer to the arbitrator with regard to that issue.

[6] OCGA § 9-9-1 et seq.

[7] Id. § 9-9-2 (c).

[8] Ga. L. 1988, p. 903, § 1.

[9] *Bd. of Trustees &c. v. Alexander*, 181 Ga. App. 360, 361 (352 SE2d 228) (1986).

[10] OCGA § 9-9-13 (b).

Relevant case law states that these four bases are the exclusive grounds for vacating an arbitration award.[11] The Arbitration Code requires a trial court to confirm an award upon the timely application of a party to the award, unless one of the statutory grounds for vacating or modifying the award is established.[12] The Code specifically states that merely because the relief granted in the arbitration award "could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm an award."[13] In this regard, the power to vacate an arbitration award "should be severely limited in order not to frustrate the purpose of avoiding litigation by resorting to arbitration."[14]

2. Rights that are cognizable in a court of law are not necessarily dispositive of an arbitrated dispute. Rather, arbitrating parties agree to waive certain such rights in favor of a quick resolution of their dispute by extralegal means. Indeed, we have recently held that by electing arbitration, the parties can agree to waive certain constitutional and procedural rights to which they would be entitled in a judicial forum, such as the right to trial by a jury.[15] The Code entitles parties to an arbitration proceeding the opportunity to be heard, to present evidence, and to cross-examine witnesses.[16] The Code also requires that arbitrators maintain a record of all pleadings, documents and testimony introduced at the hearing, and permits the transcription of the hearing by a court reporter.[17] However, the Arbitration Code does *not* require that an arbitrator enter written findings of fact in support of an award; nor does the Code require an arbitrator to explain the reasoning behind an award.[18] The authority of an arbitrator gives her the " 'inherent power to fashion a remedy as long as the award draws its essence from the contract or statute.' "[19]

3. These principles require us to reverse the Court of Appeals' ruling in this case. As explained, (1) The Arbitration Code provides the exclusive means by which a contractual agreement to arbitrate

---

[11] *Raymer v. Foster & Cooper, Inc.*, 195 Ga. App. 200, 201 (393 SE2d 49) (1990) (construing the predecessor to OCGA § 9-9-13); *Cotton States Mut. Ins. Co. v. Nunnally Lumber Co.*, 176 Ga. App. 232, 236 (335 SE2d 708) (1985) (same).

[12] OCGA § 9-9-12.

[13] OCGA § 9-9-13 (d).

[14] *Goodrich v. Southland Homes Corp.*, 214 Ga. App. 790 (449 SE2d 154) (1994) (citation omitted). See *Amerispec Franchise v. Cross*, 215 Ga. App. 669, 670 (452 SE2d 188) (1994).

[15] *Ekereke v. Obong*, 265 Ga. 728, 729 (462 SE2d 372) (1995).

[16] OCGA § 9-9-8 (b).

[17] OCGA § 9-9-8 (e).

[18] See § 9-9-10; *Cotton States*, 176 Ga. App. at 234 (in rendering an award, arbitrators are required only to make "a final and definite award upon the submitted subject matter."). Nor do the Construction Industry Arbitration Rules, pursuant to which the arbitration in this case was conducted, impose these requirements upon the arbitrator.

[19] *MARTA v. Local 732*, 261 Ga. 191, 195 (403 SE2d 51) (1991).

will be enforced; (2) The Arbitration Code expressly states that an arbitration award must be confirmed unless it is vacated or modified in accordance with the Code; and (3) Unless one of the four statutory grounds set forth in § 9-9-13 (b) for vacating an arbitration award is found to exist, a reviewing court is bound to confirm the award.

It cannot be said that any of the four statutory grounds for vacating an arbitration award exist in this case. Nothing on the face of the arbitration award appears to be the result of corruption, fraud, or misconduct, or evidences partiality on the part of the arbitrator. Accordingly, we find no evidence of the first two statutory grounds for vacating an arbitration award.[20]

Moreover, both parties expressly agreed that the arbitrator would resolve all existing disputes between them. Hence, we find that the arbitrator in this case did not overstep his authority. In this regard, the Court of Appeals incorrectly ruled that the arbitrator erred "in entering findings and an award in favor of non-parties" — the subcontractors who filed liens against the property.[21] As noted above, the arbitrator did not make awards to the subcontractors, but rather merely determined whether Greene or the homeowners would be responsible for discharging the liens filed by the subcontractors. As the arbitrator made this determination in accordance with the express instruction and agreement of the parties, the third statutory ground for vacating an award also must fail.[22] Finally, the homeowners make no claim that the procedures of the Code were not followed, thereby eliminating the fourth and final possible grounds for vacating the award.[23] Because none of the four statutory grounds for vacating an award exist in this case, the court was duty-bound to confirm the award.[24]

The Court of Appeals also erred in ruling that on a motion to vacate an arbitration award, the rule prohibiting a court from weighing evidence that has already been considered by the arbitrator is dependent upon the court finding some evidence to support the award.[25] The prohibition against considering the sufficiency of the evidence as grounds for vacating an arbitration award is unconditional. Therefore, a reviewing court is prohibited from weighing the evidence submitted

---

[20] See OCGA § 9-9-13 (b) (1) and (2).

[21] 218 Ga. App. at 198.

[22] See OCGA § 9-9-13 (b) (3).

[23] Id. (b) (4).

[24] We note also that the Court of Appeals incorrectly placed the burden upon Greene to come forward with evidence to support the arbitrator's award. See 218 Ga. App. at 198; n. 5, supra. As made clear by the Code sections discussed above, the burden is affirmatively placed upon the party challenging the award to come forward with evidence establishing the existence of one of the four statutory grounds for vacating the award.

[25] See n. 2, supra, and accompanying text.

before the arbitrator, regardless of whether the court believes there to be sufficient evidence, or even any evidence, to support the award.

Finally, allowing an appellate court to make a determination of the sufficiency of the evidence in arbitration cases would only frustrate the purpose of arbitration. A primary advantage of arbitration is the expeditious and final resolution of disputes by means that circumvent the time and expense associated with civil litigation. The legislature recognized this advantage by enacting the Arbitration Code, in which it made limited provision for the judicial review of arbitration awards, and set forth four grounds upon which a court may vacate awards. However, that legislative action did *not* make arbitration a part of the judicial process, nor did it make arbitration subject to traditional rules of appellate review. To the contrary, arbitration is a unique procedure that exists in Georgia due to legislative fiat, and it is conducted in accordance with the rules established by the legislature. Were we to allow an appellate court to determine whether there is sufficient evidence to support an arbitration award, we would make such awards entirely subject to independent determinations by courts of law, and thereby frustrate both the prompt resolution of arbitrated disputes and the finality of arbitration awards.

*Judgment reversed. All the Justices concur.*

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED APRIL 29, 1996.

*Cook, Noell, Tolley & Wiggins, Edward D. Tolley, Ronald E. Houser, Husby, Myers & Stroberg, Roland H. Stroberg,* for appellants.

*Eugene D. Butt,* pro se.

*Hendrick, Phillips, Schemm & Salzman, David R. Hendrick, Victoria H. Tobin, Schnader, Harrison, Segal & Lewis, C. Wilson DuBose, Sutherland, Asbill & Brennan, James P. Groton, Smith, Currie & Hancock, Robert B. Ansley, Jr., Frank E. Riggs,* amici curiae.

## S96A0454. ROLLINS v. ROLLINS.
(468 SE2d 384)

ORDER OF COURT.

It appearing that the application for discretionary appeal was improvidently granted, it is ordered that the appeal be hereby dis-

missed.

*All the Justices concur, except Benham, C. J., Sears and Carley, JJ., who dissent.*

CARLEY, Justice, dissenting.

For the reasons which follow, I must respectfully dissent to the majority's dismissal of this appeal as improvidently granted.

In this divorce case, Mr. Rollins appealed from the final judgment and decree entered on a jury verdict which, in part, awarded Ms. Rollins $42,000 in lump sum alimony payable within one year. The trial court also awarded Ms. Rollins attorney's fees of about $9,000, likewise payable within one year. This Court granted Mr. Rollins' application for discretionary appeal, without dissent, to consider "[w]hether the awards of alimony and attorney['s] fees, which require Roger Rollins to pay $51,000 within a year of the date of the verdict, are excessive." Mr. Rollins contends that the awards were indeed excessive because there was insufficient evidence of his ability to pay over the span of just one year.

The parties at one time owned considerable real estate and a hardware business, but the business went bankrupt and all the property was foreclosed upon. Mr. Rollins testified that he now has a large indebtedness and no assets except a business begun by him and his father. According to Mr. Rollins, the business has not done as well as expected and his gross income has been $11,000 in 1993, $16,000 in 1994 and $6,000 in 1995 as of the April trial. Ms. Rollins relies upon Mr. Rollins' lack of credibility, his past earnings and assets and a single monthly bank statement showing total deposits into the business checking account of $4,600.

Awards of alimony and attorney's fees "which are substantially disproportionate to the husband's ability to pay are not permitted to stand. [Cit.]" *Smith v. Smith*, 237 Ga. 499, 500 (228 SE2d 883) (1976). See also *George v. George*, 233 Ga. 637 (1) (212 SE2d 813) (1975). In certain circumstances, the amounts of alimony and attorney's fees can be based upon earning capacity, but a party's past income is only one of numerous factors which must go into a determination of a party's earning capacity. *Duncan v. Duncan*, 262 Ga. 872, 873 (1) (426 SE2d 857) (1993).

The monthly bank statement relied upon by Ms. Rollins, without any showing of expenses in that month or the net business income in other months, was not evidence that Mr. Rollins had any property or resources from which the sum of $51,000 could have been paid within one year of the jury verdict, nor was there any other such evidence. *Weatherford v. Weatherford*, 204 Ga. 553, 555 (50 SE2d 323) (1948). See also *Baldwin v. Baldwin*, 226 Ga. 680 (177 SE2d 85) (1970). And, in my opinion, the jury was not authorized to find from the evidence

that Mr. Rollins' earnings might likely be increased in an amount sufficient to pay the $51,000 within one year. *Weatherford v. Weatherford*, supra. See also *Baldwin v. Baldwin*, supra.

Ms. Rollins had the burden of proof to show Mr. Rollins' ability to pay the $51,000. See *Bodrey v. Bodrey*, 246 Ga. 122, 124 (4) (269 SE2d 14) (1980); *Hollandsworth v. Hollandsworth*, 242 Ga. 790, 792 (3) (251 SE2d 532) (1979). Because, in my opinion, she produced no evidence which could meet that burden, I believe that the judgments of the trial court should be reversed. See *Duncan v. Duncan*, supra at 874-875 (2); *Childs v. Childs*, 224 Ga. 531, 534 (2) (163 SE2d 693) (1968). Therefore, I dissent to the order dismissing the appeal without consideration of the merits thereof.

I am authorized to state that Chief Justice Benham and Justice Sears join in this dissent.

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED APRIL 29, 1996.

*Ronald C. Conner, Monica K. Gilroy,* for appellant.
*Anthony M. Zezima,* for appellee.

S95Y0195. IN THE MATTER OF M. McNEILL HOLLOWAY.
(469 SE2d 167)

PER CURIAM.

Respondent M. McNeill Holloway entered a plea of guilty to the felony offense of unlawful invasion of privacy.[1] He was sentenced under the First Offender Act to four years imprisonment, to be served on probation, and was ordered to pay a fine of $3,000. As a condition of probation, he was required to spend six weekends in jail, perform 300 hours of community service, and undergo psychiatric therapy. The sentencing court further ordered that Holloway surrender his license to practice law for a minimum of six months or until the State Bar of Georgia determined that the license should be reinstated.

Holloway's guilty plea was predicated upon charges that he surreptitiously used a video camera to record his secretary while she was in the bathroom of his cabin at Usry Pond, after he had fabricated a story to lure her there. It was shown that Holloway had constructed an elaborate observation area underneath the bathroom floor and had

---

[1] OCGA §§ 16-11-62; 16-11-69. Holloway was initially charged with two counts of invasion of privacy, but an order of nolle prosequi was entered with respect to the second count.

altered the bathroom cabinet to conceal himself and a video camera while he lay in wait for his victim. Sometime later, the victim inadvertently found the videotape with her initials on it and viewed it.

Holloway filed a petition for voluntary discipline in which he admitted a violation of Standard 66 of Bar Rule 4-102 (d),[2] and requested that the State Bar of Georgia "approve a period of suspension not to exceed six months to commence immediately upon the issuance of any final order. . . ." Following the procedure of Bar Rule 4-106, the Office of General Counsel petitioned this Court for appointment of a special master to conduct a show cause hearing as to why Holloway should not be disbarred from the practice of law in this state. The appointment was ordered and an evidentiary hearing was conducted.

The special master found as mitigating circumstances which militated against disbarment that Holloway's general reputation in the community is good; that he is a competent attorney; that he has had no previous criminal convictions or disciplinary complaints; that the crime did not involve illegal acts as an attorney, but as a private citizen; that he suffers from the psychiatric disorders of voyeurism, bereavement, obsessive compulsive spectrum disorder, and narcissistic personality traits; and that, according to his treating psychiatrist, the likelihood is "slight" that he would in the future pose a danger to the public. Based on those factors, the special master recommended that Holloway be suspended from the practice of law for 15 months from the date of his conviction, and that he receive a public reprimand. The State Bar filed exceptions to the special master's recommendation, contending that Holloway's conduct necessitates disbarment and that the special master failed to give appropriate weight and consideration to various factors militating in favor of disbarment, specifically that Holloway was admittedly aware of his actions when he constructed the observation area, lured his victim there, and lay in wait for her. The Bar also argues that Holloway's psychiatric disorders should not mitigate discipline.

After consideration of the record in this case, we conclude that the mitigating factors found by the special master, when considered in the context of recent disciplinary decisions of this Court, warrant a punishment less drastic than disbarment. That conviction of a felony does not by itself require disbarment is clear from our decision in *In the Matter of Witt*, 264 Ga. 852 (452 SE2d 507) (1995). To disbar Holloway because of the sexual nature of his offense would be entirely inconsistent with our decisions in *In the Matter of Yarbrough*, 264

---

[2] Under Standard 66 (a), "[c]onviction of any felony or misdemeanor involving moral turpitude shall be grounds for disbarment." The imposition of first offender probation constitutes a conviction under subsection (b) (5) of Standard 66.

Ga. 720 (450 SE2d 414) (1994), and *In the Matter of Brooks*, 264 Ga. 583 (449 SE2d 87) (1994), in both of which the Respondents were suspended. We conclude, therefore, that the appropriate sanction to impose on Holloway is suspension from the practice of law for three years, the same sanction given Brooks for multiple misdemeanor convictions and twice that given Yarbrough for a single misdemeanor conviction.

It is hereby ordered that Holloway is suspended from the practice of law in Georgia for a period of three years, commencing from the date of his suspension by the court which sentenced him. In the event his probation is revoked, he shall be suspended for such time as remains on his sentence. Holloway is reminded of his duties under Bar Rule 4-219 (c) to timely notify all clients of his inability to represent them, to take all actions necessary to protect the interests of his clients, and to certify to this Court that he has satisfied the requirements of such rule.

*Suspended. All the Justices concur, except Hunstein, Thompson and Hines, JJ., who dissent.*

SEARS, Justice, concurring.

I totally agree with Justice Hunstein's dissent that Holloway's surreptitious voyeurism constituted perverted behavior that is manifestly unacceptable for someone licensed to practice law in the State of Georgia. For such revolting behavior, this Court would be remiss if it failed to send a strong message regarding the ineluctability of imminent justice both to Holloway and the Bar at large. For such outrageous conduct, this Court also would be remiss if it failed to mete out an appropriate form of punishment to Holloway, who, as the dissent correctly emphasizes, has shown a wanton disregard for basic decency, and blatant contempt for the privacy rights of his victim.

Nonetheless, I respectfully disagree with the dissent's conclusion that this Court has adopted a policy whereby it will not disbar an attorney who is guilty of a sexual offense perpetrated against a woman. The sexual victimization of women is a topic in the forefront of today's social agenda, and I for one am overjoyed to see that the issue is receiving serious attention and is being earnestly discussed on all levels. However, my strong desire to see an end to such conduct cannot obviate my duty to evaluate each attorney disciplinary matter that comes before this Court on the basis of the particular facts attendant to each matter. My review of all of the facts relative to this disciplinary matter, and the mitigating factors as found by the special master, lead me to conclude that Holloway should be suspended from the practice of law for three years, rather than disbarred.

In this regard, I must also disagree with the dissent's somewhat cursory determination that there are no mitigating factors which war-

rant imposing a lesser form of punishment than disbarment. In addition to finding that Holloway had committed the offense of unlawful invasion of privacy, the special master who presided over the evidentiary hearing found that Holloway had an unblemished record in the community and the Bar, free of complaints. The special master also found that prior to his heinous conduct at the cabin, Holloway had an outstanding reputation in his community as to truth, veracity, and his capabilities as a lawyer, and had a long history of civic, community, and charitable service. Moreover, the special master reported that, following his arrest, Holloway immediately sought out professional counseling, and was contrite and remorseful over his crime. Finally, the special master noted that Holloway's crime did not involve illegal acts committed as an attorney, but rather as a private citizen, and that Holloway never neglected his professional duties to his clients.

I believe that our function in this case should be to dispense justice in a firm yet appropriate manner, and that we should not use our great power to inflict a punishment greater than that which is required to serve our purposes.[3] In so doing, we cannot evaluate Holloway's character and fitness to practice law on the basis of this single, albeit reprehensible, offense. More than most offenders, Holloway's history indicates that he is capable of redeeming himself socially and professionally. Furthermore, Holloway's gross infraction did not directly involve his duties as an attorney. Moreover, Holloway's conduct was clearly that of an unbalanced and deranged individual, and it is very appropriate that he has sought out professional counseling. In light of these highly pertinent factors, while I find it a very close call indeed, I shall opt for a punishment which graces Holloway with an opportunity to redeem himself, rather than one which totally banishes him from the profession.

Finally, I am at a loss as to how this case can be distinguished from the rulings of this Court in *In the Matter of Brooks*[4] and *In the Matter of Yarbrough.*[5] Both of those cases involved disciplinary proceedings against members of the Bar, one of whom was a sitting judge, who had committed sexual battery involving the actual *nonconsensual sexual touching of a woman victim.* As bereft of all reason as Holloway's conduct was, I cannot say that it was more offensive than the conduct engaged in by the offenders in *Brooks* and *Yarbrough*, both of whom were suspended from the practice of law for three years. Consequently, I cannot adhere to the distinction implied by the dissent between misdemeanors in those two cases and the felony in this case. Were this Court to disbar Holloway, I would be

---

[3] See *Colbert v. State*, 91 Ga. 705, 711 (17 SE 840) (1893).
[4] 264 Ga. 583 (449 SE2d 87) (1994).
[5] 264 Ga. 720 (450 SE2d 414) (1994).

greatly troubled by the disparity between that punishment and the ones inflicted in *Brooks* and *Yarbrough*. The law must be firm and constant, regardless of the personally offensive features of a particular matter.[6] We cannot dispense "one law for Rome and another for Athens, one thing today and another tomorrow."[7] Accordingly, I concur in the ruling of the majority opinion.

HUNSTEIN, Justice, dissenting.

The majority's opinion can only confirm the fact that the Georgia Supreme Court will not disbar a lawyer for committing a criminal offense of a sexual nature against an adult woman. The pattern is now firmly established: A sitting judge sexually batters five women over a twenty-three-month period — the Supreme Court suspends him for three years. *In the Matter of Brooks*, 264 Ga. 583 (449 SE2d 87) (1994) (Hunstein and Thompson, JJ., dissenting). A lawyer sexually batters a new client who has come to him for legal help — the Supreme Court suspends him for 18 months. *In the Matter of Yarbrough*, 264 Ga. 720 (450 SE2d 414) (1994) (Hunstein, J., dissenting). A lawyer invades the privacy of his secretary by videotaping her while using the bathroom, conduct so offensive that the Legislature made it a felony — the Supreme Court suspends him for three years. Majority opinion, p. 601.

To be sure, this Court does not always disbar lawyers for Standard 66 violations. There are rare cases, 14 out of 93, where we have not disbarred or accepted the lawyer's voluntary surrender of license. An examination of these exceptional cases shows that they fall into two broad categories: lawyers whose lives have been devastated by drug and alcohol addictions and lawyers who have engaged in that all-too-American pastime of cheating Uncle Sam. To these categories the Bar can now add a third: lawyers who victimize women.

There are no words in the majority opinion explicitly approving the victimization of women by lawyers. But such words are not necessary: it is actions that speak most loudly here and the message is clear and unmistakable: the court will not disbar a lawyer for committing a criminal offense of a sexual nature against women. It does not matter whether the lawyer's victim is client or employee, it does not matter whether the lawyer preys on one woman or five, whether there is physical contact or premeditated plotting, it does not even matter whether the lawyer's crime is a misdemeanor or a felony. Sex crimes against women are all on one level. Like cocaine addicts and tax evad-

---

[6] *Southern Star Lightning Rod v. Duvall*, 64 Ga. 263, 266 (1879); see *Christensen v. State*, 266 Ga. 474 (468 SE2d 188) (1996) (Sears, J., dissenting).

[7] Cicero, The Commonwealth (cited in *Standard Oil Co. v. Harris*, 120 Ga. App. 768, 770 (172 SE2d 344) (1969)).

ers, lawyers who commit sex crimes against women will be accorded special treatment by this Court. No, there are no words in the majority opinion explicitly approving the victimization of women by lawyers: the majority has no need for such words when its very actions are sufficient to convey that message.

The majority opinion, by justifying its inadequate punishment by relying on *Brooks* and *Yarbrough*, supra, has solidified this Court's approach toward lawyers who victimize women. The majority has created a glass ceiling on punishment by grouping these sex crimes into one amorphous category. And for mitigation evidence: the fact that the lawyer is a sex pervert and has knowingly and deliberately violated laws he swore to uphold will not matter if the lawyer is competent in his practice, victimizes only employees (but see *Yarbrough*, supra), and has kept the general public in ignorance of his criminal activities.

The majority opinion propagates an environment where lawyers know they can target women and can be convicted of sex crimes against women without any fear whatsoever of losing their licenses to practice law in this State.

This Court held, in its opinion disbarring J. B. Stoner, that if the law is to be respected, the public must be able to respect the individuals who administer it. *In the Matter of Stoner*, 246 Ga. 581, 582 (1) (272 SE2d 313) (1980). It follows that if the law is to be respected, the public must be able to respect the body that regulates those individuals. A three-year suspension for a lawyer with a felony conviction does not foster public respect for the law or this Court. Because disbarment is the only appropriate disciplinary sanction for M. McNeill Holloway, I dissent.

THOMPSON, Justice, dissenting.

The facts clearly demonstrate that the Respondent intentionally engaged in felonious conduct involving dishonesty, fraud, deceit and misrepresentation that seriously adversely reflects on his fitness to practice law. Because I do not agree that mitigating circumstances override his misconduct, I believe that the appropriate sanction is disbarment. I respectfully dissent.

I am authorized to state that Justice Hines joins in this dissent.

DECIDED APRIL 29, 1996.

*William P. Smith III, General Counsel State Bar, E. Duane Cooper, Assistant General Counsel State Bar,* for State Bar of Georgia.

## S95Y0778. IN THE MATTER OF WEYMAN E. CANNINGTON, JR.

(469 SE2d 165)

PER CURIAM.

Two former clients of Respondent filed separate grievances with the State Bar of Georgia, complaining about the manner in which Respondent Weyman E. Cannington, Jr., handled their cases. In each case, the Investigative Panel of the State Disciplinary Board found probable cause to believe that Respondent had violated Standard 4 of Bar Rule 4-102 by failing to account for funds he held for the client; Standard 45 by misrepresenting the facts of the situation to another attorney who inquired on behalf of the client; Standard 61 by failing to deliver promptly to the client all funds belonging to the client; Standard 63 by failing to maintain complete records concerning the client's funds and to render appropriate accounts to the client; and Standard 65 by failing to account for funds held in a fiduciary capacity and to maintain trust records reflecting the amount of money held for the client. Based on the finding of probable cause, the State Bar of Georgia filed formal disciplinary complaints against Respondent.

A special master appointed to hear evidence in both cases, found that Respondent had engaged in conduct in both cases which violated Standards 61, 63 and 65. After considering the record of the consolidated complaints, the review panel of the State Disciplinary Board also found that Respondent had violated Standards 61, 63 and 65 in each case. The review panel found that Respondent's conduct was the result of negligence and poor business practices, and that he had not engaged in professional conduct involving dishonesty, fraud, deceit or wilful misrepresentation. Noting that no complaints had been previously filed against Respondent and that he "enjoys a good reputation as a competent, reliable, honest and trustworthy attorney in the locale of his practice," the review panel recommended that Respondent be suspended for six months, with his reinstatement conditioned upon his receipt of certification from the Institute of Continuing Legal Education that he has completed five hours of continuing legal education in "Ethics," in addition to the annual CLE requirements; and upon his receipt of certification from the Director of the Law Practice Management Program of the State Bar that the program has reviewed Respondent's law office management and attorney escrow account procedures and that Respondent has implemented any administrative and/or operational changes recommended. In determining its recommended disciplinary action, the review panel took into consideration that, during the relevant time period, Respondent was serving as Mayor of Lumpkin, Georgia; judge of the municipal court; president of the state municipal association; and an active participant in many civic organizations. Both the special master and the review

panel determined that Respondent had not violated Standards 4 or 45 in either case. It was also noted that the complaining clients had received the funds due them.

The State Bar has filed exceptions to the review panel's findings and recommendation, contending that violations of Standards 4 and 45 were proven beyond a reasonable doubt, and that Respondent should be disbarred for his conduct. Respondent has also filed exceptions, asserting that a public reprimand is the appropriate level of discipline for his negligence. We conclude, as did the special master and the review panel, that the evidence presented was not sufficient to establish beyond a reasonable doubt that Respondent knowingly made false statements (Standard 45) or that he had engaged in professional conduct involving fraud, dishonesty, deceit, or wilful misrepresentation (Standard 4).

Turning to the recommended disciplinary action and the exceptions thereto, we note that while a number of lawyers who violated Standards 61, 63 and 65 have voluntarily surrendered their licenses to practice law, have been disbarred, or have been suspended for more than six months, we have ordered six-month suspensions when circumstances of the case so dictate. See, e.g., *In the Matter of McWhorter*, 262 Ga. 167 (416 SE2d 89) (1992) (six-month suspension for violations of Standards 4, 22, 23, 44, 61, 63, 65 and 68); *In the Matter of Threlkeld*, 262 Ga. 282 (417 SE2d 319) (1992) (six-month suspension for violations of Standards 22, 45, 63 and 65); *In the Matter of Boyce*, 254 Ga. 727 (334 SE2d 311) (1985) (six-month suspension for violations of Standards 4, 43, 44, 61, 63, 65 and 68). Because Respondent's conduct did not involve wilfulness and was seemingly exacerbated by his extensive civic responsibilities, we believe a six-month suspension from the practice of law, effective the date of this opinion, is appropriate. Before Respondent can apply for reinstatement, he must present certification from the Institute of Continuing Legal Education that he has completed five hours of CLE in "Ethics." Because review by the Law Practice Management Program is most effective when the reviewer has observed an attorney's practice of law for three months, a prerequisite made impossible by Respondent's suspension from the practice of law, it is ordered that Respondent contact the Program within three months of his reinstatement to the practice of law and arrange to submit his law practice, including his office management and escrow account practices, to the Program's scrutiny. Within a reasonable time following review of his practice by the Program, Respondent must present to the State Bar certification from the Program director that he has implemented any administrative and/or operational changes recommended. Failure to comply with this post-suspension mandate will subject Respondent to further disciplinary action.

*Six-month suspension. All the Justices concur.*

DECIDED APRIL 29, 1996.

*William P. Smith III, General Counsel State Bar, Cynthia C. Hinrichs, Assistant General Counsel State Bar,* for State Bar of Georgia.
*Denney, Peace, Allison & Kirk, John W. Denney,* for Cannington.

## S95G1887. BANKS et al. v. ICI AMERICAS, INC.
### (469 SE2d 171)

HUNSTEIN, Justice.

This is the second appearance of this case in this Court. In *Banks v. ICI Americas*, 264 Ga. 732 (450 SE2d 671) (1994) (hereinafter "*Banks I*"), we adopted a risk-utility analysis as the appropriate test for reaching the legal conclusion that a product's design specifications were partly or totally defective. Id. at (1). We further concluded that plaintiffs[1] were entitled to a new trial on their defective design claim against defendant ICI Americas[2] and remanded the case to the Court of Appeals with direction that a new trial be granted unless such was precluded by that court's resolution of the remaining enumerations of error. Id. at (2). Upon remand, while the Court of Appeals found no basis in any asserted error that would prevent the granting of a new trial, that court nevertheless held that plaintiffs are barred upon retrial from seeking punitive damages. *ICI Americas v. Banks*, 218 Ga. App. 237 (460 SE2d 797) (1995). Because the Court of Appeals failed to follow this Court's direction in *Banks I* and misapplied well-established law on the retroactivity of appellate opinions, we reverse.

1. This Court in *Banks I* directed the Court of Appeals to grant plaintiffs a new trial upon that court's determination that the remaining enumerations of error did not preclude a new trial. Id. at (2). The language in *Banks I* did not admit of any limitation on the grant of new trial. Accordingly, the Court of Appeals erred when it barred plaintiffs in the new trial from recovering fully all damages a jury may award them. Art. VI, Sec. VI, Par. VI of the Georgia Constitution of 1983.

2. Plaintiffs contend the Court of Appeals erred by holding that

---

[1] Plaintiffs are Wanda Banks and Charles Strum, individually and as the parents of the decedent, Marlo Strum, and Banks in her capacity of administrator of Strum's estate.

[2] ICI Americas states it is now known as Zeneca, Inc.

upon retrial a jury would not be allowed to consider whether ICI is liable for punitive damages. Plaintiffs contend there is evidence from which a jury could find that ICI designed a rodenticide knowing that it had a candy-like shape and color that would appeal to children and knowing that the rodenticide contained no ingredients which would have reduced or eliminated the risk created when children tasted or consumed it. Although the Court of Appeals has previously recognized that there was evidence adduced at the first trial showing it was foreseeable to ICI that its rodenticide would be misused by children, that the danger could have been reduced, and that ICI withheld vital information from the EPA, *ICI Americas v. Banks*, 211 Ga. App. 523-524 (440 SE2d 38) (1993), that court nevertheless held upon remand that there was no evidence supporting an award of punitive damages against ICI under the law as it existed before *Banks I* and that it did not believe this Court intended to apply *Banks I* retroactively as to the issue of punitive damages. *ICI Americas v. Banks*, supra, 218 Ga. App. at 238 (2).

"[C]ourt rulings that substantially alter the law normally apply retroactively." *General Motors Corp. v. Rasmussen*, 255 Ga. 544, 545-546 (2) (340 SE2d 586) (1986). Our direction to the Court of Appeals in *Banks I* regarding plaintiffs' entitlement to a new trial clearly reflected our determination that we had considered the purpose and history of product liability law and the inequities that could be created by our holding before ruling that *Banks I* would apply to the parties in that case. *General Motors v. Rasmussen*, supra. There is no question that plaintiffs may seek and possibly recover compensatory damages upon retrial conducted consistent with the *Banks I* risk-utility analysis. As to plaintiffs' right to seek and possibly recover punitive damages upon that retrial, neither the Court of Appeals nor ICI presents a compelling reason why plaintiffs' recovery, if any, should be limited to compensatory damages.

In *Flewellen v. Atlanta Cas. Co.*, 250 Ga. 709 (300 SE2d 673) (1983), this Court, in adopting the three-prong test set forth in *Chevron Oil Co. v. Huson*, 404 U. S. 97 (92 SC 349, 30 LE2d 296) (1971), held that a court in deciding a retroactivity question should:

> (1) Consider whether the decision to be applied nonretroactively established a new principle of law, either by overruling past precedent on which litigants relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

> (2) Balance . . . the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation would further or retard its operation.

(3) Weigh the inequity imposed by retroactive application, for, if a decision could produce substantial inequitable results if applied retroactively, there is ample basis for avoiding the injustice or hardship by a holding of nonretroactivity.

*Flewellen*, supra at 712. For benefit of bench and bar we will explicitly apply that test to this case.

We assume, arguendo, that *Banks I* established a new principle of law, as opposed to representing a new method of analyzing longstanding Georgia law holding manufacturers liable for their defective products. Balancing the merits and demerits, we find that the purpose and effect of our holding in *Banks I* will be best served by an even application of its holding in the field of product liability law and that retroactive application would further its operation. We find no merit in ICI's arguments that it relied on pre-*Banks I* law when it created and manufactured the rodenticide and thus reject ICI's argument that it would be inequitable to hold it liable for a defectively designed product under the standard of conduct set forth in *Banks I*.[3]

Accordingly, under the test in *Flewellen*, supra, the Court of Appeals erred by failing to apply *Banks I* retroactively.

3. Although this Court in *Banks I* decided that plaintiffs are entitled to a new trial, ICI argues that plaintiffs are not entitled upon retrial to an award of punitive damages (as opposed to compensatory damages) because the imposition of such damages pursuant to the changed set of legal requirements set forth in *Banks I* would be constitutionally improper under *Landgraf v. USI Film Products*, 511 U. S. ____ (114 SC 1483, 128 LE2d 229) (1994) (holding that § 102 of the Civil Rights Act of 1991, which allows successful Title VII claimants to recover compensatory and punitive damages, is not retroactively applicable to cases pending on appeal when the statute was enacted). However, *Landgraf* involved the principle against the retroactive application of *statutes*; when the newly promulgated "law" is a judicial decision, then retroactive application is favored. E.g., *Luddington v. Indiana Bell Tel. Co.*, 966 F2d 225, 228 (7th Cir. 1992); compare *Thompson v. Wilbert Vault Co.*, 178 Ga. App. 489,

---

[3] ICI argues that it could not have anticipated the "significantly different" standard in *Banks I*, which it asserts is contrary to the majority of states in that it firmly rejects the position that the "alternative safer design" factor is a sine qua non of a design defect claim. First, we note that under the evidence adduced at the first trial, ICI's failure to explain the necessity for its product's candy-like coloring leaves open the possibility that an alternative safer design did exist for the rodenticide. Secondly, it has been seriously questioned whether, indeed, a majority of states make alternative safer design a requirement. See, e.g., Shapo, In Search of the Law of Products Liability: The ALI Restatement Project, 48 Vanderbilt L. Rev. 631 (VII) (G) (1995); Vandall, The Restatement (Third) of Torts: Products Liability Section 2 (b): The Reasonable Alternative Design Requirement, 61 Tenn. L. Rev. 1407 (1994).

491 (343 SE2d 515) (1986) (principle against retroactive application of statutes) with *Otis Elevator Co. v. Tanner*, 208 Ga. App. 417 (430 SE2d 663) (1993) (appellate decisions are generally retroactive). Accordingly, we find *Landgraf* distinguishable from the instant case.

Furthermore, we do not agree with ICI that notwithstanding its liability for compensatory damages, it is insulated from liability for punitive damages in Georgia simply because its prior actions were undertaken before this Court adopted the risk-utility analysis in *Banks I*. It is well established that punitive damages in Georgia are awardable "solely to punish, penalize, or deter a defendant." OCGA § 51-12-5.1 (c).

> "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross' . . . . Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort. . . . [Cit.]"

*Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 121-122 (4) (365 SE2d 827) (1988). An award of punitive damages cannot be supported by the mere negligent failure to adhere to a legal standard; rather, there must be clear and convincing evidence that the defendant's actions showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b).

Presuming a jury finds plaintiffs to be entitled to recover compensatory damages from ICI on their design defect claim under the risk-utility analysis set forth in *Banks I*, the jury clearly would be authorized, when weighing a possible award of punitive damages, to consider whether and to what extent ICI's actions were influenced, affected, or dictated by the status of the law in this State and any other applicable state at the time of its actions. However, because any award of punitive damages must be based on clear and convincing evidence that ICI acted in a manner set forth in OCGA § 51-12-5.1 (b), it follows that evidence showing mere negligence in the design of the rodenticide cannot serve as the basis for an award of punitive damages. Thus, contrary to ICI's argument, the jury's consideration on retrial of punitive damages does not mean that ICI could be held

liable for punitive damages because it failed to adhere to the legal standard in *Banks I*; rather, ICI can be held liable if and only if the evidence of its actions in regard to the rodenticide's design clearly and convincingly show the kind of aggravating circumstances that would support an award of punitive damages under OCGA § 51-12-5.1.

Therefore, the Court of Appeals erred by holding that plaintiffs are barred upon retrial from seeking punitive damages and its opinion is accordingly reversed.

*Judgment reversed. All the Justices concur, except Fletcher, P. J., who dissents.*

FLETCHER, Presiding Justice, dissenting.

In *Banks v. ICI Americas*,[4] (*"Banks I"*) the majority remanded the case to the Court of Appeals for a resolution of the remaining enumerations of error. ICI argued in one enumeration of error that the evidence did not support an award of punitive damages. The Court of Appeals reviewed the record and agreed. Given the absence of any discussion in this Court's opinion in *Banks I* of retroactivity, the Court of Appeals did not err in addressing and resolving a pertinent issue.

The majority's treatment of the *Chevron Oil*[5] factors blurs separate issues. Whether the risk-utility analysis adopted in *Banks I* is to apply to the parties in this case,[6] or retroactively to parties not yet before the court, is not in issue in this appeal. The sole question here is one of the availability of remedies. Looking at this narrow issue, the equities clearly weigh in favor of limiting plaintiffs on retrial to compensatory damages.

The purpose of punitive damages awards is to punish and deter egregious conduct. Imposing punitive sanctions based on a rule of law created after the conduct at issue does not further the purpose of deterring tortious behavior.[7] This is certainly true when under the prior law ICI's conduct was not tortious and ICI was not liable for any damages, including punitive damages.[8]

Banks contends it is fair to impose punitive damages because California and other states had adopted the risk-utility analysis at the time of the manufacture of the rat poison. It is more consistent with the public policy of this state, however, to judge ICI's conduct for the

---

[4] 264 Ga. 732 (450 SE2d 671) (1994).

[5] *Chevron Oil Co. v. Huson*, 404 U. S. 97, 106-107 (92 SC 349, 30 LE2d 296) (1971).

[6] In its motion for reconsideration following *Banks I*, ICI did not challenge the retroactive application of the risk-utility analysis to this case.

[7] Cf. *Stone Man, Inc. v. Green*, 263 Ga. 470, 472 (435 SE2d 205) (1993) (punitive damages award generally improper where defendant has met regulatory standards).

[8] See id. at 739 (Carley, J., concurring in part and dissenting in part).

purposes of punitive damages by the standards of conduct that governed in Georgia prior to *Banks I*. Furthermore, ICI certainly relied on pre-*Banks I* law when it expended resources in defending and *winning* this case under that law.

Retroactive imposition of punitive damages under these circumstances fails to satisfy basic notions of equity and fairness,[9] and, therefore, I respectfully dissent.

DECIDED APRIL 29, 1996.

*Doffermyre, Shields, Canfield & Knowles, Robert E. Shields, R. Hutton Brown III, Richard A. Childs,* for appellants.

*Hagler, Hyles & Adams, M. Stephen Hyles, Rogers & Hardin, Brett A. Rogers, Phillip S. McKinney,* for appellee.

S96A0044. KAPLAN v. KAPLAN et al.

(469 SE2d 198)

BENHAM, Chief Justice.

Appellees, named executors of their father's will, filed his will for probate. Appellant, who married the decedent in 1978, filed a caveat on the ground of mistake of fact under OCGA § 53-2-8. The probate court granted the executors' motion to dismiss for failure to state a claim.

OCGA § 53-2-8[1] provides a method for avoiding the consequences of a testator's mistaken factual beliefs concerning the existence or conduct of an heir at law. Ms. Kaplan asserts that the mistake of fact in the present case was one concerning her conduct. She contends the testator was mistaken about her conduct in signing an ante-nuptial agreement. However, it was not the fact of her signing as to which she contends the testator was mistaken. She argues that the testator's mistake of fact was his belief that she signed an enforceable agreement.

The fundamental flaw in appellant's position is that her caveat does not allege a mistake of fact, but a mistake of judgment. Her conduct was signing the contract. The testator was not mistaken about

---

[9] See *TXO Production Corp. v. Alliance Resources Corp.*, 509 U. S. 443 (113 SC 2711, 2724, 125 LE2d 366) (1993) (notice component of Due Process Clause is satisfied if prior law fairly indicated that a punitive damages award might be imposed).

[1] A will executed under a mistake of fact as to the existence or conduct of an heir at law of the testator is inoperative, insofar as the heir at law is concerned, and the testator shall be deemed to have died intestate as to him. OCGA § 53-2-8.

that. Whether the testator believed the contract was valid, however, was a matter of the testator's judgment, not a matter of fact. " 'There is a difference between a "mistake" arising from mere ignorance and one which results from an error of judgment after investigation. . . . It is to such a mistake as that first indicated that [OCGA § 53-2-8] applies.' [Cits.]" *Thornton v. Hulme*, 218 Ga. 480 (3) (128 SE2d 744) (1962). The allegations of the caveat in the present case depict a mistake of the second type referred to in *Thornton*, a mistake which does not activate the remedial provisions of the statute.

" ' "[A] pleading should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [Cit.]' " *Sheppard v. Yara Engineering Corp.*, 248 Ga. 147, 150 (281 SE2d 586) (1981). In the present case, there is no set of facts that could establish that the testator's alleged mistake concerning the validity of the ante-nuptial agreement was a mistake of fact. The trial court was correct in dismissing Ms. Kaplan's caveat for failure to state a claim.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Sell & Melton, Edward S. Sell III, Mitchell P. House, Jr.,* for appellant.

*Arnall, Golden & Gregory, Robert L. Rothman, Bertrum L. Levy, Walter H. Bush,* for appellees.

S96A0123. HARTMAN v. THE STATE.
(469 SE2d 163)

FLETCHER, Presiding Justice.

A jury convicted William Anthony Hartman of malice murder in the shooting death of John Daniel Bearden, Jr., aggravated battery and aggravated assault in the shooting of Eugene William Meeks, and burglary and the possession of a firearm during the commission of a crime.[1] He appeals contending that the trial court erred in admitting

---

[1] The crimes occurred October 14, 1994. A special presentment was filed on December 1, 1994. Hartman was found guilty by a jury on February 9, 1995; sentenced on February 10, 1995 with an amended sentence filed on August 31, 1995. Under the amended sentence, Hartman received life for murder, a consecutive twenty-year sentence for the merged counts of aggravated assault and aggravated battery, a consecutive twenty-year sentence for burglary and a consecutive five-year sentence for possession of a firearm. Hartman filed a motion for new trial on March 7, 1995, amended it on June 20, 1995 and July 19, 1995. The trial court denied the motion on August 29, 1995. Hartman filed a notice of appeal on September 25,

"bad character" evidence and that the trial court improperly increased his sentence. Because the "character" evidence was admissible to show motive and because the court had the authority to conform the sentence to a statutory requirement, we affirm.

The evidence at trial showed that on October 13, 1994, Hartman got drunk and was thrown out of the bar at the Holiday Inn in Dalton. He then talked Butch Ivey into driving him to the residence of Bearden, whom Hartman believed had informed on him to the police. Bearden and Meeks were inside the residence and when Bearden answered Hartman's knock, Hartman shot him with a 12 gauge shotgun. Hartman then shot Meeks in the back as he tried to flee. Both Ivey and Meeks testified against Hartman.

1. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Hartman guilty of the crimes charged beyond a reasonable doubt.[2]

2. Hartman contends that the state improperly introduced evidence of his "bad character" when two witnesses testified about his prior arrest on drug charges. This evidence was relevant because the state contended that Hartman's motive for the murder was his belief that the victim had snitched on him, resulting in his drug arrest. Hartman also contends this was prior difficulties evidence between himself and the victim and the state failed to follow the procedure set forth in *Maxwell v. State*.[3] Hartman, however, failed to raise this ground as an objection at trial, and may not raise it for the first time on appeal.[4] Regarding the other "bad character" testimony of which Hartman complains, either the trial court sustained Hartman's objections, or Hartman failed to object to the testimony and, therefore, he failed to preserve these issues for appeal.[5]

At trial, the state introduced a tape-recording of a conversation among Hartman, his sister, and their mother. Hartman contends that the tape was inadmissible because it contained references to Hartman's prior drug use and because Hartman used obscene language during the conversation and, therefore, the tape demonstrated Hartman's bad character. A review of the record shows that the tape did impeach the testimony of Hartman and his sister and, therefore, was relevant and admissible in spite of the tape's negative reflection on Hartman's character.[6]

---

1995. The appeal was docketed in this Court on October 18, 1995 and submitted for decision on briefs on December 11, 1995.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] 262 Ga. 73 (414 SE2d 470) (1992).

[4] *Prince v. State*, 257 Ga. 84, 86 (355 SE2d 424) (1987).

[5] *Earnest v. State*, 262 Ga. 494, 495 (422 SE2d 188) (1992).

[6] Id. at 495.

3. Hartman also contends that the tape was inadmissible under OCGA §§ 16-11-62 and 16-11-67. Those statutes apply only to intentional interception of conversations. The conversation here was inadvertently recorded on a third person's answering machine when Hartman's sister failed to disconnect a line in multi-party conversation.

4. Hartman contends that his trial counsel was ineffective in several respects.[7] After reviewing the record, we conclude that Hartman has failed to make the required showing of prejudice.[8]

5. The trial court originally sentenced Hartman to five years on the possession of a firearm count, with the sentence to run concurrently with the 20-year sentence on the burglary count. After Hartman filed a motion for new trial, the trial court amended the sentence so that the sentence on the possession charge would run consecutively to the burglary count. OCGA § 16-11-106 (b) requires that a sentence on a charge of possession of a firearm during the commission of a felony run consecutively to any other sentence imposed. The trial court's original sentence was contrary to this statute. Therefore, the trial court did not err in amending the sentence to conform to the law.[9]

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Michael R. McCarthy,* for appellant.
*Jack O. Partain, District Attorney, Michael J. Bowers, Attorney General, Beth Attaway, Assistant Attorney General,* for appellee.

## S96A0164. YORKER v. THE STATE.
### (469 SE2d 158)

HINES, Justice.

James Yorker, Jr., was found guilty and sentenced to life imprisonment for the malice murder of George Danielly III.[1] We affirm the

---

[7] Hartman contends his trial counsel was ineffective in failing to file a motion to suppress Meeks' identification testimony; in failing to object to the tape recording; in failing to meet with Hartman more than once; in failing to request a fingerprint analysis of the murder weapon; in failing to object to the calling of witnesses who he knew would invoke the Fifth Amendment privilege against self-incrimination; in failing to prepare Hartman for cross-examination; and in failing to object to improper character evidence.

[8] *Strickland v. Washington,* 466 U. S. 668, 694-696 (104 SC 2052, 80 LE 2d 674) (1984).

[9] *Heard v. Gill,* 204 Ga. 261 (49 SE2d 656) (1948) (trial courts retain authority to correct void sentence by imposing legal sentence following a plea or verdict of guilty).

[1] The murder occurred on October 16, 1993. Yorker was indicted on February 1, 1994, for the malice murder of Danielly and three counts of aggravated assault against other indi-

conviction.

The evidence, viewed in favor of the verdict, established that Danielly approached Yorker and accused him of firing gunshots at an automobile. The two exchanged words and began to scuffle. Yorker was thrown to the ground. While on the ground, Yorker drew a gun from the waistband of his pants and fatally shot Danielly.

Yorker claimed he was justified in shooting Danielly because he was receiving a severe beating and kicking from Danielly and two other men. However, eyewitnesses testified that the only blow received by Yorker was when Danielly threw him to the ground and that Danielly did not have a weapon.

1. Reviewing the evidence in a light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Yorker did not act in self-defense and was guilty of malice murder. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Yorker contends that "[t]he trial court erred in allowing juror (Mosely) to remain on the jury after a *Batson*[2] challenge was made by Appellant during jury selection." However, the record discloses that the trial court excused juror Mosely from further service on the jury after determining that the State articulated a racially-neutral basis for using the peremptory strike. We, therefore, conclude that Yorker is attacking the trial court's denial of his *Batson* challenge of the State's peremptory strike of juror Mosely.

In a *Batson* challenge, the opponent of a peremptory strike must establish a prima facie case of racial discrimination before the proponent is required to articulate a race-neutral explanation for removing the juror in question. *Jackson v. State,* 265 Ga. 897, 899 (2) (463 SE2d 699) (1995). In this case, the trial court did not rule on whether Yorker established a prima facie case of racial discrimination. It did, however, find that the State articulated a racially-neutral basis for using a peremptory strike. The State related that the basis for removing Mosely was his statement, during voir dire, that he was uncomfortable sitting in judgment on his fellow man and that he was familiar with the club where the incident occurred. Yorker failed to present any evidence that cast doubt on the State's explanation for striking Mosely or any evidence that established a discriminatory intent. Id. Therefore, the trial court properly rejected the *Batson* chal-

---

viduals. The jury returned its verdict on August 5, 1994 finding Yorker guilty of malice murder and not guilty of the aggravated assault charges. Yorker was sentenced on the same day. His motion for new trial, filed September 6, 1994, was denied on July 17, 1995. The notice of appeal was filed August 21, 1995, and the case was docketed in this Court on October 25, 1995. The appeal was submitted for decision on December 18, 1995.

[2] *Batson v. Kentucky,* 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

lenge.

3. Yorker contends that the trial court erred in allowing the State to introduce evidence of his bond hearing testimony because it compelled him to incriminate himself. However,

[a]bsent objections grounded on the Fifth Amendment at the bail hearing, the decision of defense counsel to bring the extraneous issue of guilt or innocence into the bail proceeding [does] not preclude, on Fifth Amendment grounds, use of incriminating testimony given at the bail hearing.

*Cowards v. State*, 266 Ga. 191, 193 (2) (465 SE2d 677) (1996). Accordingly, the trial court did not err in admitting the bond hearing testimony.

4. In three separate enumerations of error, Yorker complains that the trial court erred in allowing into evidence, following a *Jackson-Denno*[3] hearing, his custodial statements because they were not freely and voluntarily made. Yorker maintains that the statements were involuntary because he was a juvenile, under duress, operating under insufficient sleep, and was without the aid of counsel and did not totally understand the consequences of his interrogation.

A trial court's conclusions of fact and credibility following a *Jackson-Denno* hearing are to be accepted unless clearly erroneous. *Berry v. State*, 254 Ga. 101, 104 (1) (326 SE2d 748) (1985); *Sanborn v. State*, 251 Ga. 169, 170 (2) (304 SE2d 377) (1983). Here, the trial court found that Yorker was advised of each of his *Miranda*[4] rights, that he understood them, that he voluntarily waived them, and that he thereafter gave his statement freely and voluntarily without any hope of benefit or fear of injury. Evidence presented at the hearing established that: Yorker was sixteen, had completed ninth grade, and could read and write at the time of the interrogation; Yorker's *Miranda* rights were read to him prior to the interrogation and he was informed that he was being detained in connection with a specific shooting; Yorker and his mother signed a written waiver and at no point did they request the interrogation to stop; a representative from the Department of Children and Youth Services was present during the interrogation, which lasted forty-five minutes to an hour; and, that during the interrogation, Yorker never repudiated his statements. The evidence supports the trial court's finding that the statements were voluntary. Thus, there was no error in the trial court's ruling in favor of admissibility. *Head v. State*, 262 Ga. 795, 796 (3) (426 SE2d 547) (1993); *Blackwell v. State*, 259 Ga. 810, 811 (2) (388

---

[3] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).
[4] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

SE2d 515) (1990).

*Judgment affirmed. All the Justices concur, except Sears, J., who concurs in the judgment only.*

DECIDED APRIL 29, 1996.

*Roosevelt Warren*, for appellant.

*Ralph M. Walke*, District Attorney, *Jeffrey J. Connor*, Assistant District Attorney, *Michael J. Bowers*, Attorney General, *Caroline W. Donaldson*, Assistant Attorney General, for appellee.

S96A0169. FLOURNOY v. THE STATE.
(469 SE2d 195)

CARLEY, Justice.

After a jury trial, Emory Flournoy was found guilty of one count of felony murder and four counts of aggravated assault. He was sentenced to life for the murder and to four twenty-year terms for the assaults. He appeals from the judgments of conviction and sentences entered by the trial court on the jury's guilty verdicts.[1]

1. Construing the evidence most favorably for the State and most strongly against Flournoy shows the following: After one of his companions had flagged down a jeep and exchanged words with the driver, Flournoy began firing a semi-automatic pistol. The driver of the jeep pulled away and the passengers ducked as they heard seven or eight shots and felt broken glass. A bullet struck one of the passengers in the back and he died shortly thereafter. Three of the surviving passengers identified Flournoy as the perpetrator, as did Flournoy's companion who had flagged down the jeep. Based upon this evidence, a rational trier of fact was authorized to find proof of Flournoy's guilt of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Flournoy urges that certain evidence was subject to a "continuing witness" objection and was erroneously allowed to go out with the jury. See *Tibbs v. Tibbs*, 257 Ga. 370 (359 SE2d 674) (1987). The record shows, however, that Flournoy raised no "continuing witness" objection either when the evidence was introduced or when it was in-

---

[1] The crimes were committed on June 24, 1994 and Flournoy was indicted on August 16, 1994. The guilty verdicts were returned on March 14, 1995 and, on March 17, 1995, the judgments of conviction and sentences were entered thereon. The motion for new trial was filed on April 10, 1995 and was denied on August 8, 1995. The notice of appeal was filed on August 23, 1995 and the case was docketed in this Court on October 26, 1995. The appeal was submitted for decision on December 18, 1995.

cluded in the exhibits sent to the jury room. It follows that this issue has not been preserved for appeal. An enumeration of error "complaining of the admission of evidence or of documents going out with the jury presents nothing for decision by the Supreme Court where no objection is shown to have been made at trial." *Morris v. State*, 200 Ga. 471 (1) (37 SE2d 345) (1946). Because the "continuing witness" issue was not preserved for review, any discussion of it in this appeal would constitute dicta and would not establish a binding precedent of this Court. See *Dorsey v. City of Atlanta*, 216 Ga. 778, 782 (119 SE2d 553) (1961); *Moyers v. State*, 186 Ga. 446, 459 (1) (197 SE 846) (1938).

*Judgments affirmed. All the Justices concur.*

FLETCHER, Presiding Justice, concurring.

I concur in the judgment, but write separately because I disagree with the Court of Appeals cases that exempt the photographic line-up forms from the continuing witness objection.[2] In my opinion, the photographic identification forms should not be delivered to the jury for it to consider in reaching a verdict, unlike the actual photographic line-up, which may be delivered if properly admitted into evidence.

Georgia courts allow litigants to object to a written statement as a "continuing witness" to avoid placing undue emphasis on written testimony.[3] This objection prevents the writing from going out with the jury to be read and reread during its deliberations.[4] Instead, the written testimony is treated like oral testimony that the jury hears only once from a witness.[5] Applying this rule, we have held that trial courts should not provide to the jury any answers to interrogatories,[6] written dying declarations,[7] signed statements of guilt, " 'or other instruments of evidence depending for their value on the credibility of the maker.' "[8]

Like the written testimony we have previously found subject to the continuing witness objection, the photographic identification forms introduced in this case are documentary evidence that rely on the maker's credibility for their value. The witnesses signed a statement that "positively identified photo #5 as being the person who

---

[2] See *Samples v. State*, 217 Ga. App. 509, 510 (460 SE2d 795) (1995); *Parks v. State*, 199 Ga. App. 736, 738-739 (406 SE2d 229) (1991); *Kenney v. State*, 196 Ga. App. 776, 777 (397 SE2d 131) (1990).

[3] *Tibbs v. Tibbs*, 257 Ga. 370, 370-371 (359 SE2d 674) (1987).

[4] *Shedden v. Stiles*, 121 Ga. 637, 640 (49 SE 719) (1905).

[5] *Thomason v. Genuine Parts Co.*, 156 Ga. App. 599, 601 (275 SE2d 159) (1980).

[6] *Shedden*, 121 Ga. at 639-640.

[7] *Strickland v. State*, 167 Ga. 452, 460-462 (145 SE 879) (1928).

[8] *Royals v. State*, 208 Ga. 78, 81 (65 SE2d 158) (1951) (quoting *People v. Spranger*, 145 NE 706, 710 (Ill. 1924)).

committed the offense of *murder*." A handwritten note, "90% as shooter," was added at the bottom of each form. These statements, if read and reread in the jury room, would speak more than once on the disputed issue of the shooter's identity and unfairly elevate written testimony over similar oral testimony. Therefore, I believe that they should not go out with the jury during its deliberations when the defendant makes a proper objection.

I am authorized to state that Justice Sears joins in this concurrence.

DECIDED APRIL 29, 1996.

*Stacy S. Levy, Nancy K. Peterson,* for appellant.
*J. Tom Morgan, District Attorney, Barbara B. Conroy, Tamar P. Stern, District Attorneys, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

## S96A0213. CLIFFORD v. THE STATE.
### (469 SE2d 155)

HINES, Justice.

Shelton Lee Clifford was found guilty of malice murder, felony murder while in the commission of aggravated assault, and possession of a firearm during the commission of murder in connection with the fatal shooting of Samuel J. Crowder. We affirm Clifford's convictions.[1]

The evidence, considered in a light most favorable to the verdict, showed that Clifford and Leonard Sapp had a confrontation on July 10, 1993. Just after midnight on July 11, Clifford and some of his supporters arrived at the murder scene and Clifford and Sapp exchanged insults. Clifford drew a handgun, fired into the air, and then into a residence where Crowder was fatally wounded by a .45 caliber bullet. Eyewitnesses testified that Clifford was the only one with a weapon and that the only shots fired at the residence came from Clifford's direction. A .45 caliber shell casing was found in the area where Clifford was standing. Clifford fled the scene after the shooting.

---

[1] The crimes occurred on July 11, 1993. Clifford was indicted on September 21, 1993, for malice murder, felony murder while in the commission of aggravated assault, and possession of a firearm during the commission of murder. He was tried on November 30-December 2, 1994, and was found guilty of all charges. On December 2, 1994, Clifford was sentenced to life imprisonment for the malice murder and five years of incarceration to be served consecutively for the possession of firearm charge. The felony murder stood vacated by operation of law, OCGA § 16-1-7. Clifford was granted an out-of-time appeal on January 31, 1995, and filed a notice of appeal that day. The appeal was docketed in this Court on October 31, 1995, and the case was submitted for decision without oral argument on December 25, 1995.

1. The evidence was sufficient to enable a rational trier of fact to find Clifford guilty beyond a reasonable doubt of the crimes with which he was charged. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Any inconsistencies in the witnesses' testimony did not render it without probative value, but went to the weight and credit to be afforded it by the jury. OCGA § 24-9-80. The jury is to disregard only testimony shown to be wilfully and knowingly false in its entirety, which was not the situation here. OCGA § 24-9-85; *Jones v. State,* 265 Ga. 84, 85 (2) (453 SE2d 716) (1995).

2. Clifford contends that the trial court committed error of constitutional magnitude by improperly commenting on his failure to testify or to present evidence[2] when it charged the jury, "[n]ow while you may consider the number [of] witnesses on each side and the exhibits submitted on each side, you are not required to decide in favor of the side with the most witnesses or exhibits." The challenge fails.

When asked for objections to the charge, Clifford made no objection to the instruction nor did he reserve the right to do so on motion for new trial or on appeal. In general, under these circumstances appellate review is barred. *Russell v. State,* 264 Ga. 121, 122 (3) (441 SE2d 750) (1994). However, this Court may review an erroneous charge, even without exception, where there has been substantial error in the charge which was harmful as a matter of law. OCGA § 5-5-24 (c). Although such harm is asserted, that is not the case.

It is true that this type of charge is ordinarily inapt in a criminal case and it is the better practice not to give it.[3] But to do so may not constitute reversible error, if the instruction is found to be harmless. See *Fountain v. State,* 207 Ga. 144 (1) (60 SE2d 433) (1950), overruled on other grounds, *Lavender v. State,* 234 Ga. 608, 610 (2) (216 SE2d 855) (1975); *Harper v. State,* 201 Ga. 10, 17 (2) (39 SE2d 45) (1946); *Couch v. State,* 73 Ga. App. 153, 158 (5) (35 SE2d 708) (1945). A review of the court's instruction as a whole shows that the charge did not result in harm to Clifford. The entire instruction clearly informed the jury of the State's burden of proof and in no manner constituted an impermissible comment on the failure to testify or present evidence. Immediately preceding the charge, the jury was instructed that the defendant was under no duty to present any evidence tending to prove innocence or to take the stand and testify, and that if the

---

[2] During cross-examination of a State's witness, Clifford had admitted into evidence as "Defendant's Exhibit No. 1" the Georgia Bureau of Investigation's Division of Forensic Sciences' Official Report regarding the bullet from the victim's body.

[3] The charge may be properly given as part of the instruction to the jury about assessing the credibility of witnesses in a civil case. See Suggested Pattern Jury Instructions, Vol. I: Civil Cases, Part II (D), General Instructions (3rd ed. 1991). This is so because it relates to the quantum of proof in a civil case, that is, a determination of where the preponderance of the evidence lies. OCGA § 24-4-4.

defendant elected not to testify, the jury was not to hold that fact against him nor to draw from it any hurtful, harmful, or adverse inference.

3. Clifford's contention that the trial court misstated the law by charging that intent "may be inferred from the proven circumstances or by acts and conduct or it may be *in your discretion* inferred when it is the natural and necessary consequence of the act"[4] fails. Clifford neither objected to the charge nor reserved his right to do so later. *Russell*, supra at 122 (3).

4. Clifford contends that the trial court erred in failing to declare a mistrial after the jury declared it was deadlocked. The contention is unavailing.

The record discloses that sometime after the lunch recess, the jury sent out two questions, one asking what was the next step if a unanimous decision could not be reached. After approximately two hours and fifteen minutes of jury deliberation, the court returned the jury to the courtroom, gave it an *Allen*[5]-type charge and sent it back to further consider the case. Clifford made no request for a mistrial and, in fact, stated that he had no objection to the court's charge. After another recess, the jury indicated it was unable to reach a verdict. The court returned a written response telling the jury to continue to deliberate in an effort to reach a unanimous decision. Clifford did not object to the response nor did he move for a mistrial. The jury was sent home for the evening and the next day reached its verdict. Under these circumstances where there was no motion for mistrial, no objection to the court's *Allen* charge, no indication from the jury that it was hopelessly deadlocked, and where the length of deliberation was not excessive, there was no abuse of the trial court's discretion in allowing the jury to further consider the case. *Glass v. State*, 250 Ga. 736, 738 (2) (300 SE2d 812) (1983) (the determination as to whether the jury is hopelessly deadlocked is a matter somewhat in the discretion of the trial court); see, e.g., *Dean v. State*, 215 Ga. App. 23, 24 (3) (449 SE2d 622) (1994); *Albert v. State*, 180 Ga. App. 779, 786 (8) (350 SE2d 490) (1986).

5. Clifford contends that the trial court erred in failing to inquire whether or not his counsel wished to poll the jury and that his counsel had no opportunity to request a poll because the court immediately dismissed the jury after publication of the verdict. The contentions are without merit. Here, the court was not under a duty to ask the defendant if a jury poll was desired. It was up to the defendant to timely request that the jury be polled regarding its verdict. See *Fa-*

---

[4] The instruction is from Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Part 2 (I), General Charges (2nd ed. 1991).

[5] *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896).

*vors v. State*, 234 Ga. 80, 88 (6) (214 SE2d 645) (1975). Moreover, the trial record does not support the contention that defense counsel was denied the opportunity to seek a poll. Even if the court dismissed the jury shortly after publication of the verdict, defense counsel failed to register an objection or indicate in any manner that defendant wished to hear the jury on its verdict of his guilt.

*Judgments affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Stanley C. House*, for appellant.

*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General*, for appellee.

## S96A0246. APPLING v. THE STATE.
### (469 SE2d 194)

SEARS, Justice.

The appellant, Will David Appling, was tried and convicted by a jury of malice murder.[1] The trial court sentenced Appling to life in prison. In his only enumeration of error, Appling contests the sufficiency of the evidence for the conviction of malice murder. We find the evidence sufficient and affirm the conviction and sentence.

Willie Fleming, a friend of Appling's, testified that on May 10, 1993, he and Appling were sitting on a porch, with a group of friends, when Appling asked Fleming if he could borrow a gun which Fleming was holding, saying that his (Appling's) gun was not "big enough." Appling then grabbed the gun from Fleming and remarked that a car had just gone by in which Stacy Cunningham, the victim, might be riding. Appling then ran after the car, and a few minutes later Fleming heard three or four shots. Appling then ran back to his friends, dropped the gun, and kept running. The victim and Appling had been involved in previous violent disputes with each other.

The victim's girl friend, an eyewitness to the shooting, testified that she and Cunningham had arrived at her mother's house just

---

[1] The crime occurred on May 10, 1993. Appling was indicted on May 19, 1993. The guilty verdicts were filed on December 14, 1994, and the sentences were filed on December 14, 1994. Appling filed a motion for a new trial on December 21, 1994. The transcript was certified on May 2, 1995, and the trial court denied the motion for new trial on October 24, 1995. Appling filed his notice of appeal to the Court of Appeals on October 24, 1995, and the Court of Appeals transferred the case to this Court on November 2, 1995. The case was docketed in this Court on November 8, 1995, and was submitted for decision on January 2, 1996.

before the shooting, that they went inside for ten or fifteen minutes, and that, as they were leaving, Appling shot Cunningham while Cunningham was opening the car door for her. Cunningham then got up and ran to a nearby trailer, while Appling continued to fire at him. Cunningham was shot at least three times in the chest and back and died as a result.

We find that, construed in the light most favorable to the verdict, the evidence was sufficient to allow a rational trier of fact to find Appling guilty of malice murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Moreover, the evidence was sufficient to authorize the jury to reject Appling's assertions of self-defense and voluntary manslaughter.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Lavender & Lavender, Robert W. Lavender, J. David Duffy,* for appellant.

*Lindsay A. Tise, Jr., District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

## S96A0311. JOHNSON v. THE STATE.
### (469 SE2d 152)

HUNSTEIN, Justice.

Anthony Johnson was convicted of murder in the shooting death of James Curtis Chatmon III. He appeals from the denial of his motion for new trial.[1] Because we find no error in the trial court's grant of the State's motion in limine regarding expert testimony Johnson sought to admit at trial, we affirm.

1. At the time of the crime, a police officer was surveilling the area through binoculars as a result of information received about Johnson. The officer and a police department dispatcher who was with the officer saw the victim standing on a sidewalk talking to Johnson's brother when Johnson approached and shot the victim several times. Both witnesses testified that the victim was unarmed and had made no threatening gestures towards Johnson. Johnson, after shoot-

---

[1] The homicide occurred on July 9, 1994. Johnson was indicted in August 1994 in Treutlen County. He was found guilty on March 8, 1995 and was sentenced the same day. His motion for new trial was filed on March 23, 1995 and denied on October 10, 1995. A notice of appeal was filed on November 8, 1995. The appeal was docketed in this Court on November 20, 1995. This appeal was submitted for decision without oral argument.

ing the victim in the chest, stood over the victim and continued firing as the victim, prone on his back, tried to drag himself away.[2] Expert testimony established the victim was struck by at least ten shots fired by a semi-automatic weapon. Johnson and the victim were not related and the evidence adduced disclosed no personal history between the two young men.

Johnson testified that the victim had been arguing with his brother and that Johnson thought they were about to fight, so he left his brother's apartment, retrieved his gun which was outside on a car bumper and checked to see if it was loaded, firing one shot into the ground; that as he neared, the victim said "I'll get you" and turned, appearing to have a chrome object in his hand; and that Johnson, thinking the object was a gun, fired at the victim.

We find the evidence adduced sufficient to enable a rational trier of fact to find Johnson guilty of murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his sole enumeration of error, Johnson contends the trial court erred by granting the State's motion in limine regarding testimony by Dr. Robert Schaeffer, a clinical psychologist. At the hearing on the motion, Dr. Schaeffer testified that as a result of his testing and interviews with Johnson, he found Johnson to be mildly mentally retarded and to have been physically abused as a child. Dr. Schaeffer opined that Johnson has "some psychological symptoms that we might consider to be similar to post-traumatic stress disorder," explaining that Johnson's actions were "activated and driven by the same psychological dynamics" as those in the battered woman syndrome. Although Dr. Schaeffer gave his opinion as to the causes for Johnson's explosive rage and fear, those causes were not in any way connected to Johnson's relationship with the crime victim. In its oral ruling, the trial court found the proffered expert testimony irrelevant, noting in particular the fact that the evidence showed that the victim of the crime was an unrelated third party and thus not in the same category as a batterer.[3]

Johnson asserts that the trial court's ruling was error because Dr. Schaeffer's expert testimony provided relevant information which was beyond the ken of the jury, namely, a psychological explanation for Johnson's explosive rage and fear which led to his unprovoked killing

---

[2] Upon the firing of the first shot, the police officer immediately ran toward the crime scene, which was over 100 yards away, while radioing for assistance. Although the officer drew his own weapon, he could not use it due to darkness (it was approximately 11:00 p.m.) and the presence of numerous other individuals in the area.

[3] The trial court made no determination whether the post-traumatic stress syndrome had reached a scientific stage of verifiable certainty so as to become competent evidence under *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982), and we intimate no opinion in that regard.

of an unarmed man. In support of this argument, Johnson relies on *Smith v. State*, 247 Ga. 612 (277 SE2d 678) (1981). In *Smith*, the defendant was charged with murdering her live-in boyfriend. The defense proffered an expert's testimony about the battered woman syndrome and the expert's opinion that the defendant's behavior conformed to that syndrome. This Court held that the proffered testimony was admissible because it supplied "an interpretation of the facts which differ[s] from the ordinary lay perception," id. at 619, and it explained why a person suffering from the syndrome "would not leave her mate, would not inform police or friends, and would fear increased aggression against herself." Id. Thus, pursuant to *Smith*, the courts of this State recognize that

> under appropriate circumstances a woman who kills her husband or boyfriend and raises the defense of self-defense may, as evidence of whether she acted in fear of her life, have an expert witness describe the "battered woman syndrome," apply that model to the facts, and conclude that the woman falls within the profile. [Cit.]

(Footnote omitted.) *Sanders v. State*, 251 Ga. 70, 74 (303 SE2d 13) (1983).

The battered woman syndrome describes "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." *State v. Kelly*, 478 A2d 364, 371 (N.J. 1984). A summary of the battered woman syndrome is set forth in *State v. Kelly*, particularly the three-phase "battering cycle" that develops in abusive relationships[4] and the state of psychological paralysis into which some women descend.[5] Id. This Court's conclusion in *Sinns v. State*, 248 Ga. 385 (3) (283 SE2d 479) (1981) that the battered woman syndrome is a "complex subject" is supported by a review of the "sustained psychological and physical trauma com-

---

[4] The "battering cycle" consists of three phrases: the "tension-building" stage in which minor abusive episodes occur and the woman attempts to be as placating and passive as possible to avoid more serious violence; the "acute battering" stage in which explosive violence occurs; and the "contrition" stage in which the batterer asks for forgiveness and makes promises, such as to seek help and to refrain from further violence. *State v. Kelly*, supra at 371.

[5] This "theory of learned helplessness" posits that as a result of the abusive relationship, a woman comes to believe that her own behavior does not have any relationship to whether she is beaten. Moreover, because she is unable to predict or control the violence, a battered woman may come to feel demoralized and paralyzed, and thus unable to take any action to improve or alter her situation.

(Footnotes omitted.) Note, "Developments in the Law, Legal Responses to Domestic Violence," Section V, Battered Women Who Kill Their Abusers, 106 Harvard L. Rev. 1498, 1579 (1993).

pounded by aggravating social and economic factors" that comprise the battered woman syndrome. *State v. Kelly*, supra at 372.

The battered woman syndrome itself is clearly not applicable to Johnson. See generally *Pruitt v. State*, 164 Ga. App. 247 (1) (296 SE2d 795) (1982). Johnson argues, however, that because his expert would testify that Johnson's actions were driven by the same psychological dynamics as those in the battered woman syndrome, the rationale in *Smith* for the admission of expert testimony on the battered woman syndrome should be applied to his case. We do not agree. Our holding in *Smith v. State*, supra, was the result of a need to treat a complex area of human response and behavior. *Sinns*, supra at 387. The facts in this case are not comparably compelling and we are not persuaded by Johnson that there was a need for expert testimony in his case for any of the reasons that led this Court in *Smith* to allow such testimony regarding the battered woman syndrome.

OCGA § 16-3-21 (a) provides that "[a] person is justified in threatening or using force against another when and to the extent that he *reasonably believes* that such threat or force is necessary to defend himself . . . against such other's imminent use of unlawful force." (Emphasis supplied.) While in those unique factual scenarios giving rise to the battered woman syndrome, expert testimony may be necessary to "attempt to show that the defendant had a mental state necessary for the defense of justification," *Chapman v. State*, 259 Ga. 706, 708 (386 SE2d 129) (1989), our holdings in regard to the admissibility of evidence of the battered woman syndrome have not otherwise changed the rule in homicides where justification is raised as a defense, namely, that justification is based upon the fears of a reasonable person, not upon the reasonable fears of the defendant. *Moore v. State*, 228 Ga. 662 (6) (187 SE2d 277) (1972).

Therefore, because Johnson's proffered expert testimony was not relevant to the jury's consideration of Johnson's justification defense, OCGA § 16-3-21 (a), the trial court did not err by granting the State's motion in limine.

*Judgment affirmed. All the Justices concur, except Sears, J., who concurs in the judgment only.*

DECIDED APRIL 29, 1996.

*Joe H. Thalgott,* for appellant.
*Ralph M. Walke, District Attorney, Jeffrey J. Connor, Assistant District Attorney, Michael J. Bowers, Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.

## S96A0377. BELK et al. v. WESTBROOKS et al.

(469 SE2d 149)

HUNSTEIN, Justice,

The Georgia Firemen's Pension Fund (hereinafter "the Fund"), of which appellees serve as the board of trustees, is a state-created pension system for firemen and voluntary firemen who serve with state, county or municipal fire departments, including volunteer fire departments, which serve areas located within counties and municipalities. OCGA Title 47, Chapter 7. The Fund is intended to supplement primary pension benefits provided by fire departments or the governmental units or volunteer districts establishing fire departments. Although members of the Fund are required to pay monthly dues, the Fund is financed principally by the proceeds of a state-wide tax on certain insurance premiums. OCGA §§ 47-7-60; 47-7-61. Membership in the Fund is voluntary, however it is limited to firemen and volunteer firemen affiliated, either as employees or volunteers, with "full-time fire departments," OCGA § 47-7-1 (4), or "volunteer fire departments," OCGA § 47-7-1 (6), which are rated between Class 1 and Class 8, inclusive, by the Insurance Services Office ("ISO") or a successor organization as provided under OCGA § 47-7-1 (4) (B) and (6) (C), respectively.[1] In order to achieve a Class 8 ranking, fire suppression facilities must have a water supply capable of delivering water at the rate of at least 250 gallons per minute (hereinafter "g.p.m.") for two hours, plus the historical maximum daily rate of consumption of water from that source for other purposes. Such a fire suppression facility must also have equipment capable of pumping and delivering water to involved property at a rate of 250 g.p.m. at a pressure of 150 pounds per square inch. Fire suppression facilities which do not achieve a Class 8 or better (i.e., lower numerical) rating are usually unable to meet the water source requirements and fire suppression facilities which do achieve a Class 8 or better rating typically are able to rely on a public, piped water system. However, the requisite water source may also be supplied by a river, lake, pond or other such source or by a fleet of vehicles sufficiently equipped to

---

[1] A "fire department" is defined under the statute as a full-time fire department or volunteer fire department which is (a) certified by the Georgia Fire Academy and (b) ranked Class 8 or better under the Fire Suppression Rating Schedule published by the ISO. "Fire suppression facility(ies)," as used hereinafter, refers to a fire department (in the generic sense), whether or not it is a fire department for purposes of OCGA § 47-7-1 (2).

The ISO is a rating organization which is required to be and is licensed as such by the Commissioner of Insurance under OCGA Title 33, Chapter 9. The function of the ISO is to develop a standardized method for the assessment of risk and loss exposure for property for fire insurance purposes. The Fire Suppression Rating Schedule developed by ISO in collaboration with other insurance and fire protection organizations provides standardized criteria for public fire suppression facilities. The ISO Rating Schedule was approved by the state insurance commissioner in 1980 and has not been amended since.

ferry and pump water at the requisite pressure and volume. Fire suppression facilities which do not meet Class 8 standards are typically rural, volunteer fire suppression facilities.

Appellants, certain named plaintiffs and all members of all Class 9 fire suppression facilities in Georgia, all of whom are rural volunteer firemen, brought the underlying action to challenge the constitutionality of OCGA § 47-7-1 on the ground that it denies them equal protection by unreasonably classifying them differently than those firemen whose fire suppression facilities are rated Class 8 or better. While appellants acknowledge that membership in the Fund is not a fundamental right, nor do they form a suspect class, they nevertheless contend that they perform essentially the same work as all other firemen and that they should not be denied membership in the Fund simply because the jurisdiction which they serve cannot, or chooses not to, expend the funds necessary to provide the water source necessary to meet Class 8 criteria, a situation over which appellants have no control. Thus, they argue, the nexus between the legitimate legislative objective of improving fire protection and the incentive chosen is constitutionally inadequate. Appellants now appeal the trial court's grant of appellees' motion for summary judgment.

Under the rational basis standard of review, classifications drawn by the state cannot be arbitrary and must bear some reasonable relation to a legitimate governmental objective. *Price v. Lithonia Lighting Co.*, 256 Ga. 49 (343 SE2d 688) (1986). Moreover, a law enacted by the General Assembly is presumed to be constitutional; the burden is on a challenger to prove its invalidity. *Love v. Whirlpool Corp.*, 264 Ga. 701 (449 SE2d 602) (1994); *Smith v. Cobb County-Kennestone Hosp. Auth.*, 262 Ga. 566 (423 SE2d 235) (1992). The contested definitional classification has been in effect since 1955; that it has not been challenged for nearly 40 years is itself an indicator of the reasonableness of the classification. *McLennan v. Aldredge*, 223 Ga. 879 (159 SE2d 682) (1968). The General Assembly has expressly stated its purpose in the existing statutory classification of firemen for Fund purposes, to-wit, to induce fire suppression facilities to upgrade in order to meet what the General Assembly recognizes as the minimum standards essential to improving fire fighting ability.[2]

The inability of individual appellants to persuade local government jurisdictions which they serve to expend tax revenues authorized for purpose of fire protection (see OCGA §§ 33-8-8.2; 33-8-8.3 (a) (1) (B)) does not render constitutionally infirm the inducement

---

[2] The statutory standards set forth in OCGA § 25-3-23 establish the minimum standards for the legal organization of a fire suppression facility (referred to therein as "fire department"). However a fire suppression facility which could meet these standards would not meet even Class 9 criteria.

selected by the legislature nor does the decision by the legislature not to mandate such expenditures at local levels. The General Assembly's election to extend the benefits of the Fund (as the state tax revenues which those benefits represent) only to those jurisdictions which satisfy certain recognized minimum fire protection criteria rests appropriately with the legislature. See *Mathews v. Diaz*, 426 U. S. 67 (96 SC 1883, 48 LE2d 478) (1976); *Dandridge v. Williams*, 397 U. S. 471 (90 SC 1153, 25 LE2d 491) (1970).

*Judgment affirmed. All the Justices concur.*

FLETCHER, Presiding Justice, concurring.

Volunteer firefighters in rural fire departments challenge their exclusion from the Georgia Firemen's Pension Fund as a violation of equal protection. There is a rational basis for granting benefits to firefighters who work for fire departments that are rated Class 8 or better but not to firefighters who work for Class 9 departments. The legislature's classification bears a reasonable relationship to the legitimate government objective of improving the fire-fighting capabilities of fire departments. By offering state-funded benefits only to firefighters who work for fire departments that meet minimum standards, the state encourages local governments to use their resources to meet those standards and thus increase their fire department's ability to suppress fires. For this reason, I concur.

DECIDED APRIL 29, 1996.

*R. Dale Perry*, for appellants.

*Harman, Owen, Saunders & Sweeney, Timothy J. Sweeney*, for appellees.

## S96A0510. BELLAMY et al. v. RESOLUTION TRUST CORPORATION.

(469 SE2d 182)

CARLEY, Justice.

The Bellamys conveyed certain property to Sunflower Properties, Inc. to use as collateral for a construction loan from Southern Federal Savings Association of Georgia, and Sunflower executed a security deed in favor of Southern. Thereafter, the construction loan went into default, and RTC was appointed receiver of Southern. As a result of litigation between Sunflower and the Bellamys, Sunflower was ordered to reconvey the property to the Bellamys, and Sunflower complied by executing a limited warranty deed. Several months later,

RTC instituted foreclosure proceedings, was the successful bidder, and in due course executed to itself a deed under power of sale. Subsequently, RTC brought this dispossessory action against the Bellamys to evict them from the property. The Bellamys filed counterclaims seeking to set aside the deed executed by RTC based upon fraud on the part of Southern. The Bellamys alleged that representatives of Southern told them at closing that the construction loan to Sunflower would be rolled over into a first mortgage upon completion of the construction and that the property would be returned to them within six months, when Southern knew at the time that this representation was not true. RTC filed a motion to dismiss contending that 12 USC § 1823 (e) shields it from such claims of fraud unless any alleged agreement was in writing. The trial court held that the motion to dismiss was converted into a motion for summary judgment, which the court granted. It is from this order that the Bellamys appeal.

1. The Bellamys contend that genuine issues of material fact exist as to whether 12 USC § 1823 (e) applies.

Under § 1823 (e), "[n]o agreement which tends to diminish or defeat the interest of [RTC] in any asset acquired by it . . . as receiver . . . shall be valid against [RTC] unless such agreement . . . is in writing" and meets certain other requirements. The term "agreement" in § 1823 (e) includes not only express promises to perform in the future, but also express and implied conditions upon performance. *Langley v. FDIC*, 484 U. S. 86, 91 (II) (A) (108 SC 396, 98 LE2d 340) (1987). Thus, regardless of whether the alleged oral agreement here included an express promise by Southern or a condition on the Bellamys' liability to Southern upon reconveyance of the property, that agreement is not binding under § 1823 (e). See *Dove v. FDIC*, 154 Ga. App. 667 (269 SE2d 516) (1980) (alleged agreement to renew and to convert a note was not binding agreement under the standards of § 1823 (e) or any other standards).

Neither fraud in the inducement nor knowledge by the RTC is relevant to application of § 1823 (e), although fraud in the factum would be. *Langley*, supra at 93 (II) (B). See *Slocumb v. FDIC*, 156 Ga. App. 821, 823 (275 SE2d 760) (1980). However, the Bellamys have not alleged fraud in the factum, "that is, the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents. . . ." *Langley*, supra at 93.

It follows that the Bellamys have shown, at best, only an oral agreement which, pursuant to § 1823 (e), would be unenforceable against RTC and, therefore, RTC was entitled to summary judgment. *FDIC v. Jones*, 161 Ga. App. 867, 868-869 (291 SE2d 70) (1982).

2. The Bellamys contend that the trial court should not have granted summary judgment prior to ruling on their motion to compel.

Section 1823 (e) plainly requires a writing executed by Southern *and* the Bellamys. "[H]ad the necessary writing been executed, [the Bellamys] would obviously be aware of the fact and capable of alleging it specifically." *Oliver v. Resolution Trust Corp.*, 747 FSupp. 1351, 1353 (E.D. Mo. 1990). However, the Bellamys have alleged no such written agreement and they now admit that no written agreement exists. Thus, although we do not generally condone the grant of summary judgment while a motion to compel discovery is pending, reversal is not required because the requested discovery could not have added anything of substance to the Bellamys' claims. *Charles S. Martin Distrib. Co. v. Bernhardt Furniture Co.*, 213 Ga. App. 481, 484 (4) (445 SE2d 297) (1994).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Kessler & Sparks, Michael A. Kessler,* for appellants.
*Michael D. Johnson, Mack, Williams, Haygood & McLean, Curtis L. Mack,* for appellee.

S96A0582. FIELDS v. THE STATE.
(469 SE2d 184)

FLETCHER, Presiding Justice.

A jury convicted Roger Fields of the malice murder of Heather Davis, his 32-month-old stepdaughter.[1] He contends that he admitted hitting Heather only because police officers promised that he could attend her funeral. The trial court found that the police officers did not induce Fields' statement by any promise. Because the trial court correctly ruled that Fields' statement was voluntary and admissible, we affirm.

1. The state presented evidence that Fields was caring for Heather at home alone while her mother was working the night shift. In a tape-recorded statement, Fields told police that he hit Heather with his palm four to five times because she refused to put away her toys and go to sleep. He then asked to see his wife and mother and told them in front of the two officers that he had struck Heather. The

---

[1] The crime occurred on November 17-18, 1994, and a grand jury indicted Fields on February 28, 1995. The jury found Fields guilty and the trial court sentenced him to life imprisonment on July 12, 1995. Fields filed a motion for a new trial on July 15, 1995, which was denied on November 28, 1995. He filed a notice of appeal on December 15, 1995. The case was docketed on January 3, 1996, and submitted for decision without oral argument on February 26, 1996.

pathologist testified that Heather died from a blunt force injury to the head; a family practitioner testified that the swollen spot on the back of Heather's head could not have been caused by a fall from her bed, but was the result of a heavy blow. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Fields guilty of murder.[2]

2. In determining whether a defendant has made a voluntary statement, courts must look at the totality of the circumstances.[3] The relevant factors show that Fields was 20 years old when he was arrested and could read and write; he signed a form at the beginning of the police interview in which he acknowledged and waived his right to remain silent and to have an attorney present; he said in his tape-recorded statement that he wanted to talk to police without a lawyer present and the officers had not threatened him or promised him anything to get him to talk; and he was questioned for two hours by two officers while his wife and mother waited in another room at the police department. Although Fields contended at trial that he wanted an attorney present during the interview, both investigating officers testified that Fields mentioned obtaining an attorney, but changed his mind before they could ask any clarifying questions and stated that he did not want an attorney present. Based on the totality of the circumstances, we conclude that the trial court correctly found that police did not induce Fields to give his statement and properly admitted the statement into evidence.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Straughan & Straughan, William T. Straughan,* for appellant.
*Timothy G. Vaughn, District Attorney, H. Frederick Mullis, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General, Caroline W. Donaldson, Assistant Attorney General,* for appellee.

## S96A0592. BROWN v. THE STATE.
(469 SE2d 186)

SEARS, Justice.

The appellant, Maurice Brown, appeals from his convictions of malice murder, armed robbery, and aggravated assault. The state

---

[2] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[3] *Gober v. State,* 264 Ga. 226, 228 (443 SE2d 616) (1994).

sought the death penalty, but the jury recommended that Brown receive a sentence of life without parole. The trial court sentenced Brown to life without parole for the malice murder conviction, to life in prison for the armed robbery conviction, and to 20 years in prison for the aggravated assault conviction, all sentences to run consecutively.[1] On appeal, Brown contends that the trial court erred in admitting into evidence a statement of one of Brown's co-conspirators and that the trial court erred in denying his motion to compensate his counsel at the rate of $150 per hour. We conclude that the evidence is sufficient to support the convictions; that the trial court did not err in admitting into evidence the statement of Brown's co-conspirator; and that the issue of compensation of counsel is not properly before us.

On the night of March 22, 1994, several young males entered a convenience store at I-20 and Georgia 44 in Greene County. One of the men approached Wiley Higdon, the lone employee in the store, and without any warning or hesitation, killed him with a handgun. The assailant immediately turned on a customer who was standing next to him and attempted to shoot him as well. The customer fled while the assailant unsuccessfully attempted to fire the gun at him. Lottery tickets and cash were taken from the store. A spent .45 caliber shell casing was found on the floor of the convenience store. There was evidence that Brown threw an object into the yard of a home near the store on the night of the shooting. Police recovered a .45 caliber handgun from that yard, and a state's expert testified that the spent shell casing had been fired from that handgun. An acquaintance of Brown's also testified that Brown came to her house on the night of the shooting with a box full of lottery tickets.

The day after the shooting, Brown, who was then 19 years old, gave a written statement to the police in which he stated that he took the gun into the store; that the gun "just went off"; and that he tried to shoot the fleeing customer. On March 24, 1994, two days after the crimes, Dustin Ashe, a fourteen-year-old co-conspirator, gave a statement to a GBI agent in which he identified Brown as the person who shot Higdon. Ashe subsequently pled guilty to armed robbery and received a 20-year sentence. In January 1995, Ashe gave another statement to the GBI agent to the same effect as the first one. At trial, Ashe's statements were admitted, over defense counsel's objection, as

---

[1] The crimes occurred on March 22, 1994. Brown was indicted on August 23, 1994, and tried from September 7 to September 12, 1995. The jury returned its verdicts on both the guilt-innocence and punishment phases of the trial on September 12. Brown filed a notice of appeal on September 27, 1995. The trial court extended the time for filing the transcript of the proceedings until December 15, 1995. The court reporter certified the trial transcript on December 14, 1995, and the appeal was docketed in this Court on January 5, 1996. The appeal was orally argued on March 19, 1996.

substantive evidence under *Gibbons v. State*.[2]

1. Having examined the evidence in the light most favorable to the verdict, we conclude that it is sufficient to support the convictions.[3]

2. In his first several enumerations of error, Brown contends that the trial court erred by permitting the state to introduce evidence of the prior statements that Ashe gave to the police. Brown first contends that OCGA § 24-3-52[4] required the trial court to exclude evidence of Ashe's prior statements because, according to Brown, those statements were made after the conspiracy had ended. However, § 24-3-52 is designed to protect a defendant from the hearsay confession of a co-conspirator who does not testify at trial.[5] This Court and the Court of Appeals have repeatedly held that where the co-conspirator testifies at trial and is subject to cross-examination, the concerns of § 24-3-52 are satisfied and the Code section has no application.[6] Further, under the exception to the hearsay rule set forth in *Gibbons v. State*,[7] this Court and the Court of Appeals have held that if the co-conspirator's testimony contradicts his prior statement implicating the defendant, the prior statement is admissible as substantive evidence.[8] Here, Ashe was present at trial and was subject to cross-examination, and his prior statements were thus not inadmissible under § 24-3-52.

Relying on *Johnson v. State*,[9] Brown next contends that the statements were inadmissible because a witness may not be impeached by a prior inconsistent statement when the witness testifies at trial merely that he does not remember the events in question. In *Johnson*, we stated that " 'where a witness merely states that he does not remember, he cannot be impeached by the showing of former statements with respect to the facts which he claims not to remember.' "[10] Here, however, Ashe testified, in relevant part, that he did not see Higdon get shot, did not see who shot him, and did not see

---

[2] 248 Ga. 858, 862 (286 SE2d 717) (1982).

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] Section 24-3-52 provides that "[t]he confession of one joint offender or conspirator made after the enterprise is ended shall be admissible only against himself." We have held that a conspiracy has come to an end when one co-conspirator identifies other co-conspirators to the police and relates their participation in the conspiracy. E.g., *Crowder v. State*, 237 Ga. 141, 152-153 (227 SE2d 230) (1976).

[5] *Short v. State*, 256 Ga. 165, 169 (5) (345 SE2d 340) (1986); *Hill v. State*, 239 Ga. 278, 279-280 (2) (236 SE2d 626) (1977).

[6] *Knight v. State*, 266 Ga. 47, 48-49 (2), (4) (c) (464 SE2d 201) (1995); *Horne v. State*, 177 Ga. App. 765, 766 (341 SE2d 243) (1986); *Fleeman v. State*, 176 Ga. App. 447, 448 (336 SE2d 45) (1985).

[7] 248 Ga. at 862.

[8] E.g., *Knight*; *Horne*; *Fleeman*.

[9] 255 Ga. 552 (4) (341 SE2d 220) (1986).

[10] Id. at 556. See also McCormick on Evidence, Vol. 2, p. 121, § 251 (4th ed. 1992).

anyone with a gun. All of these statements were inconsistent with his prior statements. Accordingly, the trial court did not err in admitting evidence of Ashe's prior inconsistent statements.

3. Brown next contends that the court erred in denying Brown's motion for adequate compensation of counsel.[11] However, because there is not any proof that the alleged inadequate compensation of counsel denied Brown effective assistance of counsel, the attorney fee issue is not properly before us.[12]

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

*Martin L. Fierman,* for appellant.

*Fredric D. Bright, District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

S96Y0738. IN THE MATTER OF WILLIE E. ROBINSON.
(469 SE2d 190)

PER CURIAM.

The State Bar of Georgia filed a formal complaint against Willie E. Robinson alleging violations of Standards 4 and 65 of Bar Rule 4-102 (d) arising from his conduct as trustee of a trust established for a minor child as settlement of a legal matter.[1] Robinson answered the complaint, challenging the procedure against him. Nevertheless, he did not appear at the hearing set by the special master where the State Bar presented its case against him. The State Bar showed that during a three-year period, until he was removed as trustee, Robinson failed to make required accounting of trust funds, and converted substantial amounts of those funds to his own personal use. The foregoing acts constitute violations of Standards 4[2] and 65 (A) and (D).[3]

---

[11] Brown's attorney sought compensation at the rate of $150 per hour instead of the rate provided for by the indigent fee schedule in the Ocmulgee Circuit.

[12] *Moon v. State,* 258 Ga. 748, 753 (6) (375 SE2d 442) (1988).

[1] The State Bar's complaint followed Robinson's Notice of Rejection of the Bar's Notice of Discipline against him. This Court initially disbarred Robinson on February 18, 1993 for failure to file a timely Notice of Rejection. Subsequently we vacated the order of disbarment, and, after an evidentiary hearing before a special master on the issue of service, we accorded Robinson an opportunity to respond to the Notice of Discipline. On Robinson's Notice of Rejection, this disciplinary proceeding continued pursuant to Bar Rule 4-208.4 with this Court's appointment of a special master and the State Bar's filing of a formal complaint.

[2] "A lawyer shall not engage in professional conduct involving dishonesty, fraud, deceit, or wilful misrepresentation."

[3] Standard 65 (A) and (D) provides, in pertinent part: "A lawyer shall not fail to account

We agree with the special master and review panel that Robinson's conduct mandates disbarment, both because of the severity of the infractions and because of further aggravating circumstances in this case. This sanction is consistent with that specifically authorized by the Standards,[4] with the recommendation of the American Bar Association's Standards for Imposing Lawyer Sanctions,[5] as well as our decisions in similar disciplinary matters.[6] We note the additional aggravating factors in this case including Robinson's dishonest motive, his refusal to acknowledge the wrongful nature of his conduct, the vulnerability of the victim, and Robinson's substantial experience in the practice of law.[7]

We find no merit to Robinson's challenges to the underlying proceedings and arguments that alleged defects invalidate the entire disciplinary proceeding against him.[8] Nor do we find merit to Robinson's defenses regarding alleged misconduct by the review panel or the State Bar.

For the foregoing reasons, it is hereby ordered that Willie E. Robinson be disbarred from the practice of law in the State of Georgia. It is further ordered that Willie E. Robinson immediately cease the practice of law, and, within the time provided, certify to this Court that he has taken all actions necessary to protect the interests of his clients and that he has satisfied all the requirements of Bar Rule 4-219 (c).

*Disbarred. All the Justices concur.*

---

for trust property," and "[n]o funds shall be withdrawn from . . . [a] trust account for the personal use of the lawyer maintaining the account. . . ."

[4] See Standards 4 and 65 (A) and (D): "A violation of this standard may be punished by disbarment."

[5] See Standard 4.11, ABA Standards for Imposing Lawyer Sanctions (1991) (disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client).

[6] See *In the Matter of Johnston*, 266 Ga. 591 (468 SE2d 375) (1996) (conversion of trust funds and failure to make accounting of trust funds); *In the Matter of Royal*, 262 Ga. 717 (425 SE2d 650) (1993) (mishandling of funds of estate of which Respondent was executor, and failure to account for funds); *In the Matter of Meier*, 256 Ga. 72, 75 (344 SE2d 212) (1986) (a review of cases involving the mishandling of client funds).

[7] See ABA Standard 9.22 (b), (g), (h) and (i).

[8] These arguments include: that the Notice of Discipline was invalid; that the Chair of the review panel's order on Robinson's objections to the special master was untimely; that he was denied equal protection based on the differences between Bar Rule 4-212 and Bar Rule 4-208.4 (pertaining to extensions of time for filing an answer to a formal complaint and for the State Bar's filing of a formal complaint following a respondent's Notice of Rejection); that he was not given proper notice of the hearing before the special master; and that the State Bar failed to obtain an appropriate extension of time for filing the formal complaint pursuant to Bar Rule 4-208.4.

DECIDED APRIL 29, 1996.

*William P. Smith III, General Counsel State Bar, Marie L. McCarthy, Assistant General Counsel State Bar,* for State Bar of Georgia.

## S96A0777. HOBSON v. THE STATE.
### (469 SE2d 188)

CARLEY, Justice.

James D. Hobson was tried before a jury and found guilty of malice murder. He appeals from the judgment of conviction and sentence of life imprisonment entered by the trial court on the jury's guilty verdict.[1]

1. Hobson shot the victim during an argument over a coat which Hobson had bought from the victim. Two eyewitnesses testified that they saw no aggressive behavior on the part of the victim. From the evidence, a rational trier of fact was authorized to find proof, beyond a reasonable doubt, of Hobson's guilt of malice murder. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Bennett v. State,* 265 Ga. 38, 39 (1) (453 SE2d 458) (1995); *Kitchen v. State,* 263 Ga. 629, 630 (2) (436 SE2d 645) (1993); *Wiseman v. State,* 249 Ga. 559, 560 (1) (292 SE2d 670) (1982).

2. Hobson moved for a continuance so that he could hire counsel to represent him during trial. Hobson enumerates as error the denial of this motion. A review of the record reveals that the case had been pending for some time, Hobson had already dismissed his private attorney, and the motion for continuance was not made until after the jury was selected, at which time Hobson made vague complaints about his court-appointed attorney. Under the circumstances, the trial court was authorized to conclude that Hobson was attempting to use the discharge and employment of other counsel as a dilatory tactic, which was "the functional equivalent of a knowing and voluntary waiver of appointed counsel. In such instances, the trial court may proceed to trial with the defendant representing himself. [Cit.]" *Staples v. State,* 209 Ga. App. 802, 804 (3) (434 SE2d 757) (1993). See also *Adams v. State,* 210 Ga. App. 151, 153 (1) (435 SE2d 514) (1993);

---

[1] The homicide occurred on December 26, 1993 and Hobson was indicted on March 15, 1994. The guilty verdict was returned on July 21, 1994 and the judgment of conviction and life sentence also were entered on that day. Hobson's motion for new trial was filed on August 22, 1994 and denied on September 14, 1995. His notice of appeal was filed on October 6, 1995 and the case then was docketed in this Court on February 1, 1996. On March 25, 1996, the appeal was submitted for decision.

*Jefferson v. State,* 209 Ga. App. 859 (434 SE2d 814) (1993); *Tillman v. State,* 184 Ga. App. 210, 211 (2) (361 SE2d 66) (1987). Fulfilling its important responsibility in this area, the trial court fully apprised Hobson of the dangers of self-representation. *Staples v. State,* supra at 804 (3). After Hobson represented himself for a short time, the trial court did not err in permitting appointed counsel to resume representation pursuant to Hobson's own request.

3. When giving a recharge on the definitions of the offenses to be considered by the jury, pursuant to its request, the trial court did not abuse its discretion by not also recharging on self-defense and accident. *Appling v. State,* 256 Ga. 36, 38 (2) (343 SE2d 684) (1986); *Williams v. State of Ga.,* 249 Ga. 6, 9 (6) (287 SE2d 31) (1982).

4. This Court will not consider other alleged errors argued in Hobson's brief, but not included in the enumerations of error. *Doss v. State,* 262 Ga. 499, 500 (1) (422 SE2d 185) (1992).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996.

James D. Hobson, *pro se.*
*J. Tom Morgan, District Attorney, Barbara B. Conroy, Assistant District Attorney, Michael J. Bowers, Attorney General,* for appellee.

S96Y1096. IN THE MATTER OF RICHARD A. BRAMHALL, JR.
(469 SE2d 199)

PER CURIAM.

Richard A. Bramhall, Jr., filed a petition for voluntary suspension of his license pending final disposition of attorney disciplinary proceedings in the Commonwealth of Pennsylvania. The Respondent admitted that the temporary suspension of his license to practice law in the Commonwealth of Pennsylvania constituted a violation of Standard 67 of Georgia Bar Rule 4-102, and is ground for suspension in this State.

The State Bar of Georgia did not object to his petition and proposed suspension. The review panel unanimously agreed that the Respondent's petition should be accepted, and recommended that the Respondent be suspended from the practice of law in Georgia until he provides certification to this Court that the Supreme Court of Pennsylvania has authorized him to practice law without restrictions in the Commonwealth of Pennsylvania.

We accept the recommendation of the review panel. Accordingly, Richard A. Bramhall, Jr., is suspended from the practice of law in this state until he has provided this Court with the certification recom-

mended by the review panel. The Respondent is reminded of his duties under Bar Rule 4-219 (c) (1) and (2).

*Suspended. All the Justices concur.*

DECIDED APRIL 29, 1996.

*William P. Smith III, General Counsel State Bar, E. Duane Cooper, Assistant General Counsel State Bar,* for State Bar of Georgia.

*Robert H. Davis, Jr.,* for Bramhall.

S96A0082. LATTIMORE v. MEADOWS.
(468 SE2d 745)

FLETCHER, Presiding Justice.

Harry Hays Lattimore is the beneficiary of a substantial bequest under a 1991 codicil to the will of Carl Linton Meadows, Jr. Comer Varnedoe Meadows is the former wife of Carl Meadows. She sued the executor of Carl's will for specific performance of a contract to make a will, contending that the bequest to Lattimore contravened the terms of the Meadows' divorce decree. After Lattimore joined as a party, the trial court granted Comer Meadows' motion for summary judgment. Because the effect of Carl Meadows' divorce decree and will required him to leave his entire estate to Comer Meadows and the bequest to Lattimore contravened these terms, we affirm.

Carl and Comer divorced in 1983. The divorce decree required Carl to reaffirm his 1981 will in which he left his estate, except for a $1,000 bequest, to Comer. He complied with the decree when he executed his will in 1984. The decree also provided that Carl "shall not make any Will in contravention of the terms" of the 1981 will. In 1991, Carl executed a codicil bequeathing $100,000 to Lattimore. After Carl died in 1994 and his 1984 will and 1991 codicil were admitted to probate, Comer brought this action.

The unambiguous terms of the existing will left the entire estate to Comer, with the exception of a single $1,000 bequest. The divorce decree required Carl to reaffirm these terms and prohibited any contravention of these terms. Thus, the divorce decree operated as a contract to make a will that left Carl's entire estate, less $1,000, to Comer.[1] The large bequest to Lattimore was clearly an attempt to contravene the divorce decree and is a breach of the agreement to

---

[1] See *Jones v. Jones,* 231 Ga. 145 (200 SE2d 725) (1973).

make a will.[2]

This case is distinguishable from *Thorpe v. Thorpe*[3] because the divorce decree in that case did not require the husband to reaffirm his existing will, which excluded his illegitimate children, but only required him to execute a new will that treated all his children equally. Therefore, the subsequent will that excluded all children did not contravene the mandate of the divorce decree to treat all children equally.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED MAY 3, 1996.

*Zipperer & Lorberbaum, Alex L. Zipperer,* for appellant.
*Inglesby, Falligant, Horne, Courington & Nash, Kathleen Horne, Amy L. Copeland,* for appellee.

S96A0406, S96A0407. HIXON et al. v. WALKER COUNTY et al.
(468 SE2d 744)

CARLEY, Justice.

Appellants Lorrie and Jeffery Hixon applied for building permits and, although they ostensibly complied with all of the objective requirements of the then-applicable Walker County Land Regulations (Regulations), their applications nevertheless were denied by appellee Walker County Planning Director Ken York. The only authority cited for the denial of the applications was those sections of the Regulations which generally provided that the "Purpose" thereof was "[t]o protect the character and the social and economic stability of all parts of Walker County and to encourage the orderly and beneficial development of all parts of Walker County" and "[t]o protect and conserve the value of land throughout Walker County and the value of buildings and improvements upon the land and to minimize the conflicts among the uses of land and buildings." After the Hixons' appeal was denied by the Walker County Planning Commission, they brought this suit, seeking a writ of mandamus compelling the grant of their applications. The trial court denied the petition for mandamus and the Hixons appeal.

The "Purpose" sections appear only in the preamble of the Regu-

---

[2] Id. at 148.
[3] 260 Ga. 799 (400 SE2d 620) (1991).

lations and there is no cross-reference to those subsequent sections of the Regulations which address the substantive requirements for obtaining a building permit. See *Southern States Landfill v. City of Atlanta Bd. of Zoning Adjustment*, 261 Ga. 759, 760 (2) (410 SE2d 721) (1991). Compare *Suddeth v. Forsyth County*, 258 Ga. 773, 774 (2) (373 SE2d 746) (1988) (relating to substantive sections of a zoning ordinance). Moreover, those "Purpose" sections set forth only a statement of general goals and purposes, without providing any criteria to govern the consideration of an application for a building permit. *Dinsmore Dev. Co. v. Cherokee County*, 260 Ga. 727, 729 (1) (398 SE2d 539) (1991). See also *FSL Corp. v. Harrington*, 262 Ga. 725 (425 SE2d 276) (1993). Compare *Illusions On Peachtree St. v. Young*, 257 Ga. 142, 143 (1) (356 SE2d 510) (1987) (Municipal Code section held to contain "specific factors to be considered in effectuating the broad purpose of promoting the general health and welfare of the community").

The exercise of discretion in the issuance of licenses "must be tempered with 'ascertainable standards . . . by which an applicant can intelligently seek to qualify for a license. . . .' [Cit.]" *Arras v. Herrin*, 255 Ga. 11, 12 (334 SE2d 677) (1985). "[T]his preamble contain[s] no objective criteria upon which the [Planning Commission] could base its decision." *FSL Corp. v. Harrington*, supra at 726. Compare *Suddeth v. Forsyth County*, supra at 774 (2) (ordinance specifically providing for a discretionary balancing test). The "Purpose" sections of the Regulations "contain no standard to control the discretion of the [Planning Commission]. . . ." *Arras v. Herrin*, supra at 12.

It follows that the trial court erred in refusing to grant a writ of mandamus, since it would violate due process to rely upon the "Purpose" sections of the Regulations as a substantive basis for the denial of the Hixons' application for the building permits. *FSL Corp. v. Harrington*, supra; *Dinsmore Dev. Co. v. Cherokee County*, supra; *Arras v. Herrin*, supra.

*Judgment reversed. All the Justices concur.*

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED MAY 3, 1996.

*David G. Archer*, for appellants.
*Watson & Dana, Melissa D. Gifford, David D. Gottlieb*, for appellees.

## S96A0249. RAGLAND v. RAGLAND.
### (469 SE2d 658)

BENHAM, Chief Justice.

The parties to this appeal are both educators and are members of the same retirement system. The jury provided in the alimony portion of the verdict in the parties' divorce action that Mr. Ragland would pay Ms. Ragland a specified sum until he retired, at which time he would pay her one-half of his retirement benefits; that she would, when she retired, pay him one-half of her retirement benefits; and that both would choose the 50 percent survivor option available under their retirement system. The trial court's judgment required both parties to select the survivor option and to name the other as beneficiary. Mr. Ragland filed an application for discretionary appeal which this Court granted, posing the question, "Did the trial court err in ordering each party to name the other as a 50% survivor beneficiary to their respective retirement plans where the parties had not retired at the time of the divorce?" For the reasons set forth below, we conclude that the trial court did not err.

The contested provision of the judgment appears in a paragraph labeled neither alimony nor equitable division of property, and located between those two sections of the judgment. Mr. Ragland contends that the judgment was erroneous whether the requirement that each name the other as beneficiary under the 50 percent survivor option of their retirement plan is considered periodic alimony or equitable division of property. Because the period over which Mr. Ragland will continue to pay into the retirement plan is indefinite, bounded by his death or retirement, the award at issue here is clearly one of periodic alimony: "[W]here payments must be made for an indefinite period of time, thus making the actual amount to be paid indefinite, the obligation constitutes periodic alimony rather than an equitable division of property. [Cits.]" *Andrews v. Whitaker*, 265 Ga. 76 (3) (453 SE2d 735) (1995). We need not be concerned, therefore, with Mr. Ragland's arguments concerning equitable division of property.

As to periodic alimony, his argument is based on the proposition that the award is illegal because it requires payment of alimony after the death of the payor. He is correct that the death of the payor terminates the obligation to pay periodic alimony awarded in a contested divorce and alimony trial (*Foskey v. Foskey*, 257 Ga. 736 (2) (363 SE2d 547) (1988)), and that a trial court, without an agreement of the parties, cannot impose a duty on one party's estate to pay periodic alimony after the party's death. *Winstead v. Winstead*, 265 Ga. 690 (461 SE2d 538) (1995).

The flaw in Mr. Ragland's argument, however, is that the award in this case will not impose any duty on his estate after his death. Instead, it provides for Ms. Ragland's support after his death in the

same fashion that an annuity would. In *Andrews v. Whitaker,* supra, this Court recognized as periodic alimony a requirement that the payor spouse purchase an annuity for the payee spouse. There, the payments for the annuity would be for an indefinite period, and the payments from it would begin after the payor's death. Here, the contributions to the retirement plan will continue for an indefinite period, until Mr. Ragland retires or dies, and the payments pursuant to the election of the 50 percent survivor option will begin after Mr. Ragland's death. There is no reason to distinguish these two contractual methods of providing for a former spouse's support after the death of the payor former spouse.

We conclude, therefore, that the trial court's requirement that Mr. Ragland elect the 50 percent survivor option under the retirement plan in order to provide support to Ms. Ragland after Mr. Ragland's death is a valid award of periodic alimony.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 6, 1996.

*Kirby L. Turnage,* for appellant.
*John F. Lyndon,* for appellee.

## S96A0399. DOUGLAS v. COOK.
(469 SE2d 656)

HUNSTEIN, Justice.

Joyce Douglas f/k/a Joyce Cook and Randy Cook were divorced in June 1993. The parties' settlement agreement and an addendum thereto, which were incorporated into the divorce decree, provided, inter alia, that the parties would receive an equal share of the net proceeds from the sale of the marital home and property should Cook ever sell it; that Cook would pay Douglas a monthly installment of $200, due the first of each month for the seven-year period between August 1, 1995 and August 1, 2002; that the parties would share custody of the couple's two children; that Cook would be responsible for the children's health care; and that Douglas would have the right to claim the children as tax exemptions.

Five months later, Cook filed a petition to modify, seeking full custody of the children and alleging that a mutual mistake had been made in the settlement agreement and addendum. Cook also moved to have his alimony obligation terminated in light of Douglas' remarriage. After a hearing on the matter, the trial court entered an order which, in pertinent part, left the parties in joint custody of the children; granted Cook full ownership of the former marital residence;

held that Douglas' acquisition of $9,000 in personal property from Cook constituted "a full and final payment of any equity due" from the home; relieved Cook of any alimony obligation; made Douglas responsible for half of the children's health care; and allowed Cook to claim one child as a tax exemption. We granted Douglas' application to appeal from this order and reverse.

1. There was no limitation or contingency, such as remarriage or death, upon the provision for Cook's payment to Douglas of the monthly payment of $200 for a definite seven-year period. This monthly installment provision was clearly a lump sum alimony award, as opposed to periodic alimony, and thus did not terminate upon Douglas' remarriage. *Winokur v. Winokur*, 258 Ga. 88 (1) (365 SE2d 94) (1988). The trial court erred by relieving Cook from his responsibility to make these payments.

2. A trial court can reform a divorce decree based on mutual mistake in those limited instances where both parties agree completely as to what their intent was and that the settlement agreement incorporated into the decree failed to reflect that intent. *Park v. Park*, 233 Ga. 36 (209 SE2d 584) (1974); *Smith v. Smith*, 230 Ga. 238 (196 SE2d 437) (1973). Otherwise, the law is well settled that alimony and child support provisions in a divorce decree can be changed only through the procedures set forth in OCGA §§ 19-6-18 and 19-6-19 for the modification of a divorce decree. *Pearson v. Pearson*, 265 Ga. 100 (454 SE2d 124) (1995) (child support); *Lindwall v. Lindwall*, 242 Ga. 13 (3) (247 SE2d 752) (1978) (alimony). OCGA § 19-6-19 is not authority for the modification or revision of judgments for equitable division of property. *Holler v. Holler*, 257 Ga. 27 (354 SE2d 140) (1987).

In the instant case, the parties were in complete agreement that the monthly installment provision was intended to replace, rather than supplement, the provision granting Douglas an equal share in the proceeds from the sale of the martial residence and realty. Despite this stipulation, the trial court treated the monthly installment payment solely as periodic payment terminable upon remarriage (but see Division 1, supra), and held Douglas' acquisition of $9,000 in personalty from the home to be full payment for Douglas' equitable property interest in the realty. Reformation of the decree in this regard was error given the sharp dispute between the parties over the basis for Douglas' removal of the furniture from the home.[1] See *Park v. Park*, supra at 38 (reformation not proper where factual disputes exist); see generally *Prince v. Friedman*, 202 Ga. 136 (1) (42 SE2d 434) (1947). However, the trial court's ruling in this regard was harm-

---

[1] We note that the hearing transcript supports Douglas' claim that Cook failed to identify the personal property or establish how he arrived at the valuation of $9,000.

less, given the parties' stipulation that the monthly installment provision had replaced the provision regarding disposition of the equity in the marital residence.

3. The trial court also erred in its rulings regarding the change in tax exemptions and responsibility for health care. Modification of a decree in regard to child support payments requires satisfactory proof of a change in the income and financial status of either former spouse or in the needs of the child or children. OCGA § 19-6-19. A review of the hearing transcript reveals that Douglas disputed the need for any modification and that the sole evidence of change adduced by Cook was the fact of Douglas' remarriage. That evidence was not sufficient to support modification of the divorce decree provisions regarding these matters. See *Scherberger v. Scherberger*, 260 Ga. 635, 636 (1) (398 SE2d 363) (1990) (remarriage causes nothing more than "the possibility of an enhancement" of the party's financial condition, since "[n]ot all marriages result in enhanced economic status"). See also *Bagley v. Bagley*, 226 Ga. 742 (177 SE2d 255) (1970). To the extent the trial court's ruling may have been based upon a reformation of the contract, that ruling was error for the reason set forth in Division 2, supra.

*Judgment reversed. All the Justices concur.*

DECIDED MAY 6, 1996.

*Howard E. Yancey, Jr.*, for appellant.
*Charles R. Reddick*, for appellee.

S96A0442. SWAFFORD v. DADE COUNTY BOARD OF COMMISSIONERS.
(469 SE2d 666)

BENHAM, Chief Justice.

One year after Swafford's appointment as a member and chairman of the Dade County Board of Tax Assessors, the Dade County Board of Commissioners suspended him pending removal from office, then removed him for cause pursuant to OCGA § 48-5-295. A first removal resolution was withdrawn by consent because of defective notice, but after a second hearing, Swafford was removed. He contested the removal before the Board and appealed its decision to superior court, where it was affirmed. In granting his discretionary application for review of the superior court's order, this Court posed two questions: 1) Was the compliance with the discretionary appeal procedures necessary? See *Parsons v. Chatham County Bd. of Commrs.*, 204 Ga. App. 130 (1) (418 SE2d 459) (1992); 2) Did the superior court

err in affirming the decision of the Board of Commissioners?

1. Since it is incumbent on this Court to examine its own jurisdiction (*Collins v. AT & T*, 265 Ga. 37 (456 SE2d 50) (1995)), we address first the question of the route by which such appeals as this must come to this Court. In *Parsons*, supra, the Court of Appeals relied on this Court's decision in *Geron v. Calibre Cos.*, 250 Ga. 213 (1) (296 SE2d 602) (1982), for the proposition that judgments of trial courts reviewing decisions of a county board of commissioners may be appealed directly rather than by discretionary appeal. In *Geron*, this Court relied on *Kirton v. Biggers*, 135 Ga. App. 416 (3) (218 SE2d 113) (1975), for the proposition that a county board of commissioners is not an administrative agency. However, the final holding in that case was that "the scope and criteria of judicial review of such body's decisions is closely analogous to that of an 'agency.'" Id. at 419. While it is true that county boards of commissioners also function as legislative bodies, the function involved here, determining whether to remove from office a person appointed to that office by the board of commissioners, is the equivalent of the function of an administrative agency. That being so, we hold that appeals in cases such as this one require compliance with discretionary appeal procedures. OCGA § 5-6-35 (a) (1). To the extent they hold otherwise, *Geron* and *Parsons* are overruled.

2. Acknowledging that this Court has upheld OCGA § 48-5-295 against a due process challenge (*Kirton v. Biggers*, 232 Ga. 223 (1) (206 SE2d 33) (1974)), Swafford argues that the earlier case did not involve the issue he raises, which is whether he was denied due process because the body which brought his fitness for office into question was also the body which would decide that question. That, and his associated arguments that due process required that he be given a jury trial, and that the members of the Board of Commissioners were required to disqualify themselves because they had supposedly prejudged him, were sufficiently answered in *Hill v. Johnson*, 214 Ga. 417, 420 (105 SE2d 309) (1958):

> Whether or not the members of the board of aldermen have prejudged the petitioner's case, the legislature has designated such members as the proper forum for hearing the impeachment proceedings, and he is not denied due process of law by reason of the fact that the impeachment proceedings will be conducted by them.

3. Without citation of authority, Swafford asserts that the superior court's review on the record rather than de novo denies him due process. We disagree. "The fundamental idea of due process is notice and an opportunity to be heard. [Cit.] Due process neither guarantees

a right to appeal nor a particular form or method of state procedure. [Cit.]" *Nix v. Long Mt. Resources,* 262 Ga. 506 (3) (422 SE2d 195) (1992). The provision for the superior court to review the decision of the board of commissioners on the record is consistent with the nature of that body and its powers:

> The board of commissioners, as the appointing authority of the board of tax assessors, necessarily has a certain discretion as to the level of performance which it is willing to tolerate. As long as no abuse of such discretion is shown, this court should not substitute its findings of fact or construction of the evidence for that of the governmental body having appointing and removal powers.

*Kirton v. Biggers,* 135 Ga. App. 416 (3), supra. We hold, therefore, that the provision for review in the superior court on the record made before the Board of Commissioners is adequate to ensure due process.

4. Swafford's complaints about the partiality of the members of the Board of Commissioners and the county attorney, who acted as prosecutor, were waived by his failure to present them to the Board. " 'Generally, questions or objections which were not raised or urged in the original proceedings for review of a decision or order of a zoning official or board will not be considered on further review.' [Cit.]" *Hyman v. Pruitt,* 226 Ga. 625 (1) (176 SE2d 707) (1970).

5. Swafford contends here as he did in superior court that the notice he received was inadequate to inform him of the nature of the charges he faced. "Mere vagaries or generalities are insufficient, and the notice must be 'sufficiently specific and detailed to convey to the employee the substantial nature of the charge without requiring speculation on his part as to the precise complaint he must answer.' " *Hughes v. Russell,* 148 Ga. App. 143, 144 (251 SE2d 70) (1978). Applying that standard to the record of this case, we conclude that the notice was sufficient: as to each ground for removal, the notice provided to Swafford sufficient detail to identify the incident and persons involved and the wrongdoing alleged, including in several instances the statements of the persons involved.

6. Finally, Swafford asserts that the evidence presented to the Board of Commissioners was insufficient to warrant his removal. In considering this issue, we have reviewed the evidence presented to the board because "on appeal our duty is not to review whether the record supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency . . . . [Cits.]" *Emory Univ. v. Levitas,* 260 Ga. 894, 898 (401 SE2d 691) (1991). The record in this case is replete with evidence of Swafford's misconduct in office. Specifically, the record contains evi-

dence to support the following conclusions: that Swafford attempted to conduct certain Board of Tax Assessors business by a telephone poll rather than an openly conducted meeting; that he harassed a female tax assessor because he believes women should not be tax assessors and he wanted a man in her job; that he harassed taxpayers in an open meeting out of personal spite concerning an assessment of his property by a former employee; and that he behaved in a harassing manner to an employee during Board meetings and threatened to have her arrested for misconduct which was attributable to him, not her. We conclude that the evidence supported the Board's removal of Swafford.

*Judgment affirmed. All the Justices concur, except Carley, J., who concurs specially.*

CARLEY, Justice, concurring specially.

I fully concur in the judgment and in Divisions 2 through 6 of the majority opinion, dealing with the merits of the issues raised on appeal. I cannot, however, concur in Division 1 of the majority opinion holding that this case is subject to the discretionary appeal procedures of OCGA § 5-6-35 (a) (1). I find no justification for overruling *Geron v. Calibre Cos.*, 250 Ga. 213, 216 (1) (296 SE2d 602) (1982) and *Parsons v. Chatham County Bd. of Commrs.*, 204 Ga. App. 130 (1) (418 SE2d 459) (1992). Based on the logic and precedent of those decisions, it is clear that the judgment entered in this case is directly appealable.

OCGA § 5-6-35 (a) (1) requires applications for "[a]ppeals from decisions of the superior courts reviewing decisions of . . . local administrative agencies. . . ." The exclusive focus of this subsection is upon the nature of the entity which made the decision, and not upon the nature of the decision that was made. Nothing in OCGA § 5-6-35 (a) (1) requires an application to appeal because of the administrative nature of the decision or because, in rendering it, the entity functioned like an agency. According to the unambiguous terms of the statute, unless the decision was made by a local administrative agency, an application for appeal need not be filed. It is surely for this reason that, in *Geron v. Calibre Cos.*, supra, this Court did not cite *Kirton v. Biggers*, 135 Ga. App. 416, 419 (218 SE2d 113) (1975) for the proposition that a county commission's decision is closely analogous to that of an administrative agency, but for the decidedly different proposition that a county commission is not an administrative agency. Only the latter proposition is relevant to the question of whether OCGA § 5-6-35 (a) (1) requires an application to appeal from a decision of the superior court reviewing a decision of a county commission. Accordingly, in my opinion, this Court correctly held that a superior court's order on review of a county commission's decision is

directly appealable *even if* it can be said that the county commission's decision is administrative in nature. *Geron v. Calibre Cos.*, supra at 216 (1). See also *Parsons v. Chatham County Bd. of Commrs.*, supra at 130 (1) (also involving OCGA § 48-5-295 (b)).

*Trend Dev. Corp. v. Douglas County*, 259 Ga. 425 (1) (383 SE2d 123) (1989) is plainly distinguishable. In *Trend*, this Court did not overrule *Geron* but merely held that applications for discretionary appeal are necessary in zoning cases. Zoning cases have a unique character, often originating in a county administrative agency and even bypassing the county commission altogether on their way to judicial review by mandamus or otherwise. See *Southern States Landfill v. City of Atlanta Bd. of Zoning Adjustment*, 261 Ga. 759 (410 SE2d 721) (1991); *Shockley v. Fayette County*, 260 Ga. 489 (396 SE2d 883) (1990).

Therefore, I believe that *Geron* and *Parsons* are controlling and should not be overruled, and that Swafford was not required to file an application for discretionary appeal. I concur specially because Swafford did file a superfluous application which this Court granted and the majority has correctly affirmed the judgment of the superior court on the merits.

DECIDED MAY 6, 1996.

*Farrar & Farrar, Archibald A. Farrar, Jr., Christopher L. Corbin,* for appellant.

*Franklin & Franklin, Herbert E. Franklin, Jr.,* for appellee.

S96A0475. TROUP et al. v. LODEN.
(469 SE2d 664)

FLETCHER, Presiding Justice.

In 1974 Ida Maxwell Loden executed a warranty deed transferring land to her son, Thomas Edison Loden. Two other sons signed the deed as witnesses. In 1994 Betty Troup and other heirs of the witnessing sons sued Thomas to void the deed or establish a constructive trust based on a promise he allegedly made when the deed was executed to divide the property with his brothers after their mother's death. Ida Loden died in 1983, but Thomas Loden did not give his brothers any property before their deaths in 1985 and 1988. The trial court concluded that laches barred the plaintiffs' claims and granted summary judgment to Thomas. Because the claimants' inexcusable delay in seeking to enforce the agreement has rendered the ascertainment of the truth difficult, we affirm.

1. Courts of equity may impose an equitable bar to a complaint when the lapse of time and a claimant's neglect in asserting rights causes prejudice to the adverse party.[1] In determining whether laches should apply, courts consider the length of the delay, the sufficiency of the excuse, the loss of evidence on disputed matters, the opportunity for the claimant to have acted sooner, and whether the plaintiff or defendant possessed the property during the delay.[2] The defendant must show prejudice from the delay.[3]

The record shows that neither the brothers nor their heirs filed their claim until 20 years after the conveyance and 11 years after Ida Loden's death. During these years, Thomas Loden's legal ownership is undisputed: his name appeared as sole owner on the deed and he paid all of the property taxes and insurance. The claimants' fathers, the primary beneficiaries of the alleged agreement to divide the land, chose not to enforce that agreement during their life, although they survived Ida Loden by two years in one instance and five years in the other. In addition, the claimants declined to challenge Thomas' ownership during the proceedings connected with their grandmother's and fathers' estates or to assert any interest when he sold timber on the property. These delays have prejudiced Thomas Loden by forcing him to dispute claims based on conversations with persons who are now dead.

2. A trial court may grant summary judgment if the record shows that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Because laches is a factual defense, the better practice is for "the trial judge, sitting as a chancellor in equity, and without the intervention of a jury" to hold an evidentiary hearing and issue findings of fact rather than act on motions for summary judgment as a matter of law.[4] Although there was no evidentiary hearing in this case, the record was developed through depositions of all the parties and other relevant witnesses and shows that the claimants' long delay in seeking a property division is inexcusable and has rendered the ascertainment of the truth difficult. Accordingly, the trial court properly ruled that the affirmative defense of laches bars this action.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 6, 1996.

*McClure, Ramsay & Dickerson, John A. Dickerson, Elizabeth F.*

---

[1] See OCGA §§ 9-3-3; 23-1-25.
[2] *Johnson v. Sears*, 199 Ga. 432, 435 (34 SE2d 541) (1945).
[3] *Stone v. Williams*, 265 Ga. 480 (458 SE2d 343) (1995).
[4] *Beaulieu of America v. L. T. Dennard & Co.*, 253 Ga. 21, 22 (315 SE2d 889) (1984).

*Moore,* for appellants.

*Vandiver & Vandiver, S. Ernest Vandiver III, J. Barclay Black,* for appellee.

S96Y1038. IN THE MATTER OF LOURDES NEELY COLEMAN.
(472 SE2d 841)

PER CURIAM.

Lourdes Neely Coleman filed a petition for voluntary discipline instead of an answer under Bar Rule 4-212 (d). The State Bar opposed the original petition on the ground that it did not contain sufficient admissions of fact and conduct to authorize the imposition of discipline as required under Bar Rule 4-212 (d). The State Bar did not object to the Respondent's amended petition and the special master and the review panel recommended that the Respondent be suspended for six months for her conduct violating Standards 44 and 68 of Bar Rule 4-102, with full credit for the six months she was previously suspended under Bar Rule 4-204.3. This Court entered an order suspending the Respondent on May 3, 1995, and an order of reinstatement on November 8, 1995. We agree with the review panel's recommendation. Accordingly, Lourdes Neely Coleman is suspended from the practice of law in Georgia for six months, with full credit given for the six months she was suspended under Bar Rule 4-204.3 (d).

*Suspended. All the Justices concur.*

DECIDED MAY 6, 1996.

*William P. Smith III, General Counsel State Bar, Jenny K. Mittelman, Assistant General Counsel State Bar,* for State Bar of Georgia.

S95Y0168. IN THE MATTER OF JACK O. MORSE.
(470 SE2d 232)

PER CURIAM.

This Court previously held that Jack O. Morse violated Standards 4, 22 (b), and 45 of State Bar Rule 4-102 and remanded to the review panel of the State Disciplinary Board for a recommended pun-

ishment.[1] By a divided vote, the review panel recommended that Morse receive a public reprimand. Since Morse has exhibited a pattern of repeated disregard of the disciplinary standards, we reject that recommendation and order his suspension from the practice of law in Georgia.

Like the review panel, we look to the American Bar Association's standards for guidance in determining the appropriate sanction to impose.[2] Among the factors to consider are the duty violated, the lawyer's mental state, the injury caused by the lawyer's misconduct, and the existence of aggravating and mitigating factors.

In the first disciplinary action, Morse violated Standard 22 (b) by failing to return his client's papers for ten months and attaching an attorney's lien to her claim without providing documentary support. He did not release the file or lien until the client filed a grievance with the State Bar. His actions violated his duty to his client to act diligently and his duty to the legal profession to properly withdraw from representation. The review panel concluded that Morse acted intentionally. His actions forced another attorney to reconstruct the client's file and caused a substantial delay in his former client's receipt of settlement proceeds.

In the second action, Morse violated Standard 4 when he asked a client to sign an agreement settling a workers' compensation claim without explaining the legal effect of the agreement and violated Standard 45 (b) by knowingly making a false statement that he had witnessed the signing of a settlement agreement when the client, in fact, never signed the agreement. These actions violated Morse's duty as a lawyer to the legal system, although the review panel found no evidence of intentional misconduct or harm to the client.

We find that the key factor in determining the appropriate punishment in these two actions is the aggravating factor of Morse's prior disciplinary offenses. In 1993, Morse received review panel reprimands for failing to respond to the investigative panel concerning allegations in two separate matters and for using runners to solicit clients and sharing legal fees with non-lawyers in a third action. Although his infractions here differ, they do demonstrate a general pattern of disregard towards the profession's standards of conduct.

Originally, this Court ordered a six-month suspension, which was consistent with the discipline imposed in other disciplinary proceedings for similar misconduct.[3] In his motion for reconsideration, Morse

---

[1] *In the Matter of Morse*, 265 Ga. 353 (456 SE2d 52) (1995).

[2] ABA Standards for Imposing Lawyer Sanctions (1991 ed.).

[3] See, e.g., *In the Matter of Corn*, 252 Ga. 37 (311 SE2d 447) (1984) (six-month suspension for refusing to perform necessary work to obtain client's divorce and to return client's papers); see also *In the Matter of Collins*, 261 Ga. 802 (411 SE2d 711) (1992) (one-year

outlines mitigating circumstances based on the suicide of his former partner around the time of the events that led to the current disciplinary actions. Because of this mitigating factor, we reduce Morse's suspension from the practice of law in Georgia to 90 days. We remind Morse of his obligations under Rule 4-219 (c) during his period of suspension.

*Suspended. All the Justices concur.*

DECIDED MAY 7, 1996.

*William P. Smith III, General Counsel State Bar, Cynthia C. Hinrichs, Assistant General Counsel State Bar,* for State Bar of Georgia.
*James E. Spence, Jr.,* for Morse.

S95Y1340. IN THE MATTER OF PAUL DAVID WILEY.
(468 SE2d 386)

PER CURIAM.

The Investigative Panel of the State Disciplinary Board filed a notice of discipline recommending the disbarment of Paul David Wiley. The investigative panel found that Wiley violated Standards 4, 21, 22, 23, 44, 45, 61, 63, 65, and 68 of Bar Rule 4-102 (d) based on his acceptance of a fee to represent a client on a driving under the influence charge. He has been suspended since August 1994 for failing to respond to the State Bar's notice of investigation.

Although properly served by publication, Wiley has also failed to respond to the notice of discipline. Since he did not reject the proposed discipline as provided in Bar Rule 4-208.3 (a) and disbarment is an appropriate sanction for his violations, we adopt the Investigative Panel's recommendation. Accordingly, we order that Paul David Wiley be disbarred from the practice of law in the State of Georgia and his name be removed from the roll of individuals licensed to practice in this state.

*Disbarred. All the Justices concur.*

---

suspension for abandoning a legal matter, refusing to return the client's file, and failing to take reasonable steps to avoid prejudice to client's rights); *In the Matter of Collins,* 261 Ga. 622 (409 SE2d 662) (1991) (six-month suspension for failing to appear at bankruptcy hearing, notify client of court's dismissal of action, and return attorney fees or client's papers).

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED MAY 10, 1996.

*William P. Smith III, General Counsel State Bar, E. Duane Cooper, Assistant General Counsel State Bar,* for State Bar of Georgia.

S96A0083. KING v. HAWKINS.
(469 SE2d 30)

HUNSTEIN, Justice.

Jerome Oncel Hawkins pled guilty to one count of possession with intent to distribute cocaine in March 1992 and received a life sentence.[1] Hawkins filed a petition for writ of habeas corpus in March 1993, which was granted based upon a finding that there was no factual basis for the guilty plea in the record. This Court subsequently remanded the case to the habeas court for the purpose, inter alia, of allowing Warden King time to respond to the issues raised by Hawkins. *King v. Hawkins,* 265 Ga. 93 (454 SE2d 135) (1995). On remand, the habeas court again granted Hawkins habeas corpus relief, setting aside his guilty plea and vacating his life sentence. Because the habeas court erred by ruling that the record before the trial court did not demonstrate a factual basis for Hawkins' guilty plea, we reverse.

Before a trial court can enter a judgment on a guilty plea, the court is required by Uniform Superior Court Rule 33.9 to make "such inquiry on the record as may satisfy him that there is a factual basis for the plea." See *State v. Evans,* 265 Ga. 332 (1) (454 SE2d 468) (1995) (held: USCR 33.9 is mandatory). In the instant case, the habeas court, after reviewing the evidence on the record of the guilty plea hearing,[2] found that the evidence adduced did not establish a factual basis for the plea, stressing testimony by the guilty plea prosecutor during the habeas hearing that the facts the prosecutor had recited to the trial judge at the guilty plea hearing "were not enough evidence to prove guilt beyond a reasonable doubt."

The purpose of USCR 33.9 is to protect against someone

---

[1] The record does not reflect whether Hawkins filed a direct appeal from the judgment entered on his guilty plea.

[2] The transcript of the guilty plea hearing reflects that the prosecutor informed the trial judge that Hawkins was charged with possession of cocaine with intent to distribute; that Hawkins "was caught going out to the jail and approaching the exercise yard back in the back"; that police officers "who knew [Hawkins] got suspicious and went out and checked him out"; and that the officers found "cocaine and some bills in his pocket."

pleading guilty when that person may know what he has done but may not know that those acts do not constitute the crime with which he is charged. [Cit.] USCR 33.9 provides this protection by requiring a trial court to subjectively satisfy itself that there is a factual basis for the plea. [Cit.] . . . [USCR 33.9] requires nothing more than that the trial court make itself aware of the factual basis of the plea. [Cit.]

*State v. Evans*, supra at 334 (2).

The habeas court here, by measuring the evidence adduced at the guilty plea hearing against a "beyond a reasonable doubt" standard, required considerably more than what is mandated by USCR 33.9. A trial court need not make itself aware of evidence establishing the pleader's guilt beyond a reasonable doubt in order to satisfy itself subjectively that the pleader knows both what he has done and that those acts constitute the crime with which he is charged.

Our review of the record in the guilty plea hearing reveals that the State presented a sufficient factual basis to comply with USCR 33.9. We, therefore, reverse the habeas court's grant of Hawkins' petition for writ of habeas corpus.[3]

*Judgment reversed. All the Justices concur, except Thompson, J., who concurs in the judgment only.*

DECIDED APRIL 15, 1996 —
RECONSIDERATION DENIED MAY 10, 1996.

*Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Rachelle L. Strausner, Paige R. Whitaker, Assistant Attorneys General,* for appellant.
*Adams & Jordan, D. James Jordan,* for appellee.

---

[3] Our review of the habeas court's order establishes no other ground to support grant of the writ, in that contrary to the habeas court's findings, the guilty plea transcript does reflect that Hawkins understood his constitutional rights and that he acknowledged the only available sentence was life imprisonment, thereby demonstrating his understanding of the consequences of his guilty plea.

S96A0160, S96X0162. ATLANTA INDEPENDENT SCHOOL
SYSTEM et al. v. LANE; and vice versa.
S96A0163. ATLANTA INDEPENDENT SCHOOL SYSTEM et al.
v. CITY OF ATLANTA.
(469 SE2d 22)

CARLEY, Justice.

The City of Atlanta (City) and the Atlanta Independent School
System (System) entered into an "Agreement For Sharing Revenue,"
whereby the System received an amount equal to 30 percent of the
City's local option sales tax receipts. Mr. William Lane, in his capac-
ity as a city resident and taxpayer, brought suit challenging the valid-
ity of this agreement and also seeking mandamus relief as to the re-
payment of amounts previously paid thereunder. The City filed its
own suit challenging the validity of its agreement with the System.
The suits were consolidated and the trial court held that the agree-
ment was violative of the Georgia Constitution. However, the trial
court denied mandamus relief as to the issue of repayment. It is from
this order of the trial court that the System appeals against the City
and Lane and that Lane cross-appeals against the City and the Sys-
tem.

*Case Nos. S96A0160 and S96A0163*

1. Relying upon *Kelly v. City of Atlanta*, 217 Ga. App. 365, 366
(1) (457 SE2d 675) (1995), the System urges that it has a viable res
judicata or estoppel by judgment defense to Lane's and the City's
claim that the agreement is violative of the Georgia Constitution.

With regard to constitutional issues, this Court has exclusive ju-
risdiction over all cases involving construction of the Constitution of
the State of Georgia and of the United States and all cases in which
the constitutionality of a law, ordinance, or constitutional provision
has been called into question. Art. VI, Sec. VI, Par. II (1) of the Geor-
gia Constitution. The appeal in *Kelly* was filed in this Court, but was
transferred to the Court of Appeals. That transfer merely represents
this Court's determination that *Kelly* was not a case involving a con-
stitutional issue over which we had exclusive jurisdiction.

There are a number of reasons why a case can fail to come within
this Court's exclusive jurisdiction under Art. VI, Sec. VI, Par. II (1) of
our state constitution. The constitutional issue that is raised on ap-
peal may not be one which is within our exclusive jurisdiction. Unless
the issue raised on appeal relates either to the constitutional con-
struction or to the constitutionality of a law, ordinance or constitu-
tional provision, jurisdiction is in the Court of Appeals. Art. VI, Sec.
V, Par. III of the Georgia Constitution. Although the constitutional
issue raised on appeal may be one which otherwise would be within

our exclusive jurisdiction, that constitutional issue may already have been resolved by this Court. *Phillips v. State*, 229 Ga. 313 (191 SE2d 61) (1972). Also, this Court does not have exclusive appellate jurisdiction over a case where the constitutional issue asserted on appeal has not been raised in and ruled upon by the trial court. *Senase v. State*, 258 Ga. 592 (372 SE2d 813) (1988).

There may be other reasons why a case fails to come within this Court's exclusive jurisdiction and must be transferred to the Court of Appeals. Therefore, any decision which holds that such a transfer represents this Court's determination that no constitutional issue in the case has merit is erroneous and is hereby overruled. See, e.g., *Kelly v. City of Atlanta*, supra at 366 (1); *Ryals v. State*, 215 Ga. App. 51, 52 (1) (449 SE2d 865) (1994); *Threatt v. State*, 211 Ga. App. 630 (1) (440 SE2d 61) (1994); *Nash v. State*, 179 Ga. App. 702, 703 (3) (347 SE2d 651) (1986); *George v. State*, 175 Ga. App. 229 (1) (333 SE2d 141) (1985). If this Court has exclusive jurisdiction over a case pursuant to Art. VI, Sec. VI, Par. II (1) of the Georgia Constitution, we will not transfer that case, but will issue a decision addressing the merits of the constitutional issues raised therein. However, the appeal in *Kelly* was transferred because the trial court had made no ruling on any constitutional issue. *Kelly*, supra at 366 (1). It follows that *Kelly* does not constitute authority on the issue of whether the trial court correctly held that the agreement between the City and the System is violative of the Georgia Constitution.

2. Article VIII, Sec. VI, Par. I (a) of the Georgia Constitution provides for the financing of this state's school systems through the levying of local ad valorem taxes which are not to exceed a 20-mill rate. The predecessor to this constitutional provision was construed as establishing an exclusive financing method, such that school systems subject to its mandate were prohibited from receiving funds from any local tax source other than such ad valorem taxes as were raised in accordance therewith. *City of Lithonia v. DeKalb County Bd. of Ed.*, 231 Ga. 150, 153 (200 SE2d 698) (1973). The framers of Art. VIII, Sec. VI, Par. I (a) are presumed to be aware of the interpretation which this Court placed upon the predecessor provision. *McKnight v. City of Decatur*, 200 Ga. 611, 616 (2) (37 SE2d 915) (1946). Art. VIII, Sec. VI, Par. I (a) materially differs from its predecessor only in that its mandate now broadly extends to "each school system" in this state. It is an established rule of constitutional construction that, where a provision has received a settled judicial interpretation and is then incorporated into a new constitution, it will be presumed to have been retained with the knowledge of the previous construction and the courts will be bound to adhere thereto. *Thompson v. Talmadge*, 201 Ga. 867, 885 (2) (41 SE2d 883) (1947). It follows that Art. VIII, Sec. VI, Par. I (a) establishes an exclusive financing

method, such that "each school system" in this state is prohibited from receiving funds from any local tax source other than such ad valorem taxes as were raised in accordance therewith.

Whether the System qualifies for the exemption from the 20-mill cap on ad valorem taxation authorized by Art. VIII, Sec. VI, Par. I (c) is immaterial here. Compare *Bd. of Public Ed. &c. For Bibb County v. Zimmerman*, 231 Ga. 562 (203 SE2d 178) (1974); *Ingram v. Payton*, 222 Ga. 503 (150 SE2d 825) (1966). Art. VIII, Sec. VI, Par. I (a) limits the System to ad valorem taxes levied in accordance therewith as its exclusive local tax revenue source, regardless of whether, in determining the amount of its revenue from that exclusive source, the System may be limited to a 20-mill rate. The System's reliance upon *Featherstone v. Norman*, 170 Ga. 370 (153 SE 58) (1930) and *Green & Milam v. State Revenue Comm.*, 188 Ga. 442 (4 SE2d 144) (1939) as authority for a contrary holding is misplaced. Those cases deal with the issue of the constitutionality of the state income tax statute and do not involve the construction of Art. VIII, Sec. VI, Par. I (a).

3. The System urges that the agreement does not violate Art. VIII, Sec. VI, Par. I (a) because it requires only the payment of an amount equal to 30 percent of the City's local option sales tax receipts, rather than the direct payment of that portion of the actual tax receipts. However, this distinction is immaterial. What is controlling is that the agreement is for the City's payment and the System's receipt of funds from a local tax source other than ad valorem taxes raised in accordance with Art. VIII, Sec. VI, Par. I (a). In order to comply with the agreement and at the same time meet its budget, the City would be required to encroach upon funds derived from other tax sources by an amount equal to the sums paid over to the System "and would thus be doing by indirection the very thing the Constitution in Art. VIII, Sec. [VI], Par. I [(a)] forbids to be done directly." *Harrison v. May*, 228 Ga. 684, 687 (187 SE2d 673) (1972).

4. The System urges that the agreement must nevertheless be upheld as an inter-governmental agreement authorized by Art. IX, Sec. III, Par. I (a) of the Georgia Constitution. Under that constitutional provision, a valid inter-governmental agreement "must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." By law, the City may be authorized to expend its tax receipts for educational purposes. As previously discussed, however, the System is constitutionally precluded from financing its support and maintenance of education from a local tax revenue source other than ad valorem taxes raised in accordance with Art. VIII, Sec. VI, Par. I (a). Compare *Youngblood v. State of Ga.*, 259 Ga. 864 (388 SE2d 671) (1990); *Nations v. Downtown Dev. Auth. of the City of Atlanta*, 256 Ga. 158 (345 SE2d 581) (1986). It follows that the agreement for the City's payment and the

System's receipt of funds from a local tax revenue source other than ad valorem taxes raised in accordance with that constitutional provision cannot be upheld as a valid inter-governmental agreement.

5. The System's remaining enumeration of error is moot and need not be addressed.

### Case No. S96X0162

6. Lane urges that the trial court erred in denying the mandamus relief that he sought against the System. However, mandamus relief applies prospectively only. It will not lie to compel the undoing of acts already done and this is so even though the action taken was clearly illegal. *Hilton Constr. Co. v. Rockdale County Bd. of Ed.*, 245 Ga. 533, 540 (4) (266 SE2d 157) (1980). It follows that the trial court did not err in refusing to grant mandamus compelling the System to pay back the funds it previously received under the agreement with the City.

7. Lane further urges that he is entitled to mandamus relief against the City, compelling the City to bring suit against the System. In such a suit, however, the City would be seeking reimbursement for its past contractual payments, rather than attempting to recover for its provision of past services. Compare *Screws v. City of Atlanta*, 189 Ga. 839 (8 SE2d 16) (1940). Voluntary payments are, as a general rule, not recoverable. OCGA § 13-1-13. Moreover, the City's contractual payments were expended for the public benefit of educating the City's children. Compare *Nelson v. Wainwright*, 224 Ga. 693 (164 SE2d 147) (1968). Any judgment that the City might recover in such a suit presumably would have to be satisfied by local ad valorem taxes raised in accordance with Art. VIII, Sec. VI, Par. I (a) and, that being the case, Lane and the other taxpayers whom he represents would not be benefited. Any benefit that they might gain in their general capacities as municipal taxpayers would be offset by the comparable loss that they would suffer in their specific capacities as municipal school taxpayers.

Mandamus should be denied "when it would prove unavailing, and when no result [would] be accomplished, or the status changed by its issuance. [Cit.]" *Smith v. Hodgson*, 129 Ga. 494, 497 (59 SE 272) (1907). "[E]xcept in a case of clear legal right, the writ of mandamus [is] a discretionary remedy." *Savannah &c. Canal Co. v. Shuman*, 91 Ga. 400, 402 (3) (17 SE 937) (1893). Since the City's suit against the System would probably prove to be ineffectual and, even if the City did prevail, its taxpayers would not benefit, it was not an abuse of discretion to deny Lane's mandamus claim against the City.

*Judgments affirmed. All the Justices concur.*

DECIDED APRIL 8, 1996 —
RECONSIDERATION DENIED MAY 10, 1996.

*Bondurant, Mixson & Elmore, Emmet J. Bondurant II, Jane E. Fahey, Paul H. Schwartz, Amy M. Totenberg, Holland & Knight, Joseph D. Young,* for Atlanta Independent School System.

*Clifford E. Hardwick IV, Joe M. Harris, Joiava Thomas, M. Hakim Hilliard,* for City of Atlanta.

*Proctor, Felton & Atkinson, Robert J. Proctor, Jule W. Felton, Jr., Joseph L. Kelly,* for Lane.

*Heard, Leverett, Phelps, Weaver & Campbell, E. Freeman Leverett,* amicus curiae.

## S94Y1856. IN THE MATTER OF JOANNE RAY CLARKE.
### (470 SE2d 233)

PER CURIAM.

After conducting an investigation into a grievance filed against Joanne Ray Clarke by former clients, the Investigative Panel of the State Disciplinary Board found probable cause to believe that Clarke had violated Standards 4 (engaging in professional conduct involving fraud, dishonesty, etc.), 21, 22 and 23 (failing to follow requirements for withdrawing from employment), 44 (abandoning a legal matter), 45 (knowingly engaging in illegal conduct contrary to a disciplinary rule), 61 (failing to promptly notify client of receipt of funds), 63 (failing to maintain complete records of all funds of a client coming into her possession and promptly rendering appropriate accounts to the client regarding such funds), 65 (commingling personal and client funds), and 68 (failing to respond to disciplinary authorities) of Rule 4-102 of the Rules of the State Bar of Georgia. Clarke is currently suspended from the practice of law following the grant of a petition for interim suspension. *In the Matter of Joanne Ray Clarke,* S94Y1473, July 21, 1994.

The grievance filed with the State Bar by the disgruntled clients stated that Clarke's office in Blakely, Georgia, had been closed, and informed the State Bar of Tallahassee, Florida, the address of Clarke's son, at which the complainants had last corresponded with Clarke. In their grievance, the complainants also reported that Clarke had been involuntarily committed to a state mental facility during her representation of them. Acting pursuant to State Bar Rule 4-208.1, the Investigative Panel filed a Notice of Discipline recommending that Clarke be disbarred. The State Bar attempted to serve a copy of the Notice of Discipline on Clarke by mailing a copy via

certified mail, return receipt requested, to the Blakely post office box Clarke had listed as her address with the State Bar, as well as to the Florida address provided by the complainants in their grievance. The Bar achieved service by publication after the certified mail to the Blakely post office box was returned to the State Bar with the notation that Clarke had moved and left no forwarding address. The record contains no information concerning the certified mailing to the Florida address. The Investigative Panel determined that the Office of General Counsel exercised reasonable diligence in attempting to ascertain the whereabouts of Clarke before resorting to notice by publication. See *Robinson v. Robinson*, 260 Ga. 731 (399 SE2d 64) (1991).

A Notice of Discipline recommending Clarke's disbarment was issued after the Investigative Panel considered Clarke's current suspension from the practice of law; her abandonment of her clients, causing them substantial and irreparable harm; and her failure to respond to the Office of General Counsel or the Investigative Panel during the course of the investigation. Having reviewed the record, it is hereby ordered that Joanne Ray Clarke be disbarred from the practice of law and her name removed from the roll of those individuals licensed to practice law in Georgia. *In the Matter of Carter*, 263 Ga. 483 (436 SE2d 226) (1993); *In the Matter of Frazier*, 258 Ga. 799 (374 SE2d 736) (1989). Respondent is reminded of her duties under Bar Rule 4-219 (c) to timely notify all clients of her inability to represent them, to take all actions necessary to protect the interests of her clients, and to certify to this Court that she has satisfied the requirements of such rule.

*Disbarred. All the Justices concur.*

DECIDED MAY 13, 1996.

*William P. Smith III, General Counsel State Bar, Steven J. Kaczkowski, Assistant General Counsel State Bar*, for State Bar of Georgia.

S96A0157. HOOD v. THE STATE.
(470 SE2d 235)

FLETCHER, Presiding Justice.

A jury convicted Benny Hood of malice and felony murder in the shooting death of Brian Cobb.[1] Hood appeals contending that he was

---

[1] The crime occurred January 30, 1994. Hood was indicted on July 1, 1994. The jury returned its guilty verdicts on December 15, 1994. The trial court merged the felony and

prejudiced by the presence of the victim's grandmother in the courtroom prior to her testimony. Because there was no harm and no objection to the violation of the rule of sequestration, we affirm.

The evidence at trial showed that on Superbowl Sunday, January 30, 1994, Benne Copeland drove Cedric Penson, Dexter Sistrunk, and the victim Brian Cobb to Benny Hood's house. Copeland went to get Hood, and when the two returned to the others waiting in the car, Hood led the group to a wooded area under the guise of showing them a place to buy marijuana. Once in the wooded area, Copeland got a gun from Penson and shot the victim.[2] Hood later boasted to other friends about his role in the murder. Penson and Sistrunk testified against Hood.

1. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Hood guilty of the crimes charged beyond a reasonable doubt.[3]

2. The state called the victim's grandmother as the fourth witness. She testified that she had been in the courtroom and heard the preceding witnesses. Hood contends that the court erred in not enforcing the rule of sequestration and that he was harmed. A review of the record, however, does not support a finding of harm. Additionally, Hood failed to object to her testifying and, therefore, failed to preserve this issue for appeal.[4]

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 13, 1996.

*Hurl R. Taylor, Jr.,* for appellant.

*Lewis R. Slaton, District Attorney, Leonora Grant, Anita T. Wallace, Assistant District Attorneys, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

---

malice murder counts and sentenced Hood to life imprisonment. Hood filed a motion for new trial on December 19, 1994 and amended it on May 22, 1995 and June 7, 1995. The trial court denied the motion on June 29, 1995. Hood filed a notice of appeal on July 26, 1995; the case was docketed in this Court on October 25, 1995 and oral argument held on January 9, 1996.

[2] We affirmed Copeland's conviction for malice murder. *Copeland v. State,* 266 Ga. 664 (469 SE2d 672) (1996).

[3] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] See *Earnest v. State,* 262 Ga. 494, 495 (422 SE2d 188) (1992).

## S96A0232. COPELAND v. THE STATE.

(469 SE2d 672)

FLETCHER, Presiding Justice.

A jury convicted Benne Copeland of malice and felony murder in the shooting death of Brian Cobb.[1] Copeland appeals contending that the admission of hearsay statements of a co-defendant violated his right of confrontation under the United States Constitution. Because there were sufficient indicia of reliability of the statements, we affirm.

The evidence at trial showed that on Superbowl Sunday, January 30, 1994, Copeland, who owned a blue Cadillac, picked up the victim Brian Cobb at his house. Cobb's grandmother saw him leave with someone driving a blue Cadillac like the one Copeland drove. The two then picked up Cedric Penson and Dexter Sistrunk and drove to Benny Hood's house.[2] Copeland went to get Hood, and when the two returned to the others waiting in the car, Hood led the group to a wooded area under the guise of showing them a place to buy marijuana. Once in the wooded area, Copeland got a gun from Penson and shot the victim twice. Penson and Sistrunk testified against Copeland.

1. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Copeland guilty of the crimes charged beyond a reasonable doubt.[3]

2. Corey Thompson and Denard Bell came forward as a result of posters advertising a reward by the victim's family. Thompson testified that Hood told him that he had been involved in the murder of Cobb. Bell testified that Hood told him that he and Copeland had killed someone and that Copeland was the trigger man. Copeland first contends that there was insufficient evidence independent of the statements of Hood and Penson, the two other co-conspirators, to prove the existence of a conspiracy.

(a) We have previously held that the state must make a prima facie showing of the existence of the conspiracy without resort to the declarations of the alleged co-conspirator in order to admit such declarations under the co-conspirator exception to the hearsay rule.[4] Here, the state did not rely principally on the out-of-court declara-

---

[1] The crime occurred January 30, 1994. Copeland was indicted on July 1, 1994. The jury returned its guilty verdicts on December 15, 1994. The trial court merged the felony and malice murder counts and sentenced Copeland to life imprisonment. Copeland filed a motion for new trial on January 4, 1995, which was denied on June 7, 1995. Copeland filed a notice of appeal on June 22, 1995; the case was docketed in this Court on November 7, 1995 and submitted for decision without oral argument on January 2, 1996.

[2] We affirmed Hood's conviction for malice murder. *Hood v. State*, 266 Ga. 662 (470 SE2d 235) (1996).

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] *Castell v. State*, 250 Ga. 776, 778 (301 SE2d 234) (1983).

tions of Hood to establish the conspiracy. Rather, the state called Penson, who testified that he, Copeland and Hood planned the murder together as retribution for Cobb's theft of a gun that Penson had loaned to Copeland. The existence of the conspiracy is ultimately a jury question. Penson's testimony, however, was sufficient to make a prima facie showing of the conspiracy to admit the declarations of Hood under OCGA § 24-3-5.

(b) Second, Copeland contends that admission of Hood's out-of-court statements under Georgia's co-conspirator hearsay statute, OCGA § 24-3-5,[5] violated Copeland's right of confrontation. Georgia allows the admission of declarations made by a co-conspirator during the pendency or concealment phases of the criminal activity against the other co-conspirators.[6] Because admitting statements during the concealment phase differs from the common-law rule, the United States Supreme Court has noted that evidence admitted under this exception requires a case-by-case evaluation of the hearsay for indicia of reliability.[7] In *Dutton v. Evans*,[8] the court recognized four factors that are indicia of reliability: (1) the absence of an express assertion about a past fact; (2) the declarant had personal knowledge of the identity and roles of the participants in the crime and cross-examination of the declarant would not have shown that the declarant was unlikely to know whether the defendant was involved in the crime; (3) the possibility that the declarant's statement was founded on faulty recollection was remote; and (4) the circumstances under which the declarant gave the statement suggest that the declarant did not misrepresent the defendant's involvement in the crime.[9] We have previously used these factors to determine if a co-conspirator's hearsay statement was properly admitted.[10]

Applying these factors to the facts of the present case, we conclude that only the first weighs against reliability in that the statement that Copeland and Hood killed someone and that Copeland was the shooter was clearly an assertion of a past fact and leaves nothing for the jury to infer.

The other factors, however, weigh in favor of reliability. The evidence established that the declarant, Hood, had personal knowledge of the identities and roles of the participants because two other par-

---

[5] That section provides, that "[a]fter the fact of conspiracy is proved, the declarations by one of the conspirators during the pendency of the criminal project shall be admissible against all."

[6] OCGA § 24-3-5; see also *Chatterton v. State*, 221 Ga. 424 (144 SE2d 726) (1965).

[7] *Bourjaily v. United States*, 483 U. S. 171, 183 (107 SC 2775, 97 LE2d 144) (1987).

[8] 400 U. S. 74, 88-89 (91 SC 210, 27 LE2d 213) (1970) (plurality opinion).

[9] Id. at 88-89.

[10] *Castell v. State*, 250 Ga. at 779-780. See also *Mooney v. State*, 243 Ga. 373, 390 (254 SE2d 337) (1979).

ticipants in the crime, Penson and Sistrunk, each established by their testimony that Hood had personal knowledge of the crime and its participants. Additionally, cross-examination of Hood would not have shown that he lacked knowledge of Copeland's involvement because the statement included Hood's admission of his own participation.

Looking to the third factor, we conclude that the possibility that Hood's statement was based on faulty recollection is remote. Because Hood's statement was a direct allegation about a murder and not a statement of routine events, it is unlikely that he had forgotten the critical details of the murder.

Finally, the circumstances surrounding the statement do not suggest that Hood misrepresented Copeland's involvement in the crime. Hood's statement was strongly against his own penal interest, since he admitted his part in the conspiracy to murder Cobb.[11] Thus, this factor weighs in favor of reliability.

Upon consideration of all these factors, we conclude that sufficient indicia of reliability existed to afford the jury a satisfactory basis for evaluating the truth of Hood's statement.[12] Copeland argues that the statement is not reliable because Bell and Thompson came forward as a result of a reward offer and because of the inconsistencies in their stories. These arguments miss the mark, however, because they focus on the credibility of Bell and Thompson. Copeland strongly attacked their credibility on cross-examination. In analyzing the reliability of a co-conspirator's statements, courts must focus on the *declarant's* statement and its surrounding circumstances, not the trustworthiness of the witness' testimony.[13]

3. Copeland also contends that admission of Hood's out-of-court statements through the testimony of Bell, Thompson and Penson was error under *Bruton v. United States*,[14] which prohibits the admission of the confession of a non-testifying co-defendant against the defendant in a joint trial.

(a) Hood's statements to Bell and Thompson were made shortly after the crime, prior to arrest, and were non-custodial statements to acquaintances. Therefore, the statements are more appropriately considered declarations of a co-conspirator, rather than confessions, and must be analyzed as in Division 2 above.[15]

(b) Penson testified on cross-examination that a detective told him that Hood had made a statement to police implicating Copeland.

---

[11] Compare *Horton v. Zant*, 941 F2d 1449, 1465 (11th Cir. 1991) (declarant's statement denied his own participation in the murder, blaming it all on his co-conspirator).

[12] *Dutton*, 400 U. S. at 89.

[13] *Castell*, 250 Ga. at 779-780.

[14] 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

[15] *Brown v. State*, 262 Ga. 223, 225 (416 SE2d 508) (1992).

To the extent that this reference to Hood's statement to police rises to a *Bruton* violation, it was not harmful because it was cumulative of Penson's testimony on direct that he saw Copeland shoot Cobb.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 13, 1996.

*Tony L. Axam*, for appellant.

*Lewis R. Slaton, District Attorney, Leonora Grant, Anita T. Wallace, Assistant District Attorneys, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General*, for appellee.

## S96A0301. BRANNON v. THE STATE.
(469 SE2d 676)

BENHAM, Chief Justice.

Sheila Brannon appeals from her conviction for malice murder and possession of a firearm during commission of a felony.[1] Her only enumeration of error is that the trial court erred in denying her motion for a new trial on the ground of insufficiency of the evidence.

The evidence at trial showed that Brannon shared a dwelling with the victim, Harris. No one was present for the shooting except Brannon and Harris. Her version of the events was told in a statement she made to the police on the day she surrendered and told them of the killing, and in her testimony at trial. According to Brannon, the shooting took place during playful roughhousing. She claimed that they had often played before, sometimes with the pistol which she kept cocked under her pillow. On the occasion of the shooting, she said, Harris was holding her wrists in both hands while she held the pistol; she heard a "pop" and saw Harris fall to the floor; thinking he was playing, she walked to him, whereupon she saw blood running from a wound in his head. Brannon left the body on her bed-

---

[1] The crimes occurred on March 23, 1993. Brannon reported the crimes and surrendered to the police on March 28, 1993. On August 3, 1993, she was indicted for murder, felony murder, aggravated assault, and possession of a firearm during commission of a felony. At a trial commenced on April 5 and concluded on April 7, 1994, a jury found her guilty of all charges. The trial court sentenced her to life imprisonment for the murder conviction, vacating the felony murder and aggravated assault convictions by operation of OCGA § 16-1-7, and to five years imprisonment for possession of a firearm during commission of a felony, to be served consecutively to the life sentence. Brannon's motion for new trial, filed April 25, 1994, was denied by an order filed October 20, 1995. Pursuant to a notice of appeal filed October 23, 1995, this appeal was docketed in this Court on November 17, 1995, and was submitted for decision on the briefs on January 15, 1996.

room floor for two days, then put it and parts of the carpet into a trash can. She tied the can closed with an electrical cord and put the can behind the adjacent dwelling and left it there until she told the police what happened and showed them where Harris's body was. Trial testimony indicated that Brannon lied to persons who made inquiry about Harris in the days following his death, claiming he had gone to work and then that he was missing. Brannon denied any intent to harm Harris, insisting that the shooting was a mere accident that occurred during their play.

The jury is the judge of the credibility of witnesses. *Roker v. State*, 262 Ga. 220 (1) (416 SE2d 281) (1992). The jury here was entitled to believe that Brannon shot Harris, but was not required to believe her version of the events or to credit her denial of intent. " ' "[C]riminal intent may be found by the jury 'upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected' with the act for which the accused is prosecuted.' OCGA § 16-2-6." [Cit.]' " *Griggs v. State*, 208 Ga. App. 768 (1) (432 SE2d 591) (1993). The evidence adduced at trial, that Brannon shot Harris to death and concealed his death, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Brannon was guilty of the offenses of which she was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Cooper v. State*, 212 Ga. 367 (92 SE2d 864) (1956).

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 13, 1996.

*Carla J. Friend,* for appellant.

*Lewis R. Slaton, District Attorney, John M. Turner, Carl P. Greenberg, Assistant District Attorneys, Michael J. Bowers, Attorney General, Allison B. Goldberg, Assistant Attorney General,* for appellee.

S96Y0308. IN THE MATTER OF LORETTA YVETTE LYLES.
(469 SE2d 670)

PER CURIAM.

The State Bar filed formal complaints against Loretta Lyles charging her with violating certain professional standards, including Standard 44 of Bar Rule 4-102 (wilful abandonment of a client's legal matter), in connection with her representation of two clients. We agree with the special master and review panel that Lyles wilfully abandoned the legal matters of those clients and violated other pro-

fessional standards and reject Lyles' contention that the record does not support the findings in these cases. We also agree with the discipline recommended by the special master and review panel, six months suspension in each case, with conditions on Lyles' reinstatement.

In addition to the charge of wilful abandonment of a client legal matter (Standard 44), the State Bar charged Lyles with violating Standards 23 (failure to refund unearned fees on withdrawal from employment), 45 (knowingly making a false statement of law or fact), and 68 (failure to respond to disciplinary authorities). The record amply supports the special master's findings, following a hearing, and as adopted by the review panel. In the first case, Lyles agreed to handle a probate matter but failed to file a probate petition in a timely manner. The client was forced to hire another attorney to do the work for which he had paid Respondent and lost one or more sales of estate assets as a result of the delay in probate. We agree with the review panel that Lyles' conduct in this matter violates Standards 23 and 44.[1] We also agree that the record supports the finding that Lyles failed to respond to disciplinary authorities in this matter, in violation of Standard 68.

In the second matter, Lyles successfully handled the client's appeal of his unemployment claim, then recommended he file a discrimination complaint, which matter Lyles abandoned, to the client's detriment. We agree with the special master that Lyles did not timely file an answer to the State Bar's complaint in this case. Accordingly, she is deemed to have admitted the facts alleged and violations charged as follows: Bar Rule 4-212 (a).[2] The client paid Lyles $750 to handle his discrimination action, and she filed a lawsuit on his behalf in federal district court against his former employer. Lyles continually failed to respond to the client's numerous inquiries about the status of his case and failed to inform him of the defendant's discovery requests, its motion for sanctions for failure to respond to discovery, and the trial court's grant of that motion, dismissing the client's case. When the client finally was able to contact Lyles, she simply told him the case had been "thrown out," and the client determined for himself in reviewing filings in the federal district court, that the court had dismissed it as a sanction. We agree with the special master and re-

---

[1] As noted by the special master, the evidence, under the "beyond a reasonable doubt standard," Bar Rule 4-221 (e), does not support the State Bar's charges that Lyles violated Standard 45 in this case.

[2] Although he found her in default, the special master nevertheless heard testimony and received evidence in this matter and concluded Lyles had violated each of the standards as alleged by the State Bar, with the exception of Standard 23. With regard to that standard, the special master found the testimony of the amount the client had paid Lyles too unclear to support a violation.

view panel that Lyle's default in this case results in her admission of the violations alleged of Standards 23, 44, 45 and 68.

In determining the appropriate sanction to impose, we look to the ABA Standards for guidance and consider: the duty violated, the lawyer's mental state, the injury caused by the lawyer's misconduct, and the extent of aggravating and mitigating factors.[3] In both disciplinary actions Lyles failed to keep the clients apprised of the status or progress of their cases and failed to perform fundamental legal services, causing injury to each client. In the first case, the client was unable to take advantage of opportunities to sell estate property because of the delay in probating the estate. In the second, the client's case was dismissed. In aggravation, Lyles consistently has refused to acknowledge the wrongful nature of her conduct. Her actions and failure to act in these cases indicate a pattern of misconduct, and she has been indifferent to making restitution to her clients.[4] In mitigation we note that Lyles has not been the subject of discipline prior to these matters, and that she may have had medical problems during part of the time she represented one or both clients.[5] We order that Lyles be suspended from the practice of law in this state for six months in each case, for a total of twelve months. This is consistent with the ABA Standards, as well as disciplinary cases involving similar conduct.[6] In addition, Lyles' reinstatement to the practice of law is conditioned upon her making restitution to both clients.[7] Finally, once Lyles has been reinstated, within 90 days of that reinstatement she must demonstrate that she has obtained a certificate from the Law Practice Management Program of the State Bar of Georgia, and has been advised as to the best manner in which to set up and operate her law practice. Respondent is reminded of her obligations to protect the interests of her clients as well as to comply fully with all requirements of Bar Rule 4-219 (c) (1) and (2).

---

[3] ABA Standards for Imposing Lawyer Sanctions (1991), Standard 3.0.

[4] See ABA Standard 9.22.

[5] See ABA Standard 9.32.

[6] See ABA Standards 4.42, 4.62. See, e.g., *In the Matter of Gardner*, 265 Ga. 482 (458 SE2d 355) (1995) (six-month suspension with conditions on reinstatement for failure to provide status reports to out-of-state counsel and to respond to requests for information from client and the State Bar; failure to properly withdraw from another representation; and uttering a bad check on his escrow account); *In the Matter of Collins*, 261 Ga. 802 (411 SE2d 711) (1992) (one-year suspension for abandoning a legal matter; refusing to return the client's file; and failing to take reasonable steps to avoid prejudice to client's rights); *In the Matter of Collins*, 261 Ga. 622 (409 SE2d 662) (1991) (six-month suspension for failing to appear at bankruptcy hearing, notify client of court's dismissal of action, and return attorney fees or client's papers).

[7] Lyles, before she may be reinstated, must demonstrate that she has made restitution of $750 to the client in the first case, and $300 to the client in the second case.

*Twelve-month suspension with conditions. All the Justices concur.*

DECIDED MAY 13, 1996.

*William P. Smith III, General Counsel State Bar, Jenny K. Mittelman, Assistant General Counsel State Bar,* for State Bar of Georgia.

## S95G1743. HARVEY v. THE STATE.
### (469 SE2d 176)

CARLEY, Justice.

On September 3, 1993, a bench warrant was issued in Cobb County for the arrest of Frederick Harvey. However, this bench warrant subsequently was recalled by an order entered on October 8, 1993. On October 12, 1993, a Fulton County police officer responding to a report of suspicious activity encountered Harvey who was standing with two other men. The officer asked for and received identification from all three of the men. Calling in the three names, the officer requested a computer check through the Georgia and National Crime Information Centers (NCIC). This computer check revealed the bench warrant for Harvey's arrest. The officer then asked his dispatcher to ascertain the status of the warrant and was told that it was still outstanding and valid. Harvey was then placed under arrest and, in a search incident to that arrest, cocaine was discovered. When Harvey was indicted for felony possession of cocaine with intent to distribute, he filed a motion to suppress on the ground that his arrest pursuant to the recalled bench warrant was unlawful. The trial court denied Harvey's motion and the Court of Appeals affirmed. *Harvey v. State,* 217 Ga. App. 776 (459 SE2d 433) (1995). We granted certiorari in order to review the opinion of the Court of Appeals.

The federal exclusionary rule, applicable only when evidence has been seized pursuant to an unlawful search, operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. . . ." *United States v. Calandra,* 414 U. S. 338, 348 (III) (94 SC 613, 38 LE2d 561) (1974). Therefore, any exception to the federal exclusionary rule is implicated only when evidence has been seized pursuant to an unlawful search. Thus, in *United States v. Leon,* 468 U. S. 897, 907 (II) (A) (104 SC 3405, 82 LE2d 677) (1984), the Supreme Court of the United States held that the exclusionary rule does not bar the introduction in the State's "case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magis-

trate that ultimately is found to be defective." However, that holding has no application in this case. Not only is *Leon* factually distinguishable because the evidence was seized from Harvey without a search warrant, the *Leon* "good faith" exception "is not applicable in Georgia in light of our legislatively-mandated exclusionary rule found in OCGA § 17-5-30. . . ." *Gary v. State*, 262 Ga. 573, 577 (422 SE2d 426) (1992). By its terms, OCGA § 17-5-30 authorizes no exception to Georgia's exclusionary rule when evidence has been seized unlawfully. OCGA § 17-5-30 (a) (1) and (2) clearly provide that "[a] defendant aggrieved by an unlawful search and seizure" is entitled to suppression of the evidence regardless of whether the unlawful search and seizure were accomplished with or without a warrant. Thus, as the Court of Appeals correctly held, the issue to be resolved in this case is whether the search *itself* can be upheld under an exception to the warrant requirement. Unless the warrantless search of Harvey was valid, then the seizure of the evidence was unlawful and OCGA § 17-5-30 (a) (1) mandates that Harvey's motion to suppress be granted.

A warrantless search is authorized if conducted pursuant to a lawful arrest. OCGA § 17-5-1. It is undisputed that Harvey was not lawfully arrested pursuant to the bench warrant itself, since that bench warrant had been recalled several days before Harvey was arrested. *Arizona v. Evans*, 514 U. S. ___ (115 SC 1185, 131 LE2d 34) (1995); *State v. Stringer*, 258 Ga. 605 (372 SE2d 426) (1988). However, the validity of an arrest is not necessarily dependent upon the existence of a valid arrest warrant because if the person detained is outside of his home and probable cause to arrest exists at the time of detention, a warrant is not required. *State v. Grant*, 257 Ga. 123, 125 (1) (355 SE2d 646) (1987). If, when the arrest is made, the facts and circumstances known to the arresting officer are sufficient to warrant a prudent person in believing that the accused had committed or is committing an offense, the warrantless arrest passes constitutional muster. *Callaway v. State*, 257 Ga. 12, 13-14 (2) (354 SE2d 118) (1987). Accordingly, resolution of this case ultimately is dependent upon whether, at the time of Harvey's arrest, the officer had probable cause to make that arrest. Compare *Arizona v. Evans*, supra at 1189, fn. 1 (wherein Arizona "conceded that [the] arrest violated the Fourth Amendment"); *State v. Stringer*, supra (wherein the State "stipulated that [the] arrest was not based upon probable cause").

At the moment the arrest was made, the officer knew that a valid bench warrant had been issued for Harvey's arrest. Compare *Whiteley v. Warden*, 401 U. S. 560 (91 SC 1031, 28 LE2d 306) (1971) (wherein no valid arrest warrant had ever been issued). "The radio transmission, which confirmed the outstanding warrants, established the necessary probable cause to arrest [Harvey]. [Cit.]" *Singleton v. State*, 194 Ga. App. 423 (1) (390 SE2d 648) (1990). It is of no conse-

quence that the officer later discovered that the validly issued bench warrant had been recalled. "[T]he existence of probable cause must be 'measured by current knowledge, i.e., at the moment the arrest is made and not hindsight. (Cit.)' [Cit.]" *Jackson v. State,* 191 Ga. App. 439, 441 (2) (382 SE2d 177) (1989).

The material inquiry is whether the facts within the officer's knowledge at the time of the arrest constituted reasonably trustworthy information which was sufficient to authorize a prudent person to believe that Harvey had committed an offense. *Callaway v. State,* supra at 13-14 (2). While the NCIC printouts would not be sufficient to authorize *conviction,* they have been held to be reliable enough to underlie " 'the reasonable belief which is needed to establish probable cause for arrest.' [Cits.]" *Paxton v. State,* 160 Ga. App. 19 (1) (285 SE2d 741) (1981). Thus, Harvey's arrest was lawful since the evidence shows that the officer was acting on reliable information that there was an outstanding felony warrant against Harvey. *Watts v. Cannon,* 224 Ga. 797, 798 (1) (164 SE2d 780) (1968). In relying upon the computer report, the officer was

> quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officer['s] mistake was understandable and the arrest a reasonable response to the situation facing [him] at the time.

*Hill v. California,* 401 U. S. 797, 804 (II) (91 SC 1106, 28 LE2d 484) (1971).

Although in arresting Harvey, the officer relied upon the misinformation from the NCIC, he neither knew, nor could be reasonably expected to have known, that the information was incorrect when he made the arrest. The information, which subsequently was proven wrong, was stale by only four days. This Court, in hindsight, will not declare an arrest to be invalid when the arresting officer reasonably relied upon information which he had no reason to think was incorrect. *Commonwealth v. Riley,* 425 A2d 813, 816 (I) (Pa. Super. 1981). See also *In re R. E. G.,* 602 A2d 146, 149 (II) (D.C. App. 1992); *Childress v. United States,* 381 A2d 614, 616 (I) (D.C. 1977).

*State v. Stringer,* supra, is not authority for a contrary holding. The officer in that case obtained no reliable information from the NCIC or any other source that the bench warrant was still valid and, as previously noted, the State stipulated that probable cause for the arrest did not exist. Probable cause for an arrest does not depend on, and is an entirely separate question from, the existence of a valid

bench warrant and its reasonable execution. *Stewart v. Williams*, 243 Ga. 580, 583 (2) (255 SE2d 699) (1979). See also OCGA § 17-7-90. Because of the stipulation in *Stringer*, this Court was concerned only with the validity of the bench warrant and not, as in the instant case, with the effect of a recalled bench warrant on the determination of probable cause for a warrantless arrest. Furthermore, anticipating the future holding in *Gary*, this Court refused to apply the *Leon* "good-faith" exception so as to authorize the admission of evidence seized pursuant to what had been stipulated to be an invalid arrest. There is no such stipulation as to the invalidity of Harvey's arrest, the officer who arrested Harvey obtained information from a reliable source which indicated the continuing effectiveness of a bench warrant, and, because probable cause for Harvey's warrantless arrest existed, the applicability of the *Leon* "good faith" exception is not implicated by this case. It follows that the Court of Appeals correctly affirmed the denial of Harvey's motion to suppress on the basis of the existence of probable cause for his arrest.

*Judgment affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

BENHAM, Chief Justice, dissenting.

I concur fully with Justice Sears's dissent and write separately to address the majority opinion's treatment of *State v. Stringer*, 258 Ga. 605 (372 SE2d 426) (1988), and *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992).

The majority opinion's attempt to distinguish *Stringer* on the ground that there was no stipulation in this case that the bench warrant was invalid is ineffective: though there is no stipulation here, there is no question of fact regarding the validity of the warrant. A stipulation contains no magic, but is merely a device to dispense with the need for formal proof. See *Whatley v. State*, 189 Ga. App. 173 (4) (375 SE2d 245) (1988). The uncontradicted evidence in this case that the warrant was invalid is the functional equivalent of the stipulation in *Stringer* and cannot serve to distinguish that case from this one. Just as there was no probable cause in *Stringer* other than the invalid warrant, there was no probable cause in this case.

The fact that there was an NCIC check in this case does not change the fact that here, as in *Stringer*, the warrant had been recalled. *Paxton v. State*, 160 Ga. App. 19 (1) (285 SE2d 741) (1981), the case cited in the majority opinion for the proposition that NCIC printouts provide probable cause for arrest, involved not an invalid arrest warrant, but information that the car the officer saw had been stolen. In that case, the officer was entitled to arrest without a warrant because the officer had reliable information that Paxton was at that time driving a stolen car. There was nothing to justify the arrest

in the present case other than an invalid warrant. The effort to use this factor to distinguish *Stringer* from the present case ignores this Court's holding in the last paragraph of *Stringer*: "Mere receipt of a bulletin or 'computer hit' does not provide probable cause justifying an arrest if the information in the computer system is inaccurate. [Cits.]"

The citation to *Watts v. Cannon*, 224 Ga. 797 (1) (164 SE2d 780) (1968), for the proposition that the arrest was lawful because the officer was "acting on reliable information that there was an outstanding felony warrant against Harvey" is inaccurate. The warrant in that case, so far as the opinion shows, was valid. The unavoidable fact, which the majority opinion seeks to avoid, is that the warrant in the present case was invalid and was the only reason for the arrest.

The majority opinion incorrectly states that "probable cause for [Harvey's] warrantless arrest existed, . . . ." Since the actual basis for the arrest was the invalid search warrant, and no other basis for probable cause appears in this case, the majority opinion is bootstrapping — it finds the arrest to be supported by probable cause in the form of the arresting officer's good-faith belief that the warrant was valid, then attempts to use that finding to distinguish this case from *Stringer*. The plain fact of this case is that this was not a warrantless arrest on probable cause. This case involved only an arrest on an invalid warrant, as did *Stringer*. As Justice Sears notes correctly in her dissent, "*Stringer v. State* requires this Court to hold that Harvey's arrest pursuant to an invalid bench warrant constituted an arrest without probable cause. . . ."

Finally, I am compelled to note that the majority opinion, in its effort to avoid the effect of binding precedent without facing up to the necessity of overruling it, indulges in circular reasoning: the arrest pursuant to the warrant was invalid, but the search is valid if there was probable cause to arrest, and the warrant provided that probable cause. What the majority opinion asserts, in plain language, is that the warrant, although entirely invalid, provided sufficient probable cause to arrest. That is plainly contrary to reason and to the law of this state.

The other feature of the majority opinion which I feel compelled to address is the mention of *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992), followed by a holding which amounts to a sub silentio overruling of *Gary*. The reasoning leading to the holding that the arresting officer had probable cause to arrest is based on decisional authority taken out of context. The majority opinion quotes *Singleton v. State*, 194 Ga. App. 423 (1) (390 SE2d 648) (1990), as follows: "The radio transmission, which confirmed the outstanding warrants, established the necessary probable cause to arrest [Harvey]. [Cit.]" In *Singleton*, however, there was no question regarding the validity of the

warrant. The quoted statement was made in that case to refute the appellant's argument that the officers were required to have the warrants in their physical possession at the time of the arrest. That statement does not fairly stand, as the majority opinion used it, for the proposition that probable cause is established by information about the existence of a warrant which later proves to be invalid. If that were the holding in *Singleton*, it would be, as is the majority opinion, in direct opposition to *Stringer* and *Gary*.

This Court decided *Gary* less than three-and-one-half years ago. That decision was based on Georgia statutory law. If this Court is to turn around so quickly and overrule its holding in *Gary*, to abandon the principles stated in that case, it should do so honestly and forthrightly, not by purporting to honor it, and then deciding a case directly contrary to its principles. This case is governed by *Stringer*, which is directly on point, and by *Gary*, which clearly and directly rejected the process undertaken by the majority opinion. Under the existing decisional law of this state, the judgment of the Court of Appeals was erroneous and should be reversed.

I am authorized to state that Presiding Justice Fletcher and Justice Sears join in this dissent.

SEARS, Justice, dissenting.

Because I conclude that *State v. Stringer*[1] requires this Court to hold that Harvey's arrest pursuant to an invalid bench warrant constituted an arrest without probable cause, and because the good-faith exception to the federal exclusionary rule is not applicable in this state, I dissent to the majority's holding that the Court of Appeals correctly affirmed the trial court's denial of Harvey's motion to suppress.

1. In *Stringer*, Stringer was arrested pursuant to a 21-month-old state-court bench warrant for two misdemeanor shoplifting charges. During custodial interrogation, Stringer implicated himself in a murder and armed robbery. Stringer filed a pre-trial motion to suppress the confession, on the ground that he was arrested on an invalid warrant. The trial court granted Stringer's motion, holding that there was evidence that Stringer had made several court appearances on the bench warrant and that the warrant had been recalled by another judge. This Court affirmed. We noted that "[t]he state stipulated that Stringer's arrest was not based upon probable cause but rather mere rumor,"[2] and then held that "if the bench warrant from the state court was not valid, then his arrest and the resulting statement must be suppressed." Id. at 605. We ruled that, for various reasons, the

---

[1] 258 Ga. 605 (372 SE2d 426) (1988).
[2] Id. at 605.

warrant had lost its validity over a year before his arrest and could not be relied on to validate Stringer's arrest.

We also rejected the state's contentions that the officers acted in good faith in relying on the bench warrant and that therefore the good-faith exception to the exclusionary rule should be applied to Stringer's arrest.[3] Critical to our holding in *Stringer* that good faith was not established was our finding that the arresting officer knew or should have known that the bench warrant was not valid.[4] Because we concluded that good faith did not exist, we did not have to decide whether the good-faith exception to the exclusionary rule should exist in Georgia. However, some four years later, when squarely presented with that issue, we held that the good-faith exception is not applicable in this state.[5]

2. The relevant facts of the present case are indistinguishable from *Stringer*. Harvey, as Stringer, was arrested pursuant to a bench warrant that the arresting officers thought to be valid but which was not. The majority makes several unavailing attempts to distinguish *Stringer*.

First, the majority at 673 states that "[t]he officer in [*Stringer*] obtained no reliable information from the NCIC or any other source that the bench warrant was still valid." As our opinion in *Stringer* is silent regarding the source of the officer's information regarding the bench warrant, it is difficult to understand how the majority can affirmatively state that the officer in *Stringer* had no reliable information. More significantly, however, the record in *Stringer* reveals that the officer was acting on information he received from the Georgia Crime Information Center,[6] a source as reliable as the NCIC.

The majority further attempts to distinguish *Stringer* by stating that in *Stringer* "the State stipulated that probable cause for the arrest did not exist;" by stating that there is no such stipulation in this case; and by then concluding that the invalid bench warrant provided probable cause for Harvey's arrest. The majority misses the mark in this interpretation of *Stringer*.

Because an arrest must *always* be supported by probable cause[7] (anything less would be unconstitutional), the state could not have been stipulating that probable cause for Stringer's arrest was completely lacking. Such a stipulation would have ended this Court's inquiry into the issue and would have required this Court to summarily

---

[3] See *United States v. Leon*, 468 U. S. 897 (104 SC 3405, 82 LE2d 677) (1984).

[4] Id. at 606-607.

[5] *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992).

[6] See OCGA §§ 35-3-30 to 35-3-40.

[7] *Burnham v. State*, 265 Ga. 129 (2) (453 SE2d 449) (1995); *Clark v. State*, 217 Ga. App. 113 (456 SE2d 672) (1995).

affirm the trial court's grant of Stringer's motion to suppress. Instead, the state's stipulation to which this Court referred in *Stringer* must necessarily have been a more limited concession regarding probable cause, unrelated to the bench warrant.[8] Further, because the state relied on the bench warrant to support Stringer's arrest on appeal, and because probable cause is necessary to support any arrest, the state was necessarily contending that the warrant provided probable cause for Stringer's arrest. For this same reason, this Court, in evaluating the merits of that contention, was necessarily evaluating whether the bench warrant provided probable cause.

In addressing the state's contention that the bench warrant supported Stringer's arrest, we began with the premise that "if the bench warrant from the state court was not valid, then [Stringer's] arrest and the resulting statement must be suppressed."[9] As previously stated, we concluded that the warrant was not valid and could not, by itself, support the arrest. Further, conclusively demonstrating that probable cause was at issue in *Stringer*, we held in *Stringer* that the "[m]ere receipt of a bulletin or 'computer hit' does not provide *probable cause justifying an arrest* if the information in the computer system is inaccurate."[10]

In sum, *Stringer* holds that receipt of information that a person is the subject of an outstanding bench warrant does not provide probable cause to arrest if that information is invalid. Although we also evaluated whether Stringer's motion to suppress could be denied based upon the good-faith exception to the exclusionary rule, our decision in *Gary v. State*[11] precludes the application of the *Leon* good-faith exception in the present case.

Accordingly, the rationale and holdings in *Stringer* compel the conclusion that Harvey's invalid bench warrant cannot be relied upon to hold that probable cause existed for his arrest. Further, because the good-faith exception to the exclusionary rule is inapplicable, the trial court should have granted Harvey's motion to suppress the evidence discovered pursuant to his arrest.

For these reasons, I dissent to the majority opinion. I am authorized to state that Chief Justice Benham and Presiding Justice Fletcher join in this dissent.

---

[8] For example, the state could have been stipulating that the information the arresting officers had regarding Stringer's participation in the murder did not provide probable cause for an arrest.

[9] Id. at 605.

[10] *Stringer*, 258 Ga. at 607.

[11] 262 Ga. 573.

DECIDED APRIL 29, 1996 —
RECONSIDERATION DENIED MAY 17, 1996.

*Steve W. Reighard,* for appellant.
*Lewis R. Slaton, District Attorney, Juliette W. Scales, Assistant District Attorney,* for appellee.
*Colette B. Resnik, Davis, Zipperman, Kirschenbaum & Lotito, Nicholas A. Lotito,* amicus curiae.

S96A0138. GUSTAFSON v. WESLEY FOUNDATION et al.
S96X0280. ST. JOHN UNITED METHODIST CHURCH
v. GUSTAFSON et al.
(469 SE2d 160)

THOMPSON, Justice

E. Louise Grant died testate in 1993. This appeal concerns Item VI of her will, which was executed in 1988, and reads, in pertinent part:

> The residue of my estate I bequeath after all other expenses . . . as follows: A. To the Wesley Foundation, University of Minnesota, Mpls., Minn., where I spent so many inspirational hours, during my college life at the University of Minnesota, one half of my remaining estate. B. The remaining half I give and bequeath to St. John United Methodist Church, Greene Street, Augusta, GA.

Grant attended the University of Minnesota in the 1920's and 30's. A few years earlier, the Wesley Foundation was organized at the University as a Methodist student organization. It ministered to Methodist students at the University until 1967, when it transferred its assets to the Metropolitan Methodist Campus Ministry ("Metropolitan").[1] From that point on, the Wesley Foundation no longer functioned actively as an independent entity and Metropolitan proceeded to minister to University students in its stead.

Metropolitan serves as a trustee body for the property and funds of the United Methodist Church which are used for campus ministries. Beginning in 1974, Metropolitan carried on its work within the framework of the United Ministries in Higher Education ("United Ministries"), a coordinating body which ministers to the needs of stu-

---

[1] In 1977, Metropolitan changed its name to Metropolitan United Campus Ministry.

dents who are members of five Protestant churches, including the United Methodist Church, at the University of Minnesota. As a participating member in United Ministries, Metropolitan actively supports ecumenical campus ministries including worship, Bible study, fellowship, seminars, counseling, support groups, and mission opportunities. The Wesley Foundation carried out these same kinds of ministries when Grant was a student at the University of Minnesota.

Naming the Wesley Foundation, Metropolitan, St. John United Methodist Church, and Amy Gustafson, Grant's sole heir, as defendants, Grant's executrix filed a petition to construe Item VI of the will. Gustafson answered, asserting the bequest to the Wesley Foundation lapsed and she is entitled as Grant's sole heir to one-half of the residue of the estate. St. John United Methodist Church responded by asserting that, if the bequest to the Wesley Foundation lapsed, then it is entitled to the bequest as the residual legatee. Wesley Foundation and Metropolitan answered by asserting that Metropolitan is entitled to the bequest because it is the successor to the Wesley Foundation and ministers to students at the University of Minnesota just as the Wesley Foundation did when Grant was a student at that institution.

Following discovery, Metropolitan and Gustafson filed cross-motions for summary judgment. The court granted Metropolitan's motion, concluding that it was the successor to the Wesley Foundation and was entitled to receive Grant's bequest. Gustafson appeals in Case No. S96A0138; St. John United Methodist Church cross-appeals in Case No. S96X0280. We affirm.

1. In construing the provisions of a will, this Court will look to the intent of the testator, and, whenever possible, the intent of the testator will control the outcome. OCGA § 53-2-91; *First Nat. Bank of Atlanta v. Jenkins*, 256 Ga. 223, 224 (345 SE2d 829) (1986). This is especially true when a bequest for a charitable purpose is in issue. Such bequests are looked upon with great favor, and courts of equity are obliged to ensure that the testator's charitable intent is enforced. *Moss v. Youngblood*, 187 Ga. 188, 197 (200 SE 689) (1938).

2. Generally, where a named charitable beneficiary merges, or is consolidated, with other similar entities, the new entity, is entitled to the bequest. *First Bank &c. Co. v. Attorney Gen.*, 359 NE2d 938 (Mass. 1977). See also *In re Morris' Will*, 234 NYS2d 122, 125 (36 Misc.2d 1094) (1962) (gift to church which ceased to exist upon consolidation with another church serving same general community passed to successor); *In re Wehrfritz' Estate*, 287 NYS 908 (158 Misc. 740) (1936) (gift to missionary society which merged with two other missionary societies after making of will was payable to new society). Of course, the aims and purposes of the new entity should be similar to those of the named beneficiary. See *In re Drenning's Will*, 266 NYS2d 625 (48 Misc.2d 1082) (1966) (gift to church which merged

with another did not lapse where aims and purposes of church were similar to that with which it merged).

In this case, the intent of the testatrix was to provide for the Wesley Foundation at the University of Minnesota. The Wesley Foundation transferred its assets to Metropolitan which carried on its ministries. The aims and purposes of Metropolitan are similar to those of the Wesley Foundation: Metropolitan ministers to Methodist students in virtually the same way that the Wesley Foundation ministered to such students when the testatrix attended the University of Minnesota. Under these circumstances, the bequest did not lapse. Metropolitan is the successor to the Wesley Foundation and it is entitled to receive the testatrix's bequest. *First Bank &c. Co. v. Attorney Gen.*, supra.

The bequest should not be defeated simply because Metropolitan deemed it advisable to join with other Protestant denominations in ministering to students at the University of Minnesota. *First Bank &c. Co. v. Attorney Gen.*, 359 NE2d 938, 942, supra; *Stephenson v. Kuntz*, 49 SE2d 235, 247 (W.Va. 1948). The testatrix did not condition her bequest so as to restrict the beneficiary's participation in an ecumenical Protestant mission. *First Bank &c. Co. v. Attorney Gen.*, supra.

3. Because there is an existing, qualified beneficiary, the court was correct in ruling that the cy pres doctrine is inapplicable. See *Hines v. Village of St. Joseph*, 227 Ga. 431 (181 SE2d 54) (1971); *In re Higbee's Estate*, 93 A2d 467, 470 (Pa. 1953).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996 —
RECONSIDERATION DENIED MAY 17, 1996.

*Jay M. Sawilowsky*, for Gustafson.

*William J. Williams, B. Thomas Cook, Jr.*, for Wesley Foundation and Metropolitan.

*Hull, Towill, Norman & Barrett, William J. Keogh III*, for St. John United Methodist Church.

S96Y0196. IN THE MATTER OF WILLIAM N. ROBBINS.
(469 SE2d 191)

PER CURIAM.

Respondent William N. Robbins challenges, on First Amendment grounds, Standard 18 of Bar Rule 4-102, prohibiting attorneys from advertising themselves as "specialists" except in limited circumstances. We hold Standard 18 is constitutional because it is suffi-

ciently narrow in scope to achieve its purpose, i.e., to prevent the public from being misled about the qualifications of attorneys. We further hold that Robbins violated Standard 18, and that, under the circumstances, he should receive a public reprimand.

The parties do not dispute the essential facts, as found by the special master and adopted by the review panel. Robbins, the sole shareholder of William N. Robbins, Attorney at Law, P.C., prepared and published a newsletter entitled *Legal Beagle*, copies of which were mailed to Robbins' former clients, as well as his and his employees' family and friends. An edition of the newsletter, announcing the return of a former attorney, stated, in part: "WELCOME TO Joe Maniscalco — Joe is an attorney who has returned to the firm with a specialty in personal injury and litigation."

The newsletter further stated:

DON'T FORGET, we specialize in *automobile accidents, motorcycle accidents, bicycle accidents, medical malpractice, workers' compensation and social security cases. Be sure to tell your friends about this. We appreciate referrals from our clients.*

Robbins has significant experience in handling the types of cases listed in the newsletter, and practices only in those areas.

The State Bar filed a Complaint against Robbins, alleging that he violated Standard 18 of Bar Rule 4-102 which prohibits a lawyer from stating or implying that he is a "specialist" except: (1) where a lawyer is engaged in patent practice before the United States Patent and Trademark Office; (2) where a lawyer is engaged in admiralty practice; and (3) where a lawyer has been certified as a specialist in a particular field under a Bar approved program of legal specialization. While Standard 18 prohibits the use of the term "specialist" except in limited circumstances, Standard 19 permits a lawyer to communicate that he or she *limits* his or her practice to a particular field.[1] Robbins admitted that neither he nor Maniscalco, referred to in his newsletter, had been certified as specialists in the areas stated in the newsletter through any Bar approved program. Robbins points to the fact that the State Bar has approved programs of legal specialization only in criminal and civil trial advocacy.[2]

1. We disagree with Robbins that the language contained in his

---

[1] Standard 19 provides: "A lawyer may state, announce or hold himself out as limiting his practice to a particular area or field of law so long as his communication of such limitation of practice is not false, fraudulent, deceptive or misleading. A violation of this Standard may be punished by a public reprimand."

[2] Rule 16, Rules of Conduct & Procedure of the Review Panel of the State Disciplinary Board. *State Bar of Georgia Directory & Handbook*, 1994-95, p. 60-H.

newsletter is protected by the First Amendment to either the State or Federal constitutions. It is well established that attorney advertising is a type of commercial speech protected by the First Amendment. *Florida Bar v. Went For It, Inc.,* ___ U. S. ___ (115 SC 2371, 2375, ___ LE2d ___) (1995); *Peel v. Attorney Registration &c. Comm.,* 496 U. S. 91 (110 SC 2281, 110 LE2d 83) (1990); *In re R. M. J.,* 455 U. S. 191, 199 (102 SC 929, 935, 71 LE2d 64 ) (1982); *Bates v. State Bar of Arizona,* 433 U. S. 350 (97 SC 2691, 53 LE2d 810) (1977). However, that First Amendment protection is not absolute, and the government may prohibit entirely advertising that is misleading, per se, and may regulate advertising that is potentially misleading. *In re R. M. J.,* 455 U. S. at 202-203; *Bates,* 433 U. S. at 383. In the latter case, the government must assert a substantial interest in regulation and may only interfere with speech to the extent reasonably necessary to prevent the perceived evil from potentially misleading advertising. *Peel,* 496 U. S. at 107; *In re R. M. J.,* 455 U. S. at 202-203.

Applying the foregoing to the advertisement in question, we have no difficulty upholding Standard 18 on its face and as applied in this case. We need not decide whether use of the term "specialist" or any variation thereof, is misleading per se because there is no question that term, in the context of lawyer advertising, is at least potentially misleading. *Bates v. State Bar of Arizona,* 433 U. S. at 366, 383.[3] There is sufficient evidence to support the State Bar's assertion that a substantial percentage of the public expects lawyers claiming to be "specialists" to have certain qualities which "non-specialists in the same field do not have, and to do a better job." Moreover, there is a reasonable possibility that a significant percentage of the public reading the term "specialist" in a lawyer's advertisement, might be misled into thinking an attorney has been "certified" or "designated" or has otherwise met objective standards established by a recognized organization.[4] Standard 18, particularly read in conjunction with Standard 19, is reasonably limited to achieve its purpose: that is, to allow attorneys to list their areas of practice without implying that they have special qualifications as established by objective standards by a recognized organization.[5]

---

[3] In *Bates* the Supreme Court recognized claims regarding "the quality of legal services . . . are not susceptible of precise measurement, [and] might well be deceptive or misleading . . . , or even false."

[4] Id. See also *Trumbull County Bar Assn. v. Joseph,* 569 NE2d 883, 884 (Ohio 1991).

[5] This is not a case where the advertising attorney has, in fact, received certification from an established organization pursuant to objective criteria. Compare *Peel,* supra, 496 U. S. at 101, 110 SC at 228, distinguishing "statements of objective facts that may support an inference of quality" from "statements of opinion or quality."

We find disingenuous and without merit Robbins' argument that he did not violate the letter of Standard 18, and, accordingly, should not be disciplined, because he did not state that he or any member of his firm was a "specialist" but, rather, said that the firm "special-

Contrary to Robbins' argument, Standard 18 does not operate as a total ban on advertising an attorney's areas of expertise. Under the limited circumstances set forth in that Standard, an attorney may state he or she is a specialist. Otherwise, an attorney may list that his or her practice is limited to a certain area or areas under Standard 19.[6]

2. We next determine the appropriate level of discipline to apply in this case. The maximum sanction authorized under Standard 18 is a public reprimand. In considering any aggravating or mitigating circumstances in this case, we find the former dominates. This is Robbins' second disciplinary infraction involving false or misleading advertising.[7] Also, Robbins not only has substantial experience in the practice of law, but he has spoken at Bar-sponsored seminars on several topics, including attorney advertising. Finally, despite his knowledge of the law in this area, Robbins has refused to acknowledge the wrongful nature of his conduct.[8] In mitigation we note only that Robbins, although not admitting wrongdoing, has been fairly cooperative with the Disciplinary Board during the proceedings.

For the foregoing reasons, it is ordered that Robbins be issued a public reprimand for violating Standard 18, and that, pursuant to Bar Rule 4-220 (c), such reprimand be administered in open court by the Chief Judge of the Superior Court of the county in which Robbins resides.

*Public reprimand. All the Justices concur.*

DECIDED APRIL 29, 1996 —
RECONSIDERATION DENIED MAY 17, 1996.

*William P. Smith III, General Counsel State Bar, Steven J. Kaczkowski, Assistant General Counsel State Bar,* for State Bar of Georgia.

---

ized" in certain areas. Nor do we find merit to Robbins' related argument that he should not be disciplined under a strict reading of Standard 18 because he stated that Maniscalco was a specialist, rather than stating that he, Robbins, was a specialist. See *The Florida Bar v. Herrick,* 571 S2d 1303, 1307 (Fla. 1990).

[6] The Supreme Court has stated that listing areas of practice may be potentially misleading, *In re R. M. J.,* 455 U. S. 191, 202-203, and has suggested a government may require that such a listing be followed by a disclaimer to the effect that the state bar does not recognize the listed areas as specialties under objective standards. Id., see also *Bates,* 433 U. S. at 384. See, e.g., *Mississippi Bar v. Attorney R,* 649 S2d 820, 823 (Miss. 1995).

[7] In 1988 Robbins received a review panel reprimand for violating Standard 5 of Bar Rule 4-102 ("A lawyer shall not make any false, fraudulent, deceptive, or misleading communication about the lawyer or the lawyer's services.").

[8] Robbins filed a Petition for Voluntary Discipline, without admitting any wrongdoing, offering to accept a Letter of Instruction pursuant to Bar Rule 4-204.5. The special master and the review panel properly concluded that level of discipline is not available after a Notice of Finding of Probable Cause and referral to a special master.

*Arnall, Golden & Gregory, Karen B. Bragman, Henry M. Perlowski,* for Robbins.

S95G1908. IN RE W. S. S.
(470 SE2d 429)

CARLEY, Justice.

A delinquency petition was filed, alleging that W. S. S. "did an immoral and indecent act to (and in the presence of) [the victim], a child under the age of 14 years, attempt anal sodomy. OCGA § 16-6-4." At the conclusion of the hearing on the petition, the juvenile court stated that the law does not require "a finding that [W. S. S.] had the sexual intent or knowledge of an adult" and that "the evidence has shown in this case that he had the requisite intent. . . ." W. S. S. appealed from the order adjudging him to be delinquent and, in an unreported opinion, the Court of Appeals affirmed. *In the Interest of W. S. S.*, 217 Ga. App. XXX (1995). We granted certiorari to determine whether it was necessary to prove that W. S. S. had the intent or knowledge required to convict an adult and, if so, whether the evidence was sufficient to establish that intent or knowledge in this case.

The crime of aggravated child molestation is committed when a person performs an act of sodomy with a child under the age of 14 and does so "with the intent to arouse or satisfy the sexual desires of either the child or the person." OCGA § 16-6-4 (a). Likewise, the attempt to commit an act of aggravated child molestation is a crime. OCGA § 16-4-1. However, at the time of the alleged conduct, W. S. S. was 11 years old. Therefore, he was not charged with the crime of attempted aggravated child molestation because, being under 13 years of age, he could not be considered or found guilty of any crime. OCGA § 16-3-1. Compare *Waugh v. State*, 263 Ga. 692, 693 (2) (437 SE2d 297) (1993).

W. S. S. was charged with the delinquent act of attempted aggravated child molestation. In relevant part, OCGA § 15-11-2 (6) (A) defines a "delinquent act" as "[a]n act designated a crime by the laws of this state. . . ." Thus, in order to find that W. S. S. committed the delinquent act with which he was charged, the juvenile court was not required to find him guilty of the crime of attempted aggravated child molestation. *K. M. S. v. State of Ga.*, 129 Ga. App. 683, 684 (200 SE2d 916) (1973). All that was necessary was that the juvenile court find from the evidence that W. S. S. had attempted an act of aggravated child molestation as defined by OCGA § 16-6-4.

At no point in the hearing did the juvenile court intimate that, contrary to OCGA § 16-6-4, it was authorized to adjudge W. S. S. to

be delinquent without finding that he had the *intent* to arouse or satisfy the sexual desires of either the victim or himself. Rather, the juvenile court merely indicated that it was not required to find that W. S. S. "had the sexual intent or knowledge of an *adult*." (Emphasis supplied.) Whether W. S. S. had the sexual desires of an adult would be irrelevant, as all that OCGA § 16-6-4 requires is proof of an intent to arouse or satisfy the sexual desires of either the child or the perpetrator. Thus, the focus is upon the sexual desires of the child or the perpetrator and not upon the sexual desires of some fictional child or adult. Accordingly, in order to show that W. S. S. was delinquent, all that needed to be shown was that he attempted to commit an act of sodomy with the intent to satisfy his own sexual desires.

It is immaterial that there may have been evidence that W. S. S. attempted the act of sodomy upon the victim without the intent to satisfy his sexual desires. The relevant inquiry is whether there was sufficient evidence that W. S. S. did attempt that act with the requisite intent. Intent is a question of fact to be determined from the words, conduct, demeanor, motive, and all other circumstances connected with the act of alleged delinquency. *In re J. B.*, 183 Ga. App. 229, 230 (6) (358 SE2d 620) (1987). On appeal, the evidence must be construed with every inference and presumption in favor of the juvenile court's findings. *In the Interest of M. J. F.*, 191 Ga. App. 792 (1) (383 SE2d 173) (1989). Applying that construction of the evidence here, W. S. S.'s intent could be inferred from the repetition of the acts related by the victim and the secrecy with which those acts had been performed. *Edmonson v. State*, 219 Ga. App. 323, 324 (4) (464 SE2d 839) (1995); *Branam v. State*, 204 Ga. App. 205 (1) (419 SE2d 86) (1992); *Grant v. State*, 193 Ga. App. 178 (387 SE2d 408) (1989); *In re J. B.*, supra at 230 (6). It follows that the Court of Appeals correctly affirmed the order of the juvenile court adjudging W. S. S. to be delinquent.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 20, 1996.

*H. Bradford Morris, Jr.*, for appellant.
*Lydia J. Sartain, District Attorney, Tracy W. Loggins, Assistant District Attorney*, for appellee.

## S96A0015. SMITH v. THE STATE.
### (470 SE2d 436)

CARLEY, Justice.

After Marvin Smith pled guilty to two counts of murder, he did not file a timely direct appeal. He subsequently filed a motion for an out-of-time appeal, contending that trial counsel rendered ineffective assistance since Smith was not informed of his right to appeal. Smith appeals from the trial court's denial of his motion for an out-of-time appeal.

An out-of-time appeal is appropriate where, as the result of ineffective assistance of counsel, a timely direct appeal was not taken. *Lane v. State*, 263 Ga. 517, 518 (2) (436 SE2d 9) (1993). It is "the remedy for a frustrated right of appeal. . . . [Cit.]" *Rowland v. State*, 264 Ga. 872, 875 (2) (452 SE2d 756) (1995). Accordingly, Smith's motion for an out-of-time appeal was properly denied unless he had a *right* to file a timely direct appeal which was frustrated by the ineffective assistance of his counsel.

A criminal defendant has the absolute right to file a timely direct appeal from a judgment of conviction and sentence entered after a jury or bench trial. However, Smith's judgments of conviction and sentences were entered after he pled guilty. A criminal defendant has no unqualified right to file a direct appeal from a judgment of conviction and sentence entered on a guilty plea. A direct appeal will lie from a judgment of conviction and sentence entered on a guilty plea "only if the issue on appeal can be resolved by facts appearing in the record. [Cit.]" *Morrow v. State*, 266 Ga. 3 (463 SE2d 472) (1995). Accordingly, the denial of Smith's motion for an out-of-time appeal can be reversed "if, and only if, the questions that he seeks to raise on appeal may be resolved by facts appearing in the record, including the transcript of his guilty plea hearing." *Caine v. State*, 266 Ga. 421 (467 SE2d 570) (1996).

As the movant, Smith had the burden to show a " 'good and sufficient' " reason for his entitlement to an out-of-time appeal. *Rowland v. State*, supra at 875 (2). Smith could not meet that burden merely by showing that he was not informed of his "rights" at the guilty plea hearing, but was required to show that he actually had a *right* to file a timely direct appeal which was frustrated by the ineffective assistance of his counsel. If Smith "had no right to file even a timely notice of appeal from the judgment of conviction entered on [his] guilty plea, he was not entitled to be informed of a non-existent 'right' to appeal." *Morrow v. State*, supra at 4. Smith could not meet his burden of proof without showing that the questions he would raise on appeal could be resolved by facts appearing in the record, including the transcript of his guilty plea hearing. *Caine v. State*, supra. The defendant in *Morrow* affirmatively failed to meet his burden because the ques-

tions he proposed to raise on appeal could not be resolved by facts appearing in the record. Smith also failed to meet his burden because he proposed no questions to raise on appeal which could be resolved by facts appearing in the record. Instead he merely asserted that he was not informed of his "right" to appeal. As has been pointed out, there is *no* absolute right to appeal from a judgment of conviction entered on a guilty plea.

Accordingly, Smith's failure to meet his burden of showing a good and sufficient reason for his entitlement to an out-of-time appeal requires affirmance of the trial court's denial of his motion for an out-of-time appeal.

*Judgment affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

BENHAM, Chief Justice, dissenting.

"[T]he defendant in any criminal proceeding . . . may appeal from any sentence, judgment, decision, or decree of the court. . . ." OCGA § 5-6-33. By creating a statutory right to appeal (*Thomas v. State*, 260 Ga. 262, 263 (392 SE2d 520) (1990)), Georgia has made its appellate courts " 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant, [cit.]. . . .' " *Evitts v. Lucey*, 469 U. S. 387, 393 (105 SC 830, 83 LE2d 821) (1985). In the last six months, this Court has eroded the statutory right of appeal of the criminal defendant who pleads guilty. In *Morrow v. State*, 266 Ga. 3 (463 SE2d 472) (1995), this Court determined that Morrow had no right to file an appeal; in *Caine v. State*, 266 Ga. 421 (467 SE2d 570) (1996), this Court dismissed Caine's appeal in which he claimed that the counsel representing him when he pled guilty did not render effective assistance of counsel; today, this Court eviscerates the right of appeal by ruling that a guilty plea criminal defendant seeking an out-of-time appeal alleging ineffective assistance of counsel must divulge the arguments he would present on appeal as a condition precedent to being permitted to file the appeal. No other class of criminal defendant is required to make such a showing in order to obtain the statutory right of appeal, and this Court's invention of such a new procedural hurdle is a curtailment of the guilty plea criminal defendant's constitutionally-guaranteed rights of due process and equal protection. *Evitts v. Lucey*, supra, 469 U. S. at 393. " 'Once the State has created a right of appeal, it must "offer such defendant a fair opportunity to obtain an adjudication on the merits of his appeal. [Cit.]" The majority has denied [Smith] such a "fair opportunity" by reducing his right of appeal to a "meaningless ritual" by precluding him from effectively asserting his appellate arguments. [Cit.]' *Morrow v. State*, [supra,] (Sears, J., dissenting)." *Caine v. State,* supra at 424 (Benham, C. J., dissenting).

When faced with the appeal of a guilty plea defendant, appellate review is limited to resolving the questions raised by applying the law to the facts appearing in the record. *Smith v. State*, 253 Ga. 169 (316 SE2d 757) (1984). See also *Caine v. State*, supra (Benham, C. J., dissenting). This holding has been used to curtail severely the issues a guilty plea defendant may raise in an appeal. See, e.g., *Morrow v. State*, supra. What is especially ironic in the majority's treatment of the appeal before us is the fact that reference to the record and transcript of Smith's guilty plea shows that Smith was never fully informed that he had the right to appeal his plea of guilty — he was not informed of the availability of appointed counsel to pursue an appeal or the time frame within which such appellate right must be exercised. *Bell v. Hopper*, 237 Ga. 810 (229 SE2d 658) (1976); *Kilgo v. State*, 198 Ga. App. 762 (3) (403 SE2d 216) (1991); *Mobley v. State*, 162 Ga. App. 23 (1) (288 SE2d 702) (1982). See *Holloway v. Hopper*, 233 Ga. 615 (212 SE2d 795) (1975). See also *Lane v. State*, 263 Ga. 517 (436 SE2d 9) (1993). The failure to inform a defendant of his appellate rights constitutes ineffective assistance of counsel, entitling the defendant to an out-of-time appeal in order to exercise the right of appeal denied him by his attorney's shortcoming. *Bell v. Hopper*, supra, 237 Ga. 810. The sole question presented by this appeal is whether the trial court erred in denying appellant an out-of-time appeal, thereby effectively denying him "a fair opportunity to obtain an adjudication on the merits of his appeal." *Evitts v. Lucey*, supra, 469 U. S. at 405. Inasmuch as trial counsel is primarily responsible for informing the client of his appellate rights (see *Kreps v. Gray*, 234 Ga. 745, 748 (218 SE2d 1) (1975) (Nichols, C. J., concurring specially)), a remand of this case to the trial court is appropriate, in order that a hearing might be held at which time appellant's former counsel could be questioned concerning what he told appellant about the full panoply of appellate rights. *Evans v. State*, 198 Ga. App. 537 (402 SE2d 131) (1991). If counsel appropriately informed appellant of his right to appeal and the failure to appeal was due to appellant's inaction, appellant is not entitled to an out-of-time appeal. *Henry v. Hopper*, 235 Ga. 196 (219 SE2d 119) (1975). If, however, the failure to appeal was due to counsel's inaction in either failing to inform appellant of his appellate rights or in failing to pursue an appeal at appellant's request, appellant is entitled to an appeal. See *Evans v. State*, supra, 198 Ga. App. at 538. These issues must be decided before appellant's right to an out-of-time appeal can be determined. If appellant was not fully informed of his right of appeal, he is entitled to exercise that right out of time. It is only when appellant exercises the right of appeal to which he may be entitled that the reviewing court should examine whether the questions raised can be resolved by the appellate record. This Court does a disservice to constitutional rights

and the appeal process by short-circuiting it when the appellant is a defendant who pled guilty.

Because I cannot condone the affirmance of the trial court's action when the guilty plea record and transcript clearly reflect that appellant was not fully informed of his right of appeal, I must dissent.

I am authorized to state that Presiding Justice Fletcher and Justice Sears join this dissent.

DECIDED MAY 20, 1996.

Marvin Smith, *pro se.*

*William T. McBroom III, District Attorney, Daniel A. Hiatt, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth Attaway, Assistant Attorney General,* for appellee.

S96A0234. FUTURE PROFESSIONALS, INC. v. DARBY et al.

(470 SE2d 644)

SEARS, Justice.

Appellant Future Professionals, Inc. ("FAPA") and appellees Darby and Aviation Information Resources, Inc. ("Darby" and "AIR") are engaged in the business of providing career counseling services to prospective job applicants in the airline industry. This case was initiated when FAPA filed a complaint seeking to determine the value of stock Darby owned in FAPA. Thereafter, AIR was joined as a defendant, and FAPA amended its original complaint to include an alleged violation of the Georgia Uniform Deceptive Trade Practices Act ("the Act" or "UDTPA"), OCGA § 10-1-370 et seq., against AIR. This appeal is concerned solely with the trial court's grant of partial summary judgment in favor of AIR with respect to that count.[1] Because we find that the phrase FAPA seeks to protect under the Act, "future airline pilots," is merely descriptive, and has not acquired any secondary meaning that would trigger protection under UDTPA, we affirm.

1. In the superior court, FAPA sought to enjoin AIR's use of the phrase "future airline pilots" in its advertisements and promotions, contending that the phrase is and has been associated by a substan-

---

[1] Because the sole remedy available under the Act is "injunctive relief . . . *under the principles of equity,*" (emphasis supplied) OCGA § 10-1-373 (a), this Court has jurisdiction over this matter. Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (2). But see *Pittman v. Harbin Clinic Professional Assn.,* 263 Ga. 66 (428 SE2d 328) (1993); *Beauchamp v. Knight,* 261 Ga. 608 (409 SE2d 208) (1991).

tial number of individuals in the aviation industry with FAPA. FAPA argued that AIR's use of the phrase "future airline pilots" to promote its products and services had created actual confusion or misunderstanding with respect to the products and services provided by FAPA, entitling it to injunctive relief.

The trial court granted AIR summary judgment on FAPA's count under the Act, ruling that the phrase "future airline pilots" is merely descriptive and is not entitled to protection under the Act. The trial court also found that the phrase is neither a protected name utilized by FAPA nor a registered trademark or service mark. FAPA argues on appeal that the trial court erred in misinterpreting the Act so as to apply it only to registered trade and service marks, and trade names. FAPA also argues that the trial court erred in granting AIR summary judgment when issues of material fact remain concerning whether the phrase "future airline pilots" has acquired secondary meaning sufficient to trigger the Act's protections.

2. Georgia protects trade names by both common law and statute.[2] One of these statutes, UDTPA, entitles a person to the protection of a trade name when another person's use of a similar name "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services."[3] A party "likely to be damaged" by such deceptive trade practices may obtain injunctive relief without proving either monetary damages or that the offender intended to deceive the consuming public by causing confusion or misunderstanding.[4] The requirements for obtaining relief under UDTPA are less stringent than other relevant statutory sections, and "all that is required [for relief under UDTPA] is that the use of a name cause confusion to others [who are] using reasonable care."[5]

While the registration of a trademark or service mark is a prerequisite for relief under certain other sections of the Code,[6] UDTPA does *not* require a party seeking relief thereunder to have registered the relevant trade or service mark or name.[7] To the extent this Court ruled otherwise in *Elite Personnel v. Elite Personnel Svcs.*,[8] that opinion is hereby overruled.

Accordingly, had the trial court in this case entered summary judgment against FAPA on its UDTPA claim merely because the

---

[2] *Deidrich v. Miller &c. Assoc.*, 254 Ga. 734, 736 (334 SE2d 308) (1985); *Giant Mart Corp. v. Giant Discount Foods*, 247 Ga. 775 (279 SE2d 683) (1981).
[3] OCGA § 10-1-372 (a) (2) (1989).
[4] Id. § 10-1-373.
[5] *Giant Mart Corp.*, 247 Ga. at 777.
[6] See OCGA §§ 10-1-450; 10-1-451; *Deidrich*, 254 Ga. at 737.
[7] *Giant Mart Corp.*, 247 Ga. at 777.
[8] 259 Ga. 192, 193 (378 SE2d 117) (1989).

phrase "future airline pilots" is not a registered trade or service mark or name belonging to FAPA, that ruling would have been in error. As emphasized by FAPA, the trial court did note in its order that the phrase "future airline pilots" was not a registered mark or name. However, we reject FAPA's argument that merely by noting that "future airline pilots" is not registered, the trial court improperly limited its application of the Act to registered marks or names. Rather, as explained in Division 3 below, we find that the trial court's ruling was properly based upon its findings that there was no genuine issue of material fact that "future airline pilots" is purely descriptive and has no secondary meaning, and that AIR was entitled to a judgment as a matter of law.

3. It is well established that descriptive words or phrases are incapable of exclusive appropriation, and are not entitled to protection as a mark or name unless the party seeking relief establishes that the word or phrase has acquired a secondary meaning due to (1) its use in connection with the business or trade of the party seeking relief, and (2) the public's understanding, through such use, that the word or phrase designates the goods, services, or business of that party.[9]

The evidence of record in this case shows that the phrase "future airline pilots" is generic in nature, and describes potential customers of businesses that provide career counseling services to job applicants in the airline industry. The evidence also shows that at the time it filed its claim, FAPA had not used the phrase "future airline pilots" in its advertising for at least several years. In this regard, the trial court correctly found that the phrase was not utilized by FAPA to describe its services. Moreover, the record contains no admissible evidence of consumer confusion or misunderstanding regarding the source of the phrase "future airline pilots," or that would tend to show that the phrase is associated by a substantial number of individuals with FAPA.[10] Accordingly, the trial court's ruling must be affirmed because there is no genuine issue of material fact that the phrase "future airline pilots" is descriptive in nature, and has not acquired any secondary meaning that would entitle it to protection under UDTPA, making AIR entitled to a judgment as a matter of law.

*Judgment affirmed. All the Justices concur, except Carley, J., who concurs specially.*

CARLEY, Justice, concurring specially.

I concur in the majority's affirmance of the grant of partial sum-

---

[9] See *Giant Mart Corp.*, 247 Ga. at 776.
[10] See *Wilson v. Nichols*, 253 Ga. 84, 86 (316 SE2d 752) (1984) (evidence submitted in opposition to motion for summary judgment must be admissible).

mary judgment in favor of Aviation Information Resources, Inc. (AIR) on Future Professionals, Inc.'s (FAPA) claim under the Georgia Uniform Deceptive Trade Practices Act (Act). I cannot, however, agree with the majority that, in order to reach that result, the unanimous decision in *Elite Personnel v. Elite Personnel Svcs.*, 259 Ga. 192, 193 (1) (378 SE2d 117) (1989) must be overruled.

This Court always has been and should continue to be reluctant to overrule its prior unanimous decisions. *Slowik v. Knorr*, 222 Ga. 669, 671 (151 SE2d 726) (1966). This is especially true where the overruling of a previous decision is unnecessary. See, e.g., *Gifford-Hill & Co. v. Harrison*, 229 Ga. 260, 262 (191 SE2d 85) (1972); *Drury v. State*, 211 Ga. 888, 889 (89 SE2d 513) (1955). Compare *Hall v. Hopper*, 234 Ga. 625, 631-634 (216 SE2d 839) (1975), where we held that a majority of this Court has the *authority* to vote not to follow prior unanimous decisions. Overruling *Elite Personnel* is clearly unnecessary because, as the majority itself notes, the trial court did *not* improperly limit its application of the Act to registered marks or names, but *did* properly base its ruling on the finding that the phrase "future airline pilots" is purely descriptive and has no secondary meaning as a matter of law.

More importantly, however, nothing in *Elite Personnel* conflicts with the majority's conclusion that registration of the relevant trade or service mark or name is not a prerequisite to seeking relief under the Act. *Elite Personnel*, supra at 193 (1), merely holds that one of the parties therein could not claim the protection of the Act because it "failed to register its name *as required by* OCGA § 10-1-490." (Emphasis supplied.) By its terms, OCGA § 10-1-490 mandates registration of certain trade names and OCGA § 10-1-493 provides that the failure to register when required is a misdemeanor. As the majority points out in its first footnote, "the sole remedy available under the Act is 'injunctive relief . . . *under the principles of equity*,' OCGA § 10-1-373 (a)." (Emphasis in original.) It seems clear to me that one who has committed a misdemeanor by failing to register a trade name cannot be deemed to have "clean hands" when seeking injunctive relief against another party's use of that name. Thus, I believe that this Court was correct in its narrow holding in *Elite Personnel*, supra at 193 (1), that one who is required to register a trade name under OCGA § 10-1-490 and fails to do so cannot claim the protection of the Act.

Because I believe that the majority has unnecessarily and erroneously overruled *Elite Personnel*, but nevertheless has correctly affirmed the judgment of the trial court, I concur specially.

DECIDED MAY 20, 1996.

*James L. Seigle*, for appellant.
*Greenfield, Bost & Kliros, William L. Bost*, for appellees.

## S96A0356. DINNING v. THE STATE.
### (470 SE2d 431)

HUNSTEIN, Justice.

Jack Douglas Dinning was found guilty of two counts of murder in the shooting deaths of Eric Rider and his mother, Dorothy Rider, two counts of armed robbery involving the Riders, and one count of burglary, as to the Riders' home. He was sentenced to four consecutive life sentences for the murders and armed robberies and twenty years to run concurrent on the burglary. He appeals the denial of his motion for a new trial.[1] Because the State's failure to disclose evidence of agreements of immunity it had made with material witnesses violated *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972) and constituted harmful error in this case, we reverse.

1. The jury was authorized from the evidence adduced at trial to make the following findings of fact: Eric Rider, who was confined to a wheelchair, lived with his 91-year-old mother at a remote residence near Lake Rabun. Mr. Rider kept at his home items such as rare gold and silver coins, numerous firearms, and stacks of old, mostly uncirculated fifty dollar bills (many of which were 1934 fifty dollar gold certificates), which Mr. Rider banded together in amounts of $1,000 per stack. Witnesses testified they spoke with Mr. Rider on January 21, 1989 but could not contact him thereafter, even for scheduled deliveries. On February 15, 1989, the Riders' bodies were found inside the residence, which had been thoroughly ransacked. Investigation revealed that coins, bills, and weapons were missing from the home. Expert testimony established that both victims had been killed by multiple gunshots to the head with a .22 caliber firearm and that the bullets could have been fired from a High Standard .22 caliber pistol.

At the time of the Riders' murders, Dinning had $2.34 in his checking account, less than $250 in two savings accounts, and was earning between $5 and $5.25 an hour at his handyman job. On Janu-

---

[1] The crimes were committed on or about January 21, 1989; the victims' bodies were discovered February 15, 1989. Dinning was indicted on May 21, 1992 in Rabun County. He was found guilty on May 13, 1993 and was sentenced the same day. His motion for new trial, filed on June 4, 1993 and amended on February 17, 1995, was denied on September 15, 1995. A notice of appeal was filed on October 10, 1995. The appeal was docketed in this Court on November 28, 1995 and was orally argued on February 19, 1996.

ary 22, 1989, the day after the murders likely occurred, Dinning telephoned Dennis Coton in Tampa, Florida and asked for Coton's help in purchasing a pound of marijuana, which Dinning estimated would cost $1,600. Dinning went to Florida on January 24 or 25 where he gave Coton several weapons including a High Standard .22 caliber pistol and a 1922 silver dollar. Dinning also purchased one pound of marijuana from Charles Piccirillo and Fred Venable for which he paid $1,500 in neatly stacked fifty dollar bills, some of which were 1934 fifty dollar gold certificates which looked like they had never been in circulation. Dinning made two other purchases of marijuana from Piccirillo and Venable, one for five pounds in February and another for ten pounds in April, paying the $7,500 and $15,000 purchase prices with stacks of $50's banded in $1,000 amounts. In May and July 1989, Dinning sold rare gold and silver coins which had belonged to Mr. Rider, telling the purchaser the coins belonged to his wife. Dinning also sold several guns identified as belonging to Mr. Rider to various individuals in late 1990.

Police learned of the existence of one of the guns in early 1991 and traced the weapon back to Dinning, who, in three conversations in March 1991, told police he had purchased the weapon at a flea market. Police investigation subsequently revealed the coin sales and marijuana purchases. Dinning was arrested on May 19, 1992. Dinning's father, upon learning of his son's arrest, telephoned Coton, retrieved the High Standard .22 caliber pistol Dinning had given Coton, and discussed with Coton his plan to dispose of the weapon by throwing it off the Howard Franklin Bridge in Tampa. Witnesses from the Florida Department of Transportation identified a High Standard .22 caliber pistol recovered from the emergency lane on the Howard Franklin Bridge in Tampa on May 28, 1992. That weapon was identified as belonging to Mr. Rider.

When arrested in May 1992, the statement Dinning gave police was consistent with his testimony at trial: that Mr. Rider had given Dinning money and guns as payment for buying other guns for Mr. Rider and that Mr. Rider had given Dinning the coins to use for a gun sale but when that deal fell through Mr. Rider told Dinning to hold the coins until the next sale (which never occurred). Dinning testified that he went to Tampa and purchased one ounce of marijuana in January and one pound in February 1989, paying with money he had received from various jobs as well as from Mr. Rider for his gun-running activities.

We find the evidence adduced at trial sufficient to enable a rational trier of fact to find Dinning guilty of the charged crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The record supports the trial court's finding[2] that Georgia law enforcement officers promised immunity against prosecution for drug-related charges to Coton, Piccirillo, and Venable, the three Florida witnesses involved in Dinning's marijuana purchases. The record also supports the trial court's finding that under the unique facts in this case, the officers who investigated the murders must be considered a part of the prosecution team so as to render the district attorney responsible for the promises made by members of the prosecution team to these witnesses. *Zant v. Moon*, 264 Ga. 93, 100 (440 SE2d 657) (1994). Accordingly, we agree with the trial court that the State's failure to provide Dinning with information concerning promises made regarding prosecutions against the three Florida witnesses violated *Giglio v. United States*, supra.

The trial court correctly recognized that a *Giglio* violation does not automatically result in a new trial. See *Owen v. State*, 265 Ga. 67, 69 (2) (453 SE2d 728) (1995). The trial court rejected Dinning's argument that because the *Giglio* violation was intentional, the evidence at trial should be reviewed under a standard of review of whether the undisclosed information could have affected the outcome, *United States v. Alzate*, 47 F3d 1103, 1110 (11th Cir. 1995), and instead found that the information was withheld as a result of negligence. Applying the "reasonable probability" standard of review, *Owen v. State*, supra at 70 (2), the trial court then concluded that even had the evidence been disclosed to the defense, the result of the proceeding would not have been different. Id. It is not necessary to address Dinning's argument that the trial court applied an incorrect standard of review because we find that, even under the standard of review used by the trial court, reversal is required.

The trial court's ruling that there was no reasonable probability the proceedings would have been different is based on its conclusions that the three Florida witnesses were not key prosecution witnesses (in that the subject matter of their testimony was corroborated by Dinning and the other evidence adduced by the State was sufficient to support the jury's verdict) and that the impeachment evidence showing bias or interest was marginal (in that the offers of immunity were not compelling and the witnesses were not implicated in the crimes for which Dinning was charged). We disagree with both conclusions.

Coton, Piccirillo, and Venable were clearly key prosecution witnesses. Their testimonies were crucial in that they established that within days of the murder Dinning possessed large amounts of Mr. Rider's money, as well as his coins and guns. No other evidence estab-

---

[2] Evidence was adduced during the hearing on Dinning's motion for a new trial and the trial court's findings are set forth in its order denying that motion.

lished Dinning's possession of large amounts of the stacked and banded fifty dollar gold certificates. Dinning's testimony cannot be considered as corroboration of these witnesses' testimonies, given the conflicts over such significant matters as the number of purchases, the amount of marijuana purchased, and the money used for the payments. As to the other evidence adduced by the State, that evidence consisted of Dinning's sales of coins and guns that occurred at least four months, but most over a year, after the crimes. This evidence lacks the immediacy of the transactions testified to by the Florida witnesses and does not raise a comparably sharp inconsistency with Dinning's explanation for his possession of the guns and coins.

We also disagree with the trial court's conclusion that the offers of immunity were not "compelling." The videotape of Coton's interview with the police contains a protracted discussion of Coton's immunity under Georgia and Florida law in exchange for his testimony against Dinning. While the offers to Piccirillo and Venable were less specific and detailed than the offer made to Coton, they nevertheless clearly showed that these witnesses knew, in exchange for their testimony, that they would not be at risk of being prosecuted for their involvement in illegal drug deals. These offers were not of "such a marginal benefit . . . that it is doubtful it would motivate a reluctant witness." *McCleskey v. Kemp,* 753 F2d 877, 884 (11th Cir. 1985). See also *Patillo v. State,* 258 Ga. 255, 260 (4) (c) (368 SE2d 493) (1988). Finally, the fact that none of these three witnesses was implicated in the Riders' murders is not the relevant consideration. Rather, "[w]hat counts is whether the witness may be shading his testimony in an effort to please the prosecution. [Cit.]" (Emphasis and punctuation omitted.) *Owens v. State,* 251 Ga. 313, 316 (305 SE2d 102) (1983).

Reversal is required

"if the [undisclosed] evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," i.e., "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [Cit.]

*Patillo v. State,* supra at 261. While we recognize that materiality is not established by the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial," *United States v. Agurs,* 427 U. S. 97, 109-110 (III) (96 SC 2392, 49 LE2d 342) (1976), we conclude from the circumstantial nature of the evidence against Dinning and the critical importance of the testimony of Coton, Piccirillo, and Venable to the State's case against Dinning, that the State's failure to disclose the challenged evidence violated Dinning's due process rights to a funda-

mentally fair trial and has undermined confidence in the outcome of the trial. We therefore hold that the trial court erred by denying Dinning's motion for a new trial.

3. Dinning also contends error in the State's failure to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). However, because a new trial is required, see Division 2, supra, any *Brady* violation is moot given the defense's current knowledge of the evidence the State allegedly failed to disclose.

4. Likewise, the reversal of this case renders it unnecessary for this Court to address Dinning's claims involving ineffective assistance of counsel, jury selection, and remarks made by the prosecutor in closing argument.

5. We turn now to those enumerated errors which may arise upon retrial: (i) Contrary to Dinning's contention, we find no error in the trial court's ruling that he was not entitled to a hearing pursuant to Uniform Superior Court Rule 31.3 (B) (evidence of similar transactions) as to the State's evidence regarding the manner in which Dinning used the money taken from the Rider residence. (ii) The record does not support Dinning's contention that the Sheriff of Rabun County personally received reward money from a trust fund set up by Mr. Rider and we find no error in the trial court's conclusion that the receipt of the money by the Rabun County Board of Commissioners raised no sense of impropriety so as to call into question the fairness of the criminal justice system. Compare *Young v. United States*, 481 U. S. 787 (III) (B) (107 SC 2124, 95 LE2d 740) (1987). (iii) We find no error in the trial court's admission of the State's only photo that depicted a full frontal pre-autopsy view of Ms. Rider's body. *Williams v. State*, 265 Ga. 681 (5) (461 SE2d 530) (1995). (iv) The record establishes that probable cause existed for the issuance of a search warrant of Dinning's residence and thus the trial court did not err by denying Dinning's motion to suppress evidence seized during that search. (v) Evidence adduced at the hearing conducted pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964) supports the trial court's rulings that Dinning was not in custody when he made statements to the police in March 1991 and that his post-arrest statement in May 1992 was voluntarily and intelligently made and was not the product of coercion. Therefore, the trial court did not err by denying Dinning's motion to suppress these statements.

6. Dinning failed to raise his final enumerated error in the trial court. Thus, it will not be addressed.

*Judgment reversed. All the Justices concur.*

Decided May 20, 1996.

*Wolfe & Steel, Brian E. Steel, Michael R. Duponte,* for appellant.

*Michael H. Crawford, District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

## S96A0792. MILLEDGE v. THE STATE.
### (470 SE2d 439)

CARLEY, Justice.

After a jury trial, Willie James Milledge was found guilty of felony murder while in the commission of an aggravated assault, aggravated assault and possession of a firearm during the commission of a crime. He was given a life sentence for the murder, a concurrent ten-year sentence for the aggravated assault and a concurrent five-year sentence for the possession of a firearm offense. He appeals from the judgments of conviction and sentences entered by the trial court on the jury's guilty verdicts.[1]

1. Milledge enumerates the general grounds, urging that his justification defense demanded his acquittal. However, the struggle with the unarmed victim to which Milledge testified at trial was inconsistent with his previous versions of the events and with his own lack of injuries. When the evidence is construed most strongly in favor of the guilty verdicts, the jury would have been authorized to find the following: Milledge and the victim were neighbors. They and another neighbor began drinking. After the other neighbor passed out, Milledge got a gun and shot the victim who was standing on his own porch. Milledge followed the wounded victim into his house and continued to fire. The victim was found in the back hallway of his house and he died from a gunshot wound to the chest. From this evidence, a rational trier of fact could find beyond a reasonable doubt that Milledge, acting without justification, used a gun to fire a fatal shot at the unarmed victim. Accordingly, the general grounds are without merit. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[1] The crimes were committed on December 21, 1994 and Milledge was indicted on June 8, 1995. The guilty verdicts were returned on September 11, 1995 and the judgments of conviction and sentences were entered on that same day. A motion for new trial was filed on September 28, 1995 and was denied on January 10, 1996. The notice of appeal was filed on January 11, 1995, the case was docketed in this Court on February 6, 1996 and the appeal was submitted for decision on April 1, 1996.

2. "Unless there are separate victims, a defendant may not be convicted of both felony murder and the underlying felony. [Cits.]" *Brown v. State*, 256 Ga. 439 (2) (349 SE2d 738) (1986). In the indictment upon which Milledge was being tried, the separate aggravated assault count alleged his commission of the same aggravated assault upon the victim as underlay the felony murder count. Thus, the former merged into the latter and it was error to enter a separate judgment of conviction and concurrent ten-year sentence for the aggravated assault.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED MAY 20, 1996.

*Jones & Jones, L. Earl Jones, Robert J. Pinnero,* for appellant.
*Britt R. Priddy, District Attorney, Michael J. Bowers, Attorney General, Allison B. Goldberg, Assistant Attorney General,* for appellee.

S95G1603. CANTRELL v. THE STATE.
(469 SE2d 660)

THOMPSON, Justice.

We granted certiorari to the Court of Appeals in *Cantrell v. State*, 217 Ga. App. 641 (459 SE2d 564) (1995), to answer this question: When a jury states it has reached a verdict of guilty on an unindicted lesser offense that is included within an indicted offense, and the jury further states that it is unable to agree on the indicted offense, is it error for the trial court to reject the verdict and require the jury to reach agreement on the indicted offense before rendering a verdict on the lesser included offense?

Cantrell was indicted and tried for possession of cocaine with intent to distribute. The court charged the jury that possession of cocaine was a lesser included offense. In the midst of deliberations, the jury inquired whether it could render a verdict on possession of cocaine without reaching a verdict on intent to distribute. The court replied:

> You should first consider whether the State has proven possession with intent to distribute beyond a reasonable doubt. If so you would be authorized to find the defendant guilty. If not you should then consider whether the State has proven possession beyond a reasonable doubt. If so you would be authorized to find the defendant guilty of posses-

sion. If not, you should find the defendant not guilty.

The jury returned to the jury room and continued deliberations. Anticipating an evening recess, the court brought the jury into the courtroom and asked if it needed more time to deliberate. The foreman replied that further deliberation was unnecessary — they could "settle it right now." Asked if he had a verdict, the foreman replied affirmatively. The verdict was tendered to the court. Dated, and signed by the foreman, it read: "We the jury . . . find the defendant . . . guilty for the possession of a controlled substance. . . . We the jury are unable to reach a verdict on the charge of intent to distribute a controlled substance. . . ." The court then asked if the jury was able to agree *unanimously* one way or the other on the intent to distribute charge and the foreman replied: "It hadn't been unanimous. We're in disagreement." The court inquired whether the jury wanted to continue deliberating on the indicted offense. When a juror responded affirmatively, the court decided to send the jury back for further deliberations. Once again, it instructed the jury that it must consider the indicted offense before it considered the lesser included offense.

As soon as the jury left the courtroom to resume deliberations, Cantrell asserted that unanimity on the greater offense was not required and that the court should have accepted the verdict on the lesser included offense. He pointed out that a unanimous verdict had been reached, i.e., the jury unanimously returned a verdict of guilty of possession of cocaine. The court disagreed, taking the position that the jury had not returned a verdict. The next day, the jury found Cantrell guilty of possession of cocaine with intent to distribute.

The Court of Appeals upheld the conviction, ruling that the trial court was authorized to shelve any verdict on the lesser included offense until the jurors reached a unanimous verdict on the greater offense. *Cantrell*, supra at 642. We reverse.

This Court has long held that when an indictment charges an offense, and the jury returns a verdict of guilty on a lesser included offense, the verdict operates as an acquittal of the greater offense. *Miller v. State*, 58 Ga. 200, 202 (2) (1877); *Jordan v. State*, 22 Ga. 545 (1857). Thus, if a jury returns a verdict on a lesser included offense, further deliberations are precluded.[1] In this case, the jury returned a verdict of guilty of possession of cocaine. In so doing, the jury acquitted Cantrell of the greater offense, possession of cocaine with intent to distribute. *Miller v. State*, supra.

---

[1] The rule is otherwise, however, if the jury returns a verdict of guilty with regard to an offense which was not within the range of instructions given by the court. *State v. Freeman*, 264 Ga. 276 (444 SE2d 80) (1994).

*Alexander v. State*, 247 Ga. 780 (279 SE2d 691) (1981), upon which the Court of Appeals relied, does not compel a different result. While *Alexander* acknowledged that a jury should be charged that it has the authority to consider a lesser offense if it finds the defendant "not guilty" of the greater offense,[2] it did not intimate that a court can insist upon unanimous agreement on a greater offense before consideration of a lesser offense. In fact, by pointing out that the trial court did not require unanimity on the greater offense, *Alexander* implied that such a charge would be erroneous. In so doing, *Alexander* cited *People v. Ray*, 204 NW2d 38 (Mich. App. 1972), in which the Michigan Court of Appeals held that where a jury deliberates a greater offense and an included offense, unanimity is not required for the greater offense before the jury can vote on the included offense.

*People v. Ray*, supra, yields a sound result. Indeed, as the District of Columbia Court of Appeals noted in *Jones v. United States*, 544 A2d 1250 (D.C. App. 1988), requiring unanimity with respect to the greater offense gives the prosecution an unfair advantage.

In *Jones*, defendant was charged with possession of cocaine with intent to distribute. After deliberating, the jury twice reported that it was deadlocked. It then inquired whether it could consider the lesser offense of simple possession if it could not reach an agreement on the greater offense. The court instructed the jury that it must convict or acquit on the greater offense before considering the lesser offense. On appeal, the court rejected a unanimity requirement with respect to the greater offense:

> Under [a unanimity requirement] the lesser offense cannot even be considered until the whole jury votes to acquit the defendant of the greater [offense]. Jurors favoring the lesser offense, unless they can dissuade those favoring the greater, must either hold out until a mistrial is declared because of the deadlock or surrender their opinions and vote for the greater offense. [Cit.] Members of the jury who have substantial doubts about an element of the greater offense, but believe the defendant guilty of the lesser offense, may very well choose to vote for conviction of the greater rather than to hold out until a mistrial is declared, leaving the defendant without a conviction on any charge. [Cits.]

---

[2] *Alexander*, supra at 784. We recognize that *Alexander* has been cited for the proposition that a jury should not consider a lesser offense unless the defendant be found not guilty of the greater offense. See, e.g., *Leslie v. State*, 211 Ga. App. 871, 872 (440 SE2d 757) (1994). We have no quarrel with such a charge so long as the court does not insist upon unanimity and is willing to accept a verdict on the lesser offense.

Id. at 1253. Accord *State v. Ogden*, 580 P2d 1049 (Or. App. 1978).

While this case does not involve a unanimity instruction, the end result is the same. By refusing to accept the jury's verdict of guilty on the possession offense, the court forced the jury to reach unanimous agreement on the intent to distribute offense before considering the possession offense.[3]

It is true that, generally speaking, if a jury is in disagreement, the disagreement is not a verdict. *Romine v. State*, 256 Ga. 521, 525 (350 SE2d 446) (1986). Thus, where a jury deliberates imposition of the death penalty, unanimity, one way or the other, is required. Id. Likewise, where a jury deliberates separate crimes, unanimity, one way or the other is required for each crime. But where, as here, a jury deliberates a greater offense and an included offense, unanimity is not required for the greater offense before the jury can vote on the included offense. See *Alexander v. State*, 247 Ga. 780, 784, supra. In this connection, we note that the pattern jury instructions do not require unanimity with respect to an indicted offense before consideration of an included offense. They simply require a unanimous verdict as to the whole.

We conclude that the jury did not have to reach unanimous agreement on the possession of cocaine with intent to distribute offense before considering the lesser included offense of possession of cocaine. It follows that the trial court erred in rejecting the verdict and requiring the jury to deliberate further.[4] *Miller v. State*, 58 Ga. 200, supra.

*Judgment reversed. All the Justices concur, except Sears, Hunstein and Carley, JJ., who dissent.*

HUNSTEIN, Justice, dissenting.

I respectfully dissent to the majority's opinion because I find neither the facts of this case nor the law of this State requires reversal of the trial court's judgment.

Cantrell and co-defendant Millsap were both charged with possession of cocaine with intent to distribute. The trial court charged the jury on the lesser-included offense of possession of cocaine. The record reveals that during the course of its deliberations, the jury presented the trial court with the question "[c]an a verdict be reached on the possession charge without a verdict on the intent to

---

[3] It was necessary for the jury to *consider* the intent to distribute charge before it considered the possession charge. The court so instructed the jury and it complied with that instruction.

[4] The State erroneously argues that the jury did not return a verdict at all because its findings were written on mere notepaper. "A verdict is legal even though written on the wrong paper. Verdicts acquire their legality from return and publication. [Cits.]" *Martin v. State*, 73 Ga. App. 573, 578 (4) (37 SE2d 411) (1946).

distribute charge?" Without objection by defense counsel, the trial court responded to this question by charging the jury:

> You should first consider whether the State has proven possession with intent to distribute beyond a reasonable doubt. If so you would be authorized to find that defendant guilty. If not you should then consider whether the State has proven possession beyond a reasonable doubt. If so you would be authorized to find the defendant guilty of possession. If not, you should find the defendant not guilty.

The giving of such an instruction is not error. *Leslie v. State*, 211 Ga. App. 871, 872 (440 SE2d 757) (1994). The jury resumed deliberations but a brief time thereafter, the trial court had the jury brought back into the courtroom to inquire into their progress and determine whether the jury would like to continue deliberating that evening. The jury foreperson acknowledged that the jury was very close to reaching a verdict and declined the offer of further deliberations, stating that "I think we can settle it right now." When the court asked the foreperson if he had the verdict with him, the foreperson responded affirmatively and handed the court a sheet of paper on which had been written as to each defendant the jury's finding of "guilty for the violation of possession of a controlled substance, cocaine" but also as to each defendant the statement that "[w]e the jury are unable to reach a verdic[t] on the charge of intent to distribute a controlled substance."

With defense counsel agreeing that clarification was required, the trial court asked the jury whether the "unable to reach a verdict" language meant that "you have unanimously agreed that it hasn't been proven beyond a reasonable doubt that [each defendant in turn] possessed cocaine with intent to distribute?" As to Cantrell, the foreperson replied that "[i]t hadn't been unanimous."[5] The jurors and foreperson responded affirmatively to the court's question whether the jury wanted to return to the jury room to discuss the matter further and, over objection that a verdict had been rendered, the trial court allowed deliberations to resume. The jury returned a verdict finding both defendants guilty of possession of cocaine with intent to distribute as well as guilty of possession of cocaine.

Because a lesser-included offense by its very nature embodies at least one essential element of a greater offense, it is axiomatic that

---

[5] As to co-defendant Millsap, although the foreperson initially stated that the jury unanimously agreed that the charge had not been proven, after the trial court noted that other members of the jury were shaking their heads, the foreperson then clarified that the jury was not unanimous.

the defendant must necessarily be guilty of the lesser offense in order to be found guilty of the greater. However, a factfinder is not authorized to find a defendant guilty of a lesser offense and then decline to deliberate upon or otherwise consider a charged greater offense. Rather, the factfinder's job is complete upon a finding of guilty on a lesser offense only in those instances where the factfinder has either determined that the State failed to carry its burden of proof as to those additional elements that constitute the greater offense or where the jury has hopelessly deadlocked on the greater offense. Hence, while a jury may find the evidence insufficient or deadlock on the greater offense, a jury cannot disregard or ignore the greater offense or fail or refuse to consider it altogether.

Instructing a jury to consider the greater offense first avoids the possibility that a jury will mistakenly conclude that its finding of guilty on a lesser offense has barred any consideration of the greater offense. Nevertheless, as a practical matter, it is neither unreasonable nor unforeseeable that a jury, in its internal handling of a case, may resolve the lesser offense before reaching the greater, given that a finding of not guilty on the lesser charge would end the need for further deliberations. In essence, the jury may merely have saved until the end of deliberations their resolution of a factually more controversial issue arising out of the additional elements of the greater offense. The fact that the jury approached a case in this reverse order does not, however, preclude the jury as a matter of law from deliberating upon and resolving the greater offense where, as a matter of fact, it is established that the jury has not reached and resolved the greater offense[6] or otherwise hopelessly deadlocked thereon.

In this case the jury had been specifically instructed that it had to render a verdict on the greater offense before it could reach the lesser offense, receiving this instruction only a brief time before the trial court on its own volition brought the jury back into the courtroom to inquire about recessing for the evening. In response to inquiries initiated by the court, the jury foreperson handed over a previously prepared document which reflected that the jury had either disregarded the trial court's instruction in regard to the sequence their deliberations should take or acted in reverse order on the matter before receiving the instruction (the latter being the more likely explanation given the time frame involved). While normally the sequence a jury follows would remain unknown and ultimately irrelevant, the trial court's fortuitous interruption of the jury's deliberations in this case had the effect of exposing the approach this

---

[6] The situation would, of course, be different where the jury finds the defendant not guilty of the lesser charge.

particular jury had taken. Although this case is unusual because the jury had memorialized its preliminary findings, it is evident from the document given the court by the foreperson, the uncontroverted need for clarification, and the responses the trial court received from the jury, that no verdict had yet been returned in this case.[7] All that the document proffered by the jury reflects is that the jury had a consensus on the possession element but disagreed over the intent to distribute elements.[8] "Where a jury is unable to agree on a verdict, that disagreement is not itself a verdict." *Romine v. State*, 256 Ga. 521, 525 (350 SE2d 446) (1986).

This was not an instance in which the jury had reached a verdict on the greater offense and had found the defendant guilty only on the lesser offense; this was not an instance in which the jury had deadlocked on the greater offense and had settled, instead, on a verdict on the lesser offense. Rather, this is a case where, at the time the trial court interrupted their deliberations, the jury was in disagreement over the greater offense but in agreement as to one essential element of that greater offense, which was conclusive as to the lesser offense. Because the jury had neither resolved the intent to distribute charge for or against defendants nor reached an unbreakable impasse in their deliberations on that charge, the trial court correctly directed the jury to resume deliberating and did not err in refusing to make the jury's preliminary finding the judgment of the court.

I am authorized to state that Justice Sears and Justice Carley join in this dissent.

DECIDED MAY 6, 1996 —
RECONSIDERATION DENIED MAY 23, 1996.

*Troy R. Millikan*, for appellant.
*Lydia J. Sartain, District Attorney, Thomas A. Gump, Assistant District Attorney*, for appellee.

---

[7] Notwithstanding the antiquated writing style of the two cases cited by the majority, it is apparent from a reading of those cases that they are factually distinguishable in that they both involve verdicts that were returned by the juries therein. Nothing in those cases support the majority's proposition that a finding of guilty on a lesser offense requires acquittal on the greater offense in situations where the evidence establishes that the jury has not completed its deliberations.

[8] There is no evidence that the jury in this case had deadlocked over the greater offense; rather, the evidence is that they disagreed over that offense but wanted to continue their deliberations. This crucial fact distinguishes this case from the foreign cases cited by the majority.

S96A0446. FRANKS v. THE STATE.

(469 SE2d 651)

HUNSTEIN, Justice.

The state is seeking the death penalty against David Scott Franks for the murder of Deborah Diane Wilson.[1] During the term of the superior court in which he was indicted, Franks filed a demand for trial pursuant to OCGA § 17-7-171 (a). More than two regular terms of court were then convened and adjourned. Although at both terms juries were impaneled and qualified to try Franks, and the defense was present in court announcing ready for trial, Franks has not been tried. Therefore, citing OCGA § 17-7-171 (b), Franks filed a motion for discharge and acquittal. The trial court subsequently conducted a hearing pursuant to OCGA § 17-10-35.2 to determine whether interim appellate review would be appropriate. In that hearing, the court denied Franks' motion for discharge and acquittal, prompting this direct appeal under OCGA § 5-6-34.[2] The court also determined that pretrial appellate review is appropriate. The court then filed a report in the office of the clerk of the superior court, pursuant to OCGA § 17-10-35.1, certifying that all pretrial proceedings are complete in the trial court and setting forth those issues which the trial court deemed to warrant pretrial review.[3] We hold that because pretrial review proceedings are not yet complete in this Court, the counting of terms under subsection (b) of OCGA § 17-7-171 has not begun, and the trial court's ruling must be affirmed.

Pursuant to OCGA § 17-7-171 (c),

[i]n cases involving a capital offense for which the death penalty is sought, if a demand for trial is entered, the counting

---

[1] Franks was also indicted for felony murder, armed robbery, two counts of aggravated battery, two counts of aggravated assault, two counts of cruelty to children, burglary and theft by taking in connection with the murder.

[2] See *Hubbard v. State*, 254 Ga. 694 (333 SE2d 827) (1985).

[3] The relief which Franks seeks in this direct appeal, were he to prevail, would render moot any other pretrial rulings which might arguably have been in error. Therefore, Franks declined to raise, in the hearing held pursuant to OCGA § 17-10-35.2, any issues warranting interim appellate review, and neither the state nor Franks filed reports pursuant to OCGA § 17-10-35.1 (a). We anticipate that the parties may elect to file such reports following disposition of this appeal, and neither party has, by delaying the filing of a report pending this appeal, waived its right to do so. Because the report of the trial court has been transmitted to this Court only as a part of the record in this direct appeal and further because the reports of the parties, if any, have not been transmitted to this Court by the clerk of the superior court pursuant to OCGA § 17-10-35.1 (c), review of pretrial proceedings in this Court pursuant to subsection (d) has not yet commenced. Upon remand of this case after disposition of this appeal, the trial court is directed to hold a final hearing pursuant to OCGA § 17-10-35.2 and to file an amended report pursuant to OCGA § 17-10-35.1 (a). The parties shall then file their reports, if any, as directed in subsection (a), and the clerk of the superior court shall transmit to this Court the reports, supplemental transcripts, supplemental record, if any, and any application for appeal as set forth in subsection (c).

of terms under subsection (b) of this Code section shall not begin until the convening of the first term following the completion of pretrial review proceedings in the Supreme Court under Code Section 17-10-35.1.

Although subsection (c) is the only portion of the statute exclusively applicable to capital cases in which the death penalty is sought, Franks argues that its provisions do not apply in this case. He points out that pretrial review in the Supreme Court is not mandatory, first because this Court may deny interim appellate review pursuant to OCGA § 17-10-35.1 (d), and second because the trial court may enter an order obviating interim appellate review pursuant to OCGA § 17-10-35.2, so that pretrial review proceedings in this Court never commence. Consequently, he contends, subsection (c) cannot be read to apply to all death penalty cases, and unless pretrial review proceedings in this Court have commenced within the time period provided for trial in subsection (b), the counting of terms in a death penalty case must proceed under subsection (b) without regard to subsection (c). Franks cites in support of this proposition *Thornton v. State*, 264 Ga. 563, 574 (18) (449 SE2d 98) (1994) and *Dalton v. State*, 263 Ga. 138, 139 (429 SE2d 89) (1993), both death penalty cases, in which we applied the procedure for counting terms set forth in subsection (b). Any other approach, he contends, could delay pretrial proceedings indefinitely, denying defendants in death penalty cases equal protection and due process.

We cannot agree with Franks that subsection (c) is inapplicable in this case, thus compelling a conclusion that his motion for discharge and acquittal should have been granted under subsection (b). Subsection (c) nowhere indicates that, for its provisions to apply in a death penalty case, the trial court must either certify issues for pretrial review or enter an order obviating such review within the time period provided for trial in subsection (b). It merely states that the counting of terms shall not begin in death penalty cases until the convening of the first term after completion of pretrial review proceedings in this Court. In this case, the trial court has determined that such review is warranted and has filed a report to that effect. Therefore, "pretrial review proceedings in [this] Court," which include, and may be limited to, the determination whether to grant interim review, are not complete, and the counting of terms under subsection (b) has not begun. However, had the trial court concluded that no issues warranted certification for pretrial appellate review and entered an order obviating such review, we would not agree with the construction of the statute urged by Franks. On the contrary, as we here construe subsection (c) of the statute, where the trial court deems pretrial review unwarranted, the counting of terms under subsection (b) would

not commence until the trial court entered its order obviating pretrial appellate review. Neither *Thornton* nor *Dalton* compels a different conclusion, because those opinions do not address circumstances involving the timeliness of proceedings under the Unified Appeal process.

We acknowledge that the statute, as we construe it, fails to limit the duration of pretrial proceedings in the superior court in death penalty cases. Nevertheless, the statute does not unconstitutionally deny death penalty defendants equal protection or due process; according the trial court a longer period for pretrial proceedings in death penalty cases than is allowed in other capital cases is rationally related to the legitimate governmental interest in following the Unified Appeal process. See *Henry v. State*, 263 Ga. 417 (434 SE2d 469) (1993); *Harper v. State*, 203 Ga. App. 775, 777 (417 SE2d 435) (1992). Likewise, the statute does not and cannot deprive death penalty defendants of their state or federal rights to a speedy trial. Those rights are fundamental, and OCGA § 17-7-171 is merely a procedural device in aid and implementation of the state constitutional right. *Henry*, 263 Ga. at 418. We also note that the statute, as contrasted with the state and federal constitutions, affords a defendant no remedy for delay in pretrial proceedings until either the trial court issues an order obviating interim review or until interim appellate review proceedings are completed in this Court. However, in the absence of constitutional infirmities, it is the role of the General Assembly, not this Court, to determine whether and how to limit by statute the duration of pretrial proceedings in death penalty cases.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 29, 1996 —
RECONSIDERATION DENIED MAY 23, 1996.

*Thompson, Fox, Chandler, Homans & Hicks, Joseph A. Homans, Robbins, Smith & McLeod, Stanley W. Robbins,* for appellant.

*Lydia J. Sartain, District Attorney, Lee Darragh, Leonard C. Parks, Assistant District Attorneys, Michael J. Bowers, Attorney General,* for appellee.

S96A0504. KELLY v. THE STATE.
(469 SE2d 653)

HUNSTEIN, Justice.

Eric Lee Kelly was convicted of the felony murders of Stella Marie Thigpen and Floyd Thigpen. He appeals from the denial of his

motion for a new trial.[1]

1. Evidence at trial established that Ms. and Mr. Thigpen were shot during an armed robbery of their pawn shop/gun store. Sixty-three handguns could not be accounted for after the robbery. Mr. Thigpen was shot three times and died at the scene; Ms. Thigpen, who was shot four times, was alive when police arrived. She told an officer that she and her husband had been shot by two black males; that both men had been armed, with one carrying a .44 caliber Magnum revolver; and that the men left in a large, older-model, blue automobile. Ms. Thigpen died shortly thereafter from her wounds.

Expert testimony established that a .44 caliber Magnum revolver is a distinctive, readily-recognizable weapon but that the victims had died from gunshot wounds inflicted by a much different weapon, a Stallard Arms .9 millimeter handgun that was found seven months after the crimes occurred by two young men preparing to swim at a Richmond County creek.[2] The weapon belonged to Eric Crawford, who testified that Kelly and Dewayne McCord[3] came to his home the morning of the crimes and, after telling him they had to "get some guns," borrowed Crawford's already-loaded weapon "in case anything happens." Around noon (shortly after the crimes), Kelly phoned Crawford and Crawford went promptly to Kelly's home, where he found Kelly, McCord, and a cardboard box containing handguns.[4] He was told that the two men had to "throw away" Crawford's gun and he was allowed to select two new guns from the box. Crawford testified that later that same day, he returned the guns to McCord, after McCord told him that Crawford would be charged with murder if caught with them, and that Kelly came to his home and told him McCord had shot two people.

Kelly gave a statement to police that he went to the Thigpens' shop with McCord, but he did not know that McCord was planning a robbery; that he froze when McCord shot the Thigpens; and that he

---

[1] The homicides occurred on December 8, 1992. Kelly was indicted October 19, 1993 in Richmond County on two counts of murder, two counts of felony murder, one count of armed robbery, and one count of possession of a firearm during commission of a crime. The State's notice of intent to seek the death penalty was filed December 21, 1993. Kelly was found guilty of two counts of felony murder on May 24, 1995 and was sentenced to life imprisonment the same day. His motion for new trial was filed May 26, 1995, amended November 6, 1995 (but filed November 30), and denied November 14, 1995. A notice of appeal was filed on December 6, 1995. The appeal was docketed in this Court on December 21, 1995. This appeal was submitted for decision without oral argument.

[2] The .44 Magnum revolver that Ms. Thigpen saw in the hands of one of her assailants was not recovered.

[3] Dewayne McCord a/k/a Terrence Jones was Kelly's co-indictee. Pursuant to his motion in this capital prosecution, Kelly was tried separately. OCGA § 17-8-4.

[4] Although Crawford could not remember at trial the number of guns in the box, he acknowledged that he had previously estimated the number at at least 50.

only carried the stolen guns to the car because McCord threatened him and pointed his gun at Kelly.

We find the evidence sufficient to enable a rational trier of fact to find Kelly guilty of the two felony murders beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The trial court did not err by denying Kelly's motion for a directed verdict. See generally *Williams v. State*, 265 Ga. 691 (1) (461 SE2d 220) (1995).

2. Kelly contends the trial court eliminated his defense of coercion and thus committed reversible error by instructing the jury in its recharge on OCGA § 16-3-26 (coercion is not a defense to a charge of murder).[5] Kelly argues that the charge was error because coercion may be a defense to a charge of *felony* murder if the jury believes the underlying felony was the result of coercion. We need not consider this argument, however, because Kelly adduced no evidence that he was coerced into committing or being a party to the aggravated assaults which were the underlying felonies to the felony murder convictions. Rather, the only evidence of coercion in this case, presented in the form of Kelly's statement to the police and his comments to Crawford, establishes that the alleged coercion arose after the murders of the Thigpens, when McCord allegedly threatened Kelly and ordered him at gunpoint to remove the stolen weapons. Because the challenged charge applied only to the felony murder charges and Kelly's evidence of coercion "purportedly occurred subsequent to the events determinative of [Kelly's] guilt or innocence of the [felony murder crimes] with which he was charged," *McDaniel v. State*, 169 Ga. App. 254, 255 (2) (312 SE2d 363) (1983), this enumeration presents no reversible error.

3. We decline Kelly's invitation to reconsider our holding in *Baker v. State*, 236 Ga. 754 (225 SE2d 269) (1976).

4. The evidence supports the trial court's finding that Kelly, after invoking his right to counsel, voluntarily and without provocation reinitiated contact with police and that he thereafter knowingly and intelligently waived his right to counsel, as well as his other rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). See *Baird v. State*, 263 Ga. 868 (2) (440 SE2d 190) (1994).

5. We find no error in the trial court's admission of a .44 Magnum revolver similar to one Ms. Thigpen told police had been used in the crimes. *Boyd v. State*, 264 Ga. 490 (2) (448 SE2d 210) (1994).

*Judgment affirmed. All the Justices concur.*

---

[5] The trial court's recharge was in response to the jury's question whether a person could be found guilty of felony murder and/or armed robbery if he was threatened with bodily harm. The trial court properly charged the jury that coercion could be a defense to an armed robbery charge.

712

Decided April 29, 1996 —
Reconsideration denied May 23, 1996.

*Tony L. Axam, Gwendolyn Johnson,* for appellant.
*Daniel J. Craig, District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

S95G1470. HURST v. GRANGE MUTUAL CASUALTY COMPANY.
(470 SE2d 659)

Benham, Chief Justice.

Grange Mutual Casualty Company issued a liability insurance policy on a 1976 pickup truck owned by appellant Steve Hurst. The vehicle was involved in a collision while being driven by Hurst's friend, Jerry Adams. In a declaratory action filed by the insurer, the trial court granted summary judgment to the insurer, absolving it of its duty to provide a defense and coverage, and the Court of Appeals affirmed in an unpublished opinion. *Hurst v. Grange Mut. Ins. Co.,* 217 Ga. App. XXX (1995). We granted Hurst's petition for writ of certiorari, and reverse the judgment of the Court of Appeals.

On the day in question, Hurst, the named insured, was driving the truck and Adams was a passenger. Hurst asked Adams to drive and, while Adams was driving, the pickup truck was involved in a collision with a tractor-trailer driven by Floyd Shiver. After Shiver filed suit against Hurst and Adams, Grange Mutual filed the instant action seeking a declaratory judgment that the terms of the policy issued to Hurst afforded no liability coverage to Adams. The insurer relied on undisputed evidence that, at the time Adams drove Hurst's truck, Adams' driver's license had been suspended or revoked. The insurer sought judicial application of the evidence to an exclusionary provision in the policy which stated that no liability coverage was provided for "any person . . . [u]sing a vehicle without a reasonable belief that person is entitled to do so." Concluding as a matter of law that Adams could not reasonably have believed that he was entitled to operate Hurst's truck on the day of the collision because he did not have a valid driver's license, the trial court found that the insurer was under no obligation under the policy issued to Hurst to defend Adams or pay out monies on his behalf, and granted summary judgment to the insurer. The Court of Appeals adopted the trial court's order and affirmed the judgment. This Court granted the petition for writ of certiorari, asking whether the policy exclusion automatically excluded from coverage an unlicensed driver using the vehicle with the express

permission of the insured who did not know that the driver was unlicensed.

1. The exclusion clause at issue differs from the traditional "omnibus" clause which authorizes coverage for a non-owner's permissive use of a vehicle. The new clause is couched in terms of entitlement rather than permission, causing a shift in the inquiry from an objective determination — whether the owner or one in legal possession of the car gave the user permission — to a mixed objective/subjective determination of the user's state of mind — the reasonableness of the user's subjective belief of entitlement. See *Ga. Farm Bureau Mut. Ins. Co. v. Fire &c. Ins. Co.*, 180 Ga. App. 777, 779 (350 SE2d 325) (1986); *Cooper v. State Farm Mut. Auto. Ins. Co.*, 849 F2d 496, 497, n. 1 (11th Cir. 1988); Jenkins and Miller, Ga. Auto. Ins. Law (1993 ed.), § 10-5 (b).

2. This exclusion has been the subject of much litigation in Georgia, and has been treated in a variety of ways on appeal.[1] In the early case law which developed around this exclusion, the Court of Appeals' decisions turned on whether the driver/tortfeasor had the express or implied permission of the vehicle owner. See *Robertson v. Lumbermen's Mut. Cas. Co.*, 160 Ga. App. 52 (2) (286 SE2d 305) (1981), overruled on other grounds *Grange Mut. Cas. Co. v. Brinkley*, 182 Ga. App. 273 (355 SE2d 767) (1987), where the Court of Appeals affirmed the trial court's grant of summary judgment to the insurer after concluding that the driver could have had no reasonable belief he was entitled to use his estranged wife's car since he had no reasonable belief that he had express or implied permission to use the vehicle. In *Nationwide Mut. Ins. Co. v. Southern Trust Ins. Co.*, 174 Ga. App. 513 (330 SE2d 443) (1985), the Court of Appeals found that the exclusion clause was not vague, ambiguous, or susceptible to more than one construction, and affirmed the submission to the trier of fact of the issue whether the driver had used the vehicle with a reasonable belief he was entitled to do so. The court focused its attention on the term "reasonable belief" and found it "clear" that coverage was excluded if the driver knew he was not entitled to drive or, if he believed he was entitled to drive but was without reasonable grounds for such a belief. The appellate court implicitly found the exclusionary language unambiguous in *Ga. Farm Bureau Mut. Ins. Co. v. Fire &c. Ins. Co.*, supra, 180 Ga. App. 777, and noted that the issue under the exclusion clause, as compared to the more traditional "omnibus" clause, was the state of mind of the driver. Since the driver did not have the owner's permission to use the vehicle and knew that he

---

[1] While serving on the Court of Appeals, Justice Carley, joined by Judge Sognier, opined that the exclusion is not violative of Georgia's public policy. *Johnson v. Blue Ridge Ins. Co.*, 189 Ga. App. 616, 617 (376 SE2d 703) (1988) (Carley, J., concurring specially).

would have been denied permission had he sought it, the appellate court affirmed the declaratory judgment finding no coverage because the driver did not have a reasonable belief he was entitled to use the vehicle. The Court of Appeals again affirmed a trial court's determination of no coverage in light of the exclusion in *McCraney v. Fire &c. Ins. Co. of Conn.*, 182 Ga. App. 895 (357 SE2d 327) (1987), where the tortfeasor/driver had stolen the car he was driving. Likewise, there was no coverage for the driver who took his friend's car without express permission, assuming that their friendship gave him implied permission to use the vehicle. *Samples v. Southern Guaranty Ins. Co.*, 197 Ga. App. 258 (398 SE2d 220) (1990). The appellate court concluded that evidence of the friendship was not sufficient to establish that the driver had a reasonable belief he was entitled to use the friend's vehicle. Id. In *United Svcs. Auto. Assn. v. Lail*, 192 Ga. App. 487, 489 (385 SE2d 424) (1989), the court went so far as to suggest that one driving with permission "therefore had a reasonable belief in his entitlement to use [the vehicle]."

When faced with a series of cases wherein the tortfeasor/driver was unlicensed and therefore was driving in violation of the law, the Court of Appeals initially affirmed a finding of coverage, holding that the operation of a vehicle in violation of licensing laws did not establish that the driver had no reasonable belief he/she was entitled to drive if the unlicensed driver had the permission of the vehicle's owner or apparent owner to do so. *Safeway Ins. Co. v. Holmes*, 194 Ga. App. 160 (2) (390 SE2d 52) (1990). Two years later, however, the Court of Appeals held that an unlicensed driver operating a vehicle with permission could not have reasonably believed he was entitled to drive the vehicle in light of his unlicensed status. *Safeway Ins. Co. v. Jones*, 202 Ga. App. 482 (415 SE2d 19) (1992). The appellate court reiterated that holding in *Cincinnati Ins. Co. v. Plummer*, 213 Ga. App. 265 (2) (444 SE2d 378) (1994), but noted that the unlicensed driver in that case was also driving without permission of the owner. See also *Cincinnati Ins. Co. v. Mullinax*, 215 Ga. App. 331 (3) (450 SE2d 336) (1994). In *Miller v. Southern Heritage Ins. Co.*, 215 Ga. App. 173 (450 SE2d 432) (1994), the Court of Appeals completely jettisoned the concept that an unlicensed driver driving a vehicle with the owner's permission could be found to have a reasonable belief he was entitled to do so. The court held that the exclusionary clause required two types of permission — the permission of the owner as well as the permission of the State. In light of the unlicensed driver's admission that he knew he was legally prohibited from driving a car, the court concluded that the exclusion of coverage applied because, as a matter of law, the driver could not have had a "reasonable belief" he was entitled to drive the car. The court distinguished *Safeway Ins. Co. v. Holmes*, supra, 194 Ga. App. 160, on the ground that there was

no evidence that the unlicensed driver in that case knew she was not legally authorized to drive. The *Miller* holding was the foundation for the Court of Appeals' unpublished opinion in the case at bar.

3. The appellate courts of several sister States have also wrestled with the exclusionary provision at issue in the case at bar. Several courts have found the clause ambiguous and construed it against the insurer. Most recently, the Supreme Court of Iowa observed that the word "entitled" was not defined in the insurance policy and concluded the policy was ambiguous since "entitled" could be interpreted to mean having a legal right or authority under applicable law or having the consent or permission of the owner or both. *Farm & City Ins. Co. v. Gilmore*, 539 NW2d 154 (Iowa 1995). In light of the ambiguity, the Iowa court adopted the reading most favorable to the insured, and held that coverage was excluded only when the driver was using the vehicle without a reasonable belief he had the permission of the vehicle's owner or apparent owner. See also *Canadian Indem. Co. v. Heflin*, 727 P2d 35 (Ariz. App. 1986), where the Supreme Court of Arizona found the exclusion clause to be "clearly ambiguous" in light of the divergent interpretations given to it by the parties and the trial court, and construed it against the insurer; *State Farm Mut. Auto. Ins. Co. v. Moore*, 544 A2d 1017, 1019 (Pa. Super. 1988), where the Pennsylvania appellate court found the clause ambiguous because "reasonably intelligent persons would differ regarding its meaning" and construed it against the insurer, holding that the unlicensed driver's reasonable belief he had the permission of the owner or one in lawful possession of the vehicle was sufficient to avoid the exclusion. The court noted that if the insurer wanted to exclude from coverage unlicensed drivers, it could have defined "entitled" to reflect that intent, or the insurer could have added an exclusion specifically removing from coverage persons without a driver's license; *State Auto. Mut. Ins. Co. v. Ellis*, 700 SW2d 801 (Ky. App. 1985), where the Kentucky appellate court determined that the policy did not specify whether "entitled" meant obtaining permission of the owner or whether a valid driver's license was required; and *Safeco Ins. Co. v. Davis*, 721 P2d 550 (Wash. App. 1986), where the Court of Appeals of Washington found the clause ambiguous since there were several reasonable interpretations of "entitled," and held that an unlicensed driver had a reasonable belief she was entitled to drive another's car because the person who regularly drove the car gave her permission to drive.

In a case closely analogous to the one before us, the Supreme Court of North Carolina ruled that summary judgment for the insurer was inappropriate because an unlicensed driver driving with the owner's permission and at the owner's request but knowing that it was wrong for him to drive without a license, could nevertheless have

a reasonable belief that he was entitled to use the vehicle. *Aetna Cas. &c. Co. v. Nationwide Mut. Ins. Co.*, 392 SE2d 377 (N.C. 1990). The North Carolina court pointed out that the dispositive question under the policy exclusion was a question of fact — the driver's reasonable belief that he was entitled to use the vehicle — and not a question of the legality of the act. Id. Applying North Carolina law, the Eleventh U. S. Circuit Court of Appeals opined that one need not show a legal right to drive to establish a reasonable belief of entitlement. *Cooper v. State Farm Mut. Auto. Ins. Co.*, supra, 849 F2d 496. Noting that reasonable minds could differ as to whether having a legal right to drive was a prerequisite to being entitled to use a vehicle, the federal appellate court determined that the policy was ambiguous and construed the ambiguity against the insurer/drafter. Id.

4. In Georgia, an insurer may fix the terms of its policy as it wishes, insuring against certain risks and excluding others, provided the terms are not contrary to law. *Hulstzman v. State Farm Fire &c. Co.*, 188 Ga. App. 12 (2) (372 SE2d 9) (1988). Where an insurer grants coverage to an insured, any exclusions from that coverage must be defined clearly and distinctly. *American Southern Ins. Co. v. Golden*, 188 Ga. App. 585, 586 (373 SE2d 652) (1988). Insurance in Georgia is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms. *Richards v. Hanover Ins. Co.*, 250 Ga. 613 (1) (299 SE2d 561) (1983). However, if a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous (*Lakeshore Marine v. Hartford Accident &c. Co.*, 164 Ga. App. 417 (2) (a) (296 SE2d 418) (1982)), and the statutory rules of contract construction will be applied. Pursuant to the rule of construction set forth at OCGA § 13-2-2 (5), the contract will be construed strictly against the insurer/drafter and in favor of the insured. See *American Southern Ins. Co. v. Golden*, supra, 188 Ga. App. at 586.

Since the insurance contract does not contain a definition of the word "entitled," we conclude that the exclusion at issue is susceptible of three logical and reasonable interpretations: that the user must be authorized by law to drive in order to reasonably believe he is entitled to use a vehicle; that the user must have the consent of the owner or apparent owner in order to reasonably believe he is entitled to use the vehicle; or, that the user must have both consent and legal authorization in order to be entitled to use the vehicle. The number of reasonable and logical interpretations makes the clause ambiguous (*Lakeshore Marine v. Hartford Accident &c. Co.*, supra, 164 Ga. App. 417), and the statutory rules of construction require that we construe the ambiguous clause against the insurer. OCGA § 13-2-2 (5). Accordingly, we adopt the interpretation least favorable to the insurer and

determine that the clause excludes from coverage only those non-owner drivers who use a vehicle without a reasonable belief that they had the permission of the owner or apparent owner to do so. Accordingly, it was error to grant summary judgment to the insurer in the case at bar when there was undisputed evidence that the non-owner user had the express permission of the owner to use the vehicle. In so holding, we must overrule those cases which can be read to hold that, as a matter of law, the clause excludes from coverage those unlicensed non-owner drivers who use the vehicle with the permission of the owner or apparent owner: *Miller v. Southern Heritage Ins. Co*, supra, 215 Ga. App. 173; *Cincinnati Ins. Co. v. Mullinax*, supra, 215 Ga. App. 331; *Cincinnati Ins. Co. v. Plummer*, supra, 213 Ga. App. 265; and *Safeway Ins. Co. v. Jones*, supra, 202 Ga. App. 482. Furthermore, to the extent they hold the exclusion clause to be unambiguous, we overrule *Nationwide Mut. Ins. Co. v. Southern Trust Ins. Co.*, supra, 174 Ga. App. 513, and *Ga. Farm Bureau Mut. Ins. Co. v. Fire &c. Ins. Co.*, supra, 180 Ga. App. 777.

5. There is no question that an insurer has a right to restrict the operation of vehicles insured by it to persons legally qualified to operate an automobile. Appleman, Insurance Law & Practice (Buckley ed.), Vol. 6C, p. 278, § 4401. All semblance of ambiguity is removed by an exclusion relieving the insurer from liability should the vehicle be driven in violation of any law as to drivers' licenses. Id. at 279. The "unlicensed driver exclusion" has been found to be within public policy when applied in a situation wherein the victims of the unlicensed driver had access to insurance funds. *Travelers Ins. Co. v. Progressive Preferred Ins. Co.*, 193 Ga. App. 864, 865 (389 SE2d 370) (1989). See also *Progressive Preferred Ins. Co. v. Williams*, 864 F2d 110 (11th Cir. 1989) wherein the Eleventh U. S. Circuit Court of Appeals found an "unlicensed driver exclusion" not void as against Georgia public policy to the extent the unlicensed driver sought liability coverage for injuries she inflicted. As the exclusion at issue did not clearly and distinctly exclude unlicensed drivers from coverage, it cannot be read as removing from the driver the protection insurance coverage offers. *American Southern Ins. Co. v. Golden*, supra, 188 Ga. App. at 586.

*Judgment reversed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Divine, Dorough & Sizemore, Kermit S. Dorough, Jr., W. James Sizemore, Jr.,* for appellant.

*Simpson, Gray & Cross, Joseph B. Gray, Jr., Melanie B. Cross,*

for appellee.

## S96A0099. HAVIRD v. SCHLACHTER.
### (470 SE2d 657)

SEARS, Justice.

This appeal concerns whether a document submitted to probate as the last will and testament of Charles Henry Elder, who died on January 13, 1992, had been revoked because of material cancellations and obliterations, or whether the proffered will should be admitted to probate pursuant to the doctrine of dependent relative revocation. The trial court granted summary judgment to the appellee, Jane Schlachter, Elder's sole heir at law, ruling that there had been material cancellations to the proffered will and that it had been effectively revoked. Further, the trial court ruled that the proffered will could not be validated under the doctrine of dependent relative revocation. We agree with both of these holdings and affirm.

OCGA § 53-2-74 provides as follows:

> An express revocation may be effected by any destruction or obliteration of an original will or a duplicate thereof, done by the testator or by another at his direction with an intention to revoke. Such intention will be presumed from the obliteration or canceling of a material portion of the will. If the part of the will which is canceled is immaterial, such as the seal, no presumption of an intention to revoke shall arise.

Contrary to Havird's contentions, our review of the document offered for probate as Elder's last will and testament demonstrates that the trial court did not err in concluding that there had been material cancellations.[1] The trial court's ruling thus raised a presumption of revocation,[2] and placed the burden on Havird, as the propounder, to show that no revocation was intended.[3] We now turn to the principal issue in the case, which is whether Havird countered the statutory presumption of revocation by raising a presumption under the doctrine of dependent relative revocation that no revocation was intended.[4]

---

[1] See *Singleton v. Shewmake*, 184 Ga. 785, 787 (1) (193 SE 232) (1937).

[2] See OCGA § 53-2-74; *Wells v. Jackson*, 265 Ga. 181 (453 SE2d 690) (1995).

[3] See *Wells v. Jackson*, 265 Ga. 181; *Carter v. First United Methodist Church of Albany*, 246 Ga. 352, 353 (271 SE2d 493) (1980); *McIntyre v. McIntyre*, 120 Ga. 67, 70 (47 SE 501) (1904) (all holding that the destruction or obliteration of a material part of a will raises a presumption of revocation, and that the propounder has the burden to show that no revocation was intended).

[4] *Carter*, 246 Ga. at 356 ("[t]he evidence was sufficient to rebut the statutory presump-

Under this doctrine,

> "[i]f it is clear that the cancellation and the making of the new will were parts of one scheme, and the revocation of the old will was so related to the making of the new as to be dependent upon it, then if the new will be not made, or if made is invalid, the old will, though canceled, should be given effect, if its contents can be ascertained in any legal way."[5]

This doctrine raises a presumption in favor of the validity of the "canceled" will, and is sufficient to rebut the statutory presumption of revocation.[6] The doctrine, however, is one of presumed intent and cannot defeat the testator's intent to revoke the "canceled" will if that intent appears from other evidence in the record.[7] Further, if a presumption is raised pursuant to the doctrine of dependent relative revocation in favor of a proffered will, it is the caveator's burden to rebut that presumption.[8]

Although this Court found evidence to support the application of the doctrine of dependent relative revocation in both *Carter* and *McIntyre*, the trial court in this case ruled that the doctrine was unavailing to Havird. The trial court reasoned that in *Carter* and *McIntyre* there was evidence that the testator intended to make a new will and that the cancellations on the old will were made in contemplation of the new will being prepared, but that in this case there was no evidence that Elder intended to make a new will but merely sought to revoke and change parts of his old will. We agree with the trial court's rationale.

In *Carter*, a 1963 will was found among the testator's personal papers and was folded together with a handwritten instrument dated May 22, 1978, titled as her will. The 1978 document was unsigned and unwitnessed and purported to establish a different testamentary scheme of distribution of her property than that contained in the 1963 will. Moreover, some of the bequests in the 1963 will had pencil marks through them. Further, before her death, the testator told her attorney that she needed to revise her will or to make a new will and that she had written out some proposed changes on tablet paper. This Court ruled that the fact that the old will was found together with the 1978 document was some evidence indicating that " 'the cancellation

---

tion of revocation . . . and to give rise to a presumption in favor of the propounder under the doctrine of dependent relative revocation").
  [5] *Carter*, 246 Ga. at 354 (quoting *McIntyre*, 120 Ga. at 71).
  [6] *Carter*, 246 Ga. at 356.
  [7] *Carter*, 246 Ga. at 355-356.
  [8] Id.

of the old will and the making of the new will were parts of one scheme, and the revocation of the old will was so related to the making of the new one as to be dependent upon it.' "[9]

Further, in *McIntyre*, the testator penciled through certain portions of his will and penciled in notes at certain places on the will indicating where additional lines should be added. He also pasted blank slips over portions of the old will, and on some of those slips the testator wrote that a certain number of lines were needed. In addition, there was evidence that he had made a statement that these changes were the beginning of a new will that he had been unable to finish. We concluded this evidence was some indication that the cancellation of the old will and the making of a new will were part of one scheme, and that the testator only intended a revocation of the old will to take effect upon execution of the new will.[10]

In the present case, unlike the evidence in *Carter* and *McIntyre*, we have only the obliterations of the proffered will, with no evidence indicating that Elder was contemplating the execution of a new will. Thus, we cannot conclude that the revocation of the old will was so closely connected to the making of a new will as to be dependent upon it. Accordingly, we cannot conclude that Elder intended the revocation to take effect upon execution of a new will. The trial court therefore properly ruled that the proffered will stands revoked.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Pamela E. Havird,* pro se.
*Bruce & Hentz, Kenneth D. Bruce,* for appellee.

S96A0323. CHARTER MEDICAL INFORMATION SERVICES, INC. v. COLLINS.
(470 SE2d 655)

THOMPSON, Justice.

State Revenue Commissioner Marcus E. Collins, Sr. served Charter Medical Information Services, Inc. ("Charter") with a notice of assessment and demand for payment of $197,565.41 in sales and/or use taxes, penalties, and interest, for the period from July 1, 1987 through July 31, 1991.[1] The assessment is based upon the transfer of

---

[9] *Carter,* 246 Ga. at 356 (quoting *McIntyre,* 120 Ga. at 71).
[10] *McIntyre,* 120 Ga. at 69-70 and 72-73.
[1] The demand was made pursuant to OCGA § 48-8-30 (a) of the Georgia Retailers' and Consumers' Sales and Use Tax Act, as amended, OCGA § 48-8-1 et seq.

certain computer equipment from Charter to other corporations which, like Charter, are wholly-owned subsidiaries of Charter Medical Corporation. Charter purchased the equipment and paid Georgia sales tax to its vendors at the time of its initial purchase. Charter later leased the equipment to sister corporations, each of which was 100 percent owned by Charter Medical Corporation. The Commissioner claimed that Charter was required to collect a second sales tax from the related corporations upon each transfer.[2] After the Commissioner denied Charter's protest letter, it filed an appeal to the Superior Court of Bibb County, asserting that the distribution of equipment to its sister corporations and the subsequent use of that equipment are exempt from Georgia sales and use tax under OCGA § 48-8-3 (42).[3] Cross-motions for summary judgment were filed. The trial court denied relief to Charter, and granted summary judgment to the Commissioner. Charter filed an application for discretionary review of that order in the Court of Appeals, which was denied. We granted a petition for writ of certiorari, and posed the following question:

Whether the literal language employed in OCGA § 48-8-3 (42) is to be given effect or whether OCGA § 1-1-2 compels that the language of that statute be construed as a scrivener's error to be given the same substantive effect as that employed in former Ga. Code Ann. § 91A-4503 (pp).

Prior to the enactment of the Official Code of Georgia, an exemption to the sales and use tax was codified in former Ga. Code Ann. § 91A-4503 (pp) (Ga. L. 1978, p. 1634). It applied where:

The use by, or lease or rental of tangible property to, a person who acquires the property from another person where both persons *are under 100% common ownership* and where the person who furnishes or leases or rents the property has: (1) Previously paid sales or use tax on the property; . . .

(Emphasis supplied.)

With the adoption of the Official Code of Georgia in 1982, Ga. Code Ann. § 91A-4503 (pp) was replaced by OCGA § 48-8-3 (42). The present provision, unaltered by legislative amendment, exempts:

The use by, or lease or rental of tangible personal property

---

[2] By stipulation of the parties, that assessed amount was set off by a credit of $18,435.83.

[3] The appeal was brought under OCGA § 48-2-59.

to, a person who acquires the property from another person where both persons have *100 percent common ownership of the property* and where the person who furnishes, leases, or rents the property has: (A) Previously paid sales or use tax on the property; . . .

(Emphasis supplied.)

OCGA § 48-8-3 (42), and its predecessor contain identical language, except that the present statute seems to require that the tax-exempted property must be owned by both the transferor and the transferee, while under the former statute, the exemption applied if the transferor and transferee are under common ownership. It is acknowledged that application of the former statute would demand dismissal of the assessment because all corporate subsidiaries involved in the transfer of the computer equipment are wholly-owned by Charter Medical Corporation, i.e., "are under 100% common ownership." The question is whether OCGA § 48-8-3 (42), which applies only to transfers between common owners of the leased property, should operate to tax the Charter leases.

The Commissioner asserts, and the trial court agreed, that in enacting the Official Code, the legislature repealed the former exemption in its entirety and imposed another exemption as to an entirely new class of transactions. That is, that the legislature intended a substantive change in the exemption provision. This Court has explained that in enacting the Official Code, it was the intent of the legislature to recodify, revise and modernize the general laws of Georgia. *Whaley v. State,* 260 Ga. 384 (393 SE2d 681) (1990). See also *Kumar v. Hall,* 262 Ga. 639, 643 (423 SE2d 653) (1992) (Michie Code only intended as a recodification and modernization of the old Code). Accord *Worley v. State,* 265 Ga. 251, 253 (454 SE2d 461) (1995); *Newsome v. Dept. of Human Resources,* 199 Ga. App. 419 (1) (405 SE2d 61) (1991). Indeed, OCGA § 1-1-2 provides: "Except as otherwise specifically provided by particular provisions of this Code, the enactment of this Code by the General Assembly is not intended to alter the substantive law in existence on the effective date of this Code."

We recently addressed a similar issue in *Brophy v. McCranie,* 264 Ga. 187 (442 SE2d 230) (1994). With the enactment of the Official Code, two paragraphs contained in the former Code were consolidated into one and certain clarifying language was omitted. If given effect, the new provision would result in a change in substantive law. We applied OCGA § 1-1-2, and held that in the absence of legislative amendment, the former provision controlled. Here, as in *Brophy,* blanket enactment of the revised Code alone is insufficient to show a legislative intent to effect a substantive change from previous law.

Looking to the language of the General Assembly in the preamble

to the original enactment, its intended effect was "to exempt from the [sales and use] tax certain transactions between persons with common ownership." Ga. L. 1978, p. 1634. It is apparent without dispute that the General Assembly has taken no specific action to change the exemption since its enactment in 1978. See generally *Brophy*, supra. The Commissioner argues that such legislative silence evidences an intent to change the former law by acquiescence. But silence alone does not compel the conclusion that the legislature intended OCGA § 48-8-3 (42) to alter the substantive law in effect at the time of the Code revision. See generally *Dept. of Corrections v. Hicks*, 209 Ga. App. 154 (433 SE2d 64) (1993).

It is our function to construe the law to implement the legislative intent. *Mullins v. First Gen. Ins. Co.*, 253 Ga. 486 (322 SE2d 265) (1984). Since there is no specific indication that the legislature intended to change the preexisting law when it adopted the Official Code, we view alterations of the Code Revision Commission in redrafting the statute and in substituting the words "common ownership of the property" for "persons under 100% common ownership," as merely a scrivener's error, and we apply the substantive law in effect at the time of enactment of the 1982 Code. Accordingly, the assessment must be set aside and Charter is entitled to summary judgment.

*Judgment reversed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Sutherland, Asbill & Brennan, Richard G. Murphy, Jr., Russell S. Bonds*, for appellant.

*Michael J. Bowers, Attorney General, David A. Runnion, Senior Assistant Attorney General*, for appellee.

S96A0392. BROWN v. THE STATE.
(470 SE2d 652)

FLETCHER, Presiding Justice.

A jury convicted Lonnie Gregory Brown of malice murder, felony murder and kidnapping in the death of Kay Jean Dunn.[1] He appeals

---

[1] The crimes occurred on April 10, 1993. Brown was indicted on September 21, 1993. The jury returned its guilty verdicts on January 19, 1994. Brown was found not guilty of rape. The trial court merged the felony murder count into the malice murder count and sentenced Brown to life imprisonment and to a consecutive life sentence for kidnapping. Brown filed a motion for new trial on January 31, 1994, which he amended on April 27, 1995. The trial court denied the motion on August 18, 1995. Brown filed his notice of appeal on

contending the trial court erred in admitting his co-defendant's statements. Because the co-defendant testified and his prior statements were inconsistent with his in-court testimony, we affirm.

1. The evidence at trial showed that on April 12, 1993, Brown's half-brother, Robert Anthony Wise, told his mental health counselor that he thought he had killed a woman over the weekend. When interviewed by police, Wise said that Brown picked him up at a bar and that the two then picked up a woman at a bus stop. In the initial interview with police, Wise stated that he forced Brown at gunpoint to drive, while Wise raped, beat and strangled the woman. With information from Wise, police found the body of Kay Jean Dunn at a construction site off of Powder Springs Road. She had been strangled with a dog chain and beaten about the torso. In later statements to police, Wise denied having a gun and claimed that he had passed out after having consensual sex with the victim and that when he woke up, Brown was dragging the victim's body out of the car and then Brown began stomping on her chest. Friends and co-workers of Brown testified that Brown had made various admissions, including that he and Wise had dumped a dead body; that he and Wise had beaten and killed a person using a dog chain; that Wise had killed a girl and pointed a gun at Brown and told him to rape the girl; that the body was dumped off of Powder Springs Road; and that he asked for help in cleaning blood and hair out of his car. An inmate who had been incarcerated with Brown testified that Brown admitted there had been no gun to his head while Wise raped the girl and that Brown held her while Wise beat her. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Brown guilty of the crimes charged beyond a reasonable doubt.[2]

2. After Wise entered a guilty plea, the state called him in its case-in-chief. Wise testified that he might have been the one who killed the victim but that he could not remember that night or whether Brown was present. Wise also testified that he could not remember the content of his statement when he pled guilty, nor could he remember his prior statements. The state then introduced Wise's prior statements. Brown contends that Wise's prior statements should have been excluded under OCGA § 24-3-52, which provides that "the confession of one joint offender . . . made after the enterprise is ended shall be admissible only against himself." Where the confessing offender testifies and is subject to cross-examination, this section will

August 31, 1995. The case was docketed in this Court on December 5, 1995 and orally argued on February 12, 1996.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

not bar admission of prior inconsistent statements.[3] Wise's prior statements were inconsistent in many material respects with his in-court testimony.[4] Therefore, it was not error to admit the prior statements.

Brown also argues that he was not given a meaningful opportunity to cross-examine Wise because Wise testified that he could not remember the murder or his prior statements. The sixth amendment, however, is satisfied if a defendant is given the opportunity to cross-examine a forgetful witness about "[h]is bias, his lack of care and attentiveness, . . . and even . . . the very fact that he has a bad memory."[5] Here, there was ample opportunity to examine Wise about his memory loss and the reasons for it, including his desire not to testify against his brother. Accordingly, we hold that Brown's right of confrontation was not violated.

3. Walter Burriss, a caseworker at Georgia Mental Health Institute, testified that in a telephone conversation, Brown told him that he had been with Wise for all but one hour on the day of the murder. Brown contends that this is inadmissible hearsay because Burriss was unable to identify Brown conclusively as the person with whom he spoke. Georgia law requires that there be a sufficient basis for a witness to identify a person with whom he spoke over the telephone, before testifying as to the contents of the conversation.[6] An identification is not sufficient if it rests solely on the contents of the conversation.[7] Here, Burriss testified that it was part of his job at GMHI to telephone patients' relatives; that Wise had given him Brown's name and telephone number to call; that he dialed the number given, asked to speak with Brown, and a person identifying himself as Brown came to the phone. Additionally, a detective who could identify Brown's voice testified that when he spoke with Brown, Brown stated that he had already spoken with someone from GMHI. These circumstances were sufficient to allow Burriss to testify regarding his conversation with Brown.

4. Brown also contends that the trial court erred in not declaring a mistrial when Burriss testified on cross-examination that Brown had said he was on probation. This testimony, however, was responsive to a question posed by Brown. Therefore, the trial court did not err.

---

[3] *Brown v. State*, 266 Ga. 633 (469 SE2d 186) (1996).

[4] Compare *Barksdale v. State*, 265 Ga. 9, 11 (453 SE2d 2) (1995) (where witness refuses to answer *any* questions, there is no testimony with which prior statement could be judged inconsistent).

[5] *United States v. Owens*, 484 U. S. 554, 559 (108 SC 838, 98 LE2d 951) (1988).

[6] *Constantino v. State*, 243 Ga. 595, 599 (255 SE2d 710), cert. denied, 444 U. S. 940 (100 SC 293, 62 LE2d 306) (1979).

[7] *Price v. State*, 208 Ga. 695 (1) (69 SE2d 253) (1952).

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Cauthorn & Phillips, Thomas E. Cauthorn III,* for appellant.
*Thomas J. Charron, District Attorney, Debra H. Bernes, Nancy I. Jordan, Frank R. Cox, Assistant District Attorneys, Michael J. Bowers, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.

S96A0458. SINKFIELD v. THE STATE.
(470 SE2d 649)

SEARS, Justice.

Appellant Damon Bernard Sinkfield appeals from his convictions for malice murder, possession of a firearm on school property, and carrying a concealed weapon. We find no error in the court's charge and recharge to the jury, or in its sentencing of Sinkfield. Nor do we find any error in the scope of closing arguments permitted by the trial court. Therefore, we affirm.

The evidence introduced at trial showed a history of violent confrontations between Sinkfield and the murder victim. Eyewitnesses testified that on the day of the murder, the victim was sitting in a car parked on school property in front of North Clayton High School, and that Sinkfield approached the car, and began to kick it and taunt the victim. After this went on for some time, the victim stepped out of the car and approached Sinkfield. Several words were exchanged, and then Sinkfield drew a gun from his pocket and shot the victim in his chest, killing him. Sinkfield then fled onto the school campus, carrying the murder weapon with him. The victim also was armed with a handgun, which he attempted to fire after Sinkfield shot him, although it did not discharge.[1]

---

[1] The crimes were committed on February 4, 1993. Sinkfield was indicted on November 11, 1993, the trial commenced on October 17, 1994, and a mistrial was declared on October 18, 1994. Thereafter, a motion to dismiss on double jeopardy grounds was filed. A hearing was held on the motion on November 17, 1994, at which the motion was denied. A second jury trial began on September 18, 1995, and the jury returned its guilty verdicts on September 22, 1995. On that same day, Sinkfield was sentenced to life imprisonment for malice murder, five consecutive years for carrying a weapon on school property, and twelve concurrent months for carrying a concealed weapon. The Sentence Order was filed on October 4, 1995. No request for a new trial was filed. A timely notice of appeal was filed on October 20, 1995. The transcript was certified by the court reporter on December 4, 1995. The appeal was docketed in this Court on December 14, 1995, and submitted for decision without oral argument on February 5, 1996.

1. Viewed most favorably to the verdict, the evidence was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that Sinkfield was guilty of malice murder, carrying a weapon on school property, and carrying a concealed weapon.[2]

2. Sinkfield claims that the trial court erred in charging the jury with regard to mutual combat. A charge on mutual combat generally is proper when there is evidence of a mutual intention or agreement to fight.[3] A mutual intention to fight sufficient to support a charge of mutual combat may be inferred from the conduct of the parties.[4] In this case, the history of violent aggressive behavior between Sinkfield and his victim and the fact that both men were armed at the time of the murder raised an inference of a mutual intention to fight, and therefore supported the court's charge on mutual combat. Moreover, we note that a charge on mutual combat enables a jury to find a criminal defendant guilty of voluntary manslaughter in lieu of murder.[5] Hence, the mutual combat charge could only have benefitted Sinkfield, and we reject this enumeration as meritless.

3. Sinkfield claims that the trial court erred in recharging the jury only on malice murder when it had asked for a clarification of that charge and whether it required certain specified findings. Sinkfield urges that the jury's recharge request indicates that it was confused with regard to the initial charges on malice murder, justification and mutual combat, and that the trial court should also have recharged on mutual combat.

The record shows that the jury requested the trial court to "clarify the definition of malice murder, especially does it mean intent to kill, or both are aggressors, or . . . both must apply and not [only one]. . . . [Also] clarify the time needed to be considered malice, such as one second, thirty seconds, etc." In response, the trial court repeated its complete charge on malice murder, including its charge on the justification defense.

A trial court is duty-bound to recharge on any part of the charge when the jury so requests, but a trial court does not err by limiting a recharge to the specific points raised by the jury's inquiry.[6] In this case, the jury requested a recharge on malice murder, and raised several specific inquiries regarding the definition of malice murder. The jury did not request a recharge on mutual combat. The trial court did not err in responding to this request by repeating its charge on malice

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] See Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, pp. 74-75 (2nd ed. 1991); see also *Anderson v. State*, 262 Ga. 7, 10 (413 SE2d 722) (1992), rev'd on other grounds, 264 Ga. 253 (443 SE2d 626) (1994).

[4] *Simmons v. State*, 172 Ga. App. 695, 696 (324 SE2d 546) (1984).

[5] *Anderson*, supra.

[6] *Williams v. State*, 263 Ga. 135, 136-137 (429 SE2d 512) (1993).

murder, and not its charge on mutual combat.[7] Hence, we reject this enumeration also.

4. Sinkfield claims the trial court erred in sentencing him for both possessing a weapon on school property and carrying a concealed weapon, because the latter offense merges with the former. The two offenses do not merge. The offense of carrying a concealed weapon does not require that it be done on school property;[8] the offense of possessing a weapon on school property requires neither that the weapon be concealed nor that it be carried on a person.[9] Hence, neither crime is fully inclusive of the other,[10] and we reject this enumeration as well.

5. Finally, Sinkfield argues that the trial court erred by allowing the State to comment in its closing argument that he had failed to produce corroborating witnesses. Appellant asks us to reconsider our holding in *Wilson v. Zant*,[11] that in making its closing argument to the jury, the State is permitted to comment on a defendant's failure to produce witnesses who allegedly would have given favorable testimony. Sinkfield urges that such reconsideration is warranted in this case, as he was unable to locate corroborating witnesses due to his incarceration, lack of contact with counsel, and lack of funds. The logistical difficulties in locating corroborating witnesses encountered by Sinkfield are shared by many, if not most, criminal defendants, and do not compel us to revisit our holding in *Wilson* that permits the prosecution in its closing argument to urge the jury to draw reasonable deductions from a defendant's failure to produce purportedly favorable witnesses.[12]

*Judgment affirmed. All the Justices concur.*

CARLEY, Justice, concurring.

I fully concur in the majority opinion and I thoroughly agree with the majority's refusal to "reconsider our holding in *Wilson v. Zant*, [249 Ga. 373 (290 SE2d 442) (1982)] that in making its closing argument to the jury, the State is permitted to comment on a defendant's failure to produce witnesses who allegedly would have given favorable testimony." However, at some point in time, I hope that we have an opportunity to reconsider some dicta in *Wilson* that absolutely precludes a defendant from making a similar comment on the State's failure to call key witnesses. This Court has followed that dicta in *Roper v. State*, 251 Ga. 95, 98 (6) (303 SE2d 103) (1983). It appears

---

[7] See *Welch v. State*, 257 Ga. 197, 198 (357 SE2d 70) (1987).

[8] OCGA § 16-11-126.

[9] OCGA § 16-11-127.1.

[10] See *State v. Burgess*, 263 Ga. 143, 145 (429 SE2d 252) (1993).

[11] 249 Ga. 373 (290 SE2d 442) (1982).

[12] 249 Ga. at 385.

that the dicta in *Wilson* and the holding in *Roper* are in conflict with *Morgan v. State*, 124 Ga. 442 (1) (52 SE 748) (1905). Nevertheless, this case does not allow us to reach this issue and any review and analysis of the rule proscribing defendant's argument concerning the State's failure to produce witnesses must await another day.

I am authorized to state that Presiding Justice Fletcher joins in this opinion.

DECIDED MAY 28, 1996.

*Christy R. Jindra,* for appellant.

*Robert E. Keller, District Attorney, Todd E. Naugle, Assistant District Attorney, Michael J. Bowers, Attorney General, Allison Goldberg, Assistant Attorney General,* for appellee.

### S96A0487. YOUNT v. MULLE.
(470 SE2d 647)

HINES, Justice.

This appeal is from the latest salvo in this continuing dispute between former spouses Cathy Reese Yount and Charles Mulle, Jr. over the custody and support of their minor son.[1] We granted Yount's application to appeal to address whether the trial court erred in granting Mulle's motion to dismiss for lack of personal jurisdiction

---

[1] The history of the parties' nearly decade of domestic litigation began in May 1987 with the award of a final decree of divorce in Tennessee. The decree awarded joint legal custody of the son with physical custody to the mother and reasonable visitation privileges to the father. In November 1987, the mother remarried and moved with the child to Chatham County, Georgia. The father remained domiciled in Tennessee. Over the next three years, the Tennessee court issued a half dozen orders regarding petitions for modification of custody and visitation and contempt. On January 29, 1991, the mother filed in Chatham County a petition for modification of custody and visitation, seeking sole permanent custody of the child. The father moved to decline jurisdiction and to dismiss the complaint on the basis that the Tennessee court retained jurisdiction. The Superior Court of Chatham County denied the father's motion and assumed jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA), OCGA § 19-9-40 et seq. It concluded that Georgia was the child's "home state" as defined by OCGA § 19-9-42 (5), and modified the Tennessee custody award with respect to the father's visitation privileges. The Court of Appeals vacated the judgment on the basis that the superior court failed to make a requisite finding of jurisdiction and remanded the case to that court for a determination of whether the Tennessee court was without jurisdiction or had declined to exercise it. *Mulle v. Yount,* 204 Ga. App. 876 (420 SE2d 776) (1992).

Subsequently, the superior court found that Tennessee no longer had jurisdiction of custody matters involving the child and entered an order denying sole custody to the mother, modifying certain terms of the father's visitation and support obligations, and directing that the parties abide by all other terms of the 1987 Tennessee decree. The judgment of the superior court was affirmed by the Court of Appeals. *Mulle v. Yount,* 211 Ga. App. 584 (440 SE2d 210) (1993).

Yount's counterclaim for modification of child support filed in response to Mulle's petition for modification of visitation and custody rights. We conclude that the court erred in dismissing the counterclaim based on the lack of personal jurisdiction, and reverse.

The father, a Tennessee resident, filed the present petition for modification of visitation and custody rights on June 15, 1995. It was premised on the mother's plans to relocate and move with the child to North Carolina. At the time of filing, the mother and son were Chatham County residents.[2] The mother answered the petition and filed a counterclaim for a modification of the husband's child support obligation based on an alleged substantial increase in the husband's income and/or financial condition. Relying on *Riggio v. Lawson*, 204 Ga. App. 774 (420 SE2d 613) (1992), the Superior Court of Chatham County concluded it did not have jurisdiction over the father for the purposes of the mother's counterclaim.

The superior court misapplied *Riggio*. That case, involving an out-of-state defendant and an incident occurring in a foreign country, merely applied the well worn principles of *Intl. Shoe Co. v. Washington*, 326 U. S. 310 (66 SC 154, 90 LE 95) (1945) to find that the defendant lacked sufficient minimum contacts with Georgia to subject her to suit in this state. The fact that defendant Riggio filed a counterclaim in response to the Georgia action did not alter this. Riggio asserted the defense of lack of personal jurisdiction under OCGA § 9-11-12 (b) (2) and included the compulsory counterclaim within her jurisdictional challenge. This was a far different situation.

Here, the party contesting personal jurisdiction of the Georgia court is the plaintiff, who made the purposeful choice to avail himself of the courts of this state. Compare *Kemp v. Sharp*, 261 Ga. 600 (409 SE2d 204) (1991). Having invoked this state's jurisdiction to attempt to accomplish his ends, he could not then renounce it for a related cause unfavorable to him. See *Gaither v. Gaither*, 206 Ga. 808 (58 SE2d 834) (1950). The fact that the UCCJA may have prescribed that, at the time, Mulle bring the action for modification in Georgia[3] does not alter this. See *Howerton v. Garrett*, 237 Ga. 371 (228 SE2d 786) (1976); *Houck v. Houck*, 248 Ga. 419 (284 SE2d 12) (1981).

By filing the present petition for modification of custody and visitation, Mulle subjected himself to the jurisdiction of the Georgia court for the purpose of his ex-wife's counterclaim for increased child

---

[2] On August 25, 1995, Mulle also filed in the Superior Court of Chatham County a motion for contempt against Yount alleging her wilful violation of custody and visitation orders issued by the Tennessee and Georgia courts. By the time of this filing, Yount and the parties' son had relocated to North Carolina.

[3] Under the UCCJA, jurisdiction for modification of child custody matters generally is in the home state of the child.

support. The superior court erred in concluding otherwise.[4]
*Judgment reversed. All the Justices concur.*

DECIDED MAY 28, 1996.

*George M. Hubbard III,* for appellant.
*McCorkle, Pedigo & Johnson, Carl S. Pedigo, Jr.,* for appellee.

### S96A0605. HAWES v. THE STATE.
(470 SE2d 664)

SEARS, Justice.

Gary Anderson Hawes appeals from his conviction for felony murder. We find no error in the trial court's denial of a special demurrer which sought to strike the use of Hawes' alias name from the indictment. Furthermore, assuming without deciding that the trial court erred by admitting a criminal contempt order into evidence for purposes of witness impeachment, we find any resulting error to have been harmless. We also find the trial court's recharge to the jury that it could consider a count charging felony murder after deadlocking on a count charging malice murder to be satisfactory under *Edge v. State*.[1] Therefore, we affirm.[2]

The evidence introduced at trial showed that while socializing at an apartment complex, Hawes accompanied a young woman, Ms. Howard, to an apartment in the complex so that she could retrieve her child. The child was in the apartment with his father, an African-American, who would become Hawes' victim. Hawes and the victim got into a fight, and Hawes' co-defendant eventually joined in the fray. While a number of onlookers stood by, some of them shouting encouragement to Hawes, Hawes struck the victim in the back of the head with an aluminum baseball bat, knocking him to the ground.

---

[4] The question of whether or not the Georgia court retains jurisdiction of either the petition for modification of custody or for support is not before us.

[1] 261 Ga. 865 (414 SE2d 463) (1992).

[2] The murder took place on February 25, 1995, and Hawes was indicted on March 29, 1995 for murder and felony murder, with aggravated assault being the underlying felony. The trial began on June 19, 1995, and on June 22, 1995, the trial court found that the jury had deadlocked on the charge of murder, and accepted the jury's guilty verdict on the charge of felony murder. Hawes was sentenced by the court to life imprisonment. A motion for new trial was filed on July 18, 1995, and the court reporter certified the trial transcript on July 22, 1995. On November 6, 1995, a hearing was held on the motion for new trial, and the motion was denied on November 14, 1995. A notice of appeal was timely filed with this Court on November 29, 1995, the appeal was docketed with this Court on January 8, 1996, and oral argument was held on March 19, 1996.

Once the victim was on the ground, Hawes continued to hit him with the baseball bat, sometimes swinging it as if it were a golf club, while his co-defendant simultaneously beat and kicked the victim. The victim tried to get up off of the ground, and tried to crawl away, but his assailants' blows made it impossible. The beating stopped only when the victim's sister laid herself on top of the victim in order to ward off Hawes' blows. When emergency medical workers arrived, the victim only showed faint vital signs. He died a short time later of blunt force trauma to the head.

Before going to the apartment complex, Hawes and his co-defendant were each seen taking an aluminum baseball bat with them. Hawes commented at that time, "I am going to go and kill me a nigger."[3] After the beating, while fleeing the apartment complex, Hawes was asked why he had hit the victim with a baseball bat. Hawes responded that he was "going to kill him a nigger."

1. Viewed most favorably to the verdict, the facts introduced into evidence could enable a rational trier of fact to find Hawes guilty of felony murder.[4]

2. Hawes claims that the trial court erred by denying his special demurrer seeking to strike his alias name, "Stomper," from the indictment. Hawes argues that he was prejudiced by inclusion of the alias in the indictment because the victim in this case quite literally was beaten and stomped to death.

It is established in Georgia that an indictment may allege that a criminal defendant is known by an alias.[5] Insofar as it is uncontroverted that Hawes was well known by the alias of "Stomper," there was nothing presumptively improper about the State indicting Hawes under both his legal and alias names.

Hawes has not come forward with evidence to establish that the State indicted him under his alias in order to prejudice him in the eyes of the jury by conjuring images of the murder in this particular case. If anything, the record indicates that the State's inclusion of "Stomper" in the indictment helped significantly to identify Hawes as the individual charged under the indictment. Several witnesses testified that they knew Hawes only by his alias of "Stomper," and Hawes himself testified that most people know him as "Stomper." To the extent that the gruesome connection between Hawes' crime and his alias might possibly have raised questions in the minds of the jury,

---

[3] The witness who recounted this statement also testified that she was unsure whether Hawes' comment was meant to be taken seriously.

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[5] *Allen v. State*, 231 Ga. 17, 18 (200 SE2d 106) (1973), cert. denied, 414 U. S. 1159 (94 SC 919, 39 LE2d 112) (1974); *Andrews v. State*, 196 Ga. 84, 110-111 (26 SE2d 263) (1943); *Scott v. State*, 185 Ga. App. 887 (366 SE2d 196) (1988).

such questions were answered when Hawes testified under oath that he acquired the alias as a child, when he had a propensity to "run down the street stomping." Thus, the connection between the alias and the killing in this case appears to have been fortuitous, and we reject Hawes' first enumeration.

3. Hawes enumerates as error the trial court's admission into evidence of a contempt order issued against one of his witnesses, Ms. Howard, the young woman whom he accompanied when she went to retrieve her child just before Hawes fought with and killed the victim. Ms. Howard testified in the trial court that the victim had physically abused her on numerous occasions during their five-year relationship. Presumably, this testimony was intended to show the victim's propensity to behave violently, thereby justifying Hawes' actions.

On cross-examination, the State questioned Ms. Howard regarding an earlier magistrate's court proceeding concerning a criminal warrant she had sworn out against the victim, accusing him of battery. As was explained by Ms. Howard during her trial testimony, a hearing had been held in magistrate's court concerning the battery warrant. At the hearing in magistrate's court, Ms. Howard had admitted on the stand that she had sworn out the warrant because she had been angry with the victim, and that she had fabricated part of the factual allegations asserted in support of the warrant. The magistrate's court had issued an order holding Ms. Howard in criminal contempt for her abuse of the criminal justice system. At Hawes' trial, the State introduced a certified copy of that contempt order into evidence over Hawes' hearsay objection, for purposes of impeaching Ms. Howard's testimony.[6]

A witness's credibility may be impeached by evidence of conviction of a crime involving moral turpitude.[7] The concept of a crime involving moral turpitude, while nothing new, is not always susceptible to a clear and certain definition.[8] We have said that for purposes of witness impeachment, crimes involving moral turpitude are "restricted to the gravest offenses, constituting of felonies, infamous crimes, and those that are malum in se and disclose a depraved

---

[6] Hawes' hearsay objection, which he raises again on appeal, is meritless. It is based upon the argument that the truthfulness of the order's contents was improperly admitted without challenge, because the signing judge was not available for cross-examination. Certified copies of prior convictions are deemed sufficiently valid to be admitted into evidence. OCGA § 24-7-20.

[7] Hall v. Hall, 261 Ga. 188 (402 SE2d 726) (1991); Lewis v. State, 243 Ga. 443, 444 (254 SE2d 830) (1979).

[8] See Ramsey v. State, 145 Ga. App. 60, 62 (243 SE2d 555) (1978) (what constitutes moral turpitude is "at best amorphous"); McIntosh v. State, 443 S2d 1283, 1284 (Ala. 1983) (analyzing same definition of moral turpitude as used in Georgia); State v. Malusky, 230 NW 735, 737 (N.D. 1930) (same).

mind."[9] We have also indicated that moral turpitude is roughly the equivalent of infamy.[10] Likewise, the Court of Appeals has opined that a crime involving moral turpitude must be malum in se and not merely malum prohibitum, and involves " ' "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." ' "[11] Also noteworthy is the Court of Appeals' recent holding that convictions for both criminal and civil contempt are neither felonies nor misdemeanors.[12]

Assuming without deciding that a criminal contempt citation based upon the false swearing out of a warrant is not a crime malum in se, and therefore does not involve moral turpitude for purposes of witness impeachment, we find that in this case, any error resulting from the admission into evidence of the contempt order was harmless. The record discloses that Ms. Howard admitted under cross-examination that she had lied in swearing out the warrant charging the victim with battery, and that she had been issued a contempt order by the magistrate's court for that misconduct. Hence, the evidence contained in the order was cumulative of other properly-admitted evidence, and therefore was harmless as a matter of law.[13]

4. Finally, Hawes claims that the trial court erred when, after correctly charging the jury regarding malice murder, voluntary manslaughter, and felony murder, it recharged the jury that it could reach a verdict on felony murder without having first disposed of the malice murder charge.

The record reveals that the trial court properly charged the jury as to malice murder and voluntary manslaughter (Count I) and felony murder (Count II). As part of its charge, the court instructed the jury that if it found provocation and passion (as previously had been defined) with respect to the killing, it could find Hawes guilty of voluntary manslaughter, but it could not find him guilty of felony murder. The jury then asked for reinstruction regarding whether it had to reach a unanimous verdict as to all counts. The court recharged the jury that there were three possible verdicts under Count I — guilty of malice murder, guilty of voluntary manslaughter, or not guilty — and if the jury found Hawes either guilty of malice murder or guilty of voluntary manslaughter, then it need not consider Count II, felony

---

[9] *Hall,* supra.

[10] Id.

[11] *Ramsey,* supra (citations omitted).

[12] *Flanagan v. State,* 212 Ga. App. 468, 469 (442 SE2d 16) (1994).

[13] *McLendon v. State,* 259 Ga. 778, 780 (387 SE2d 133) (1990); *Maher v. State,* 216 Ga. App. 666, 667 (455 SE2d 377) (1995).

murder.

After two hours of deliberation, the jury asked whether it could deadlock as to Count I and still reach a verdict as to Count II, or whether that would result in a mistrial. Upon questioning the foreperson, the court learned that the jury believed itself to be deadlocked as to one of the counts of the indictment, but that it had not yet reached a verdict as to the other count.

After conferring with counsel, the trial court recharged the jury by reminding it of the possible verdicts on Count I that previously had been explained to it. The court instructed the jury that it was to continue deliberating with an eye toward a unanimous verdict as to each count, and that it was not to consider whether a mistrial might be declared as a result of its decisions. Then a juror asked whether Count I had to be disposed of before Count II could be considered, or, if the jury deadlocked on one count, was it free to go on to consider the other count. The juror also asked for a recharge on the definition of malice. After again conferring with counsel, the court recharged properly on malice, and instructed the jury that it "need not dispose of Count I before you go on to consider Count II. It does not matter what order your decisions are made, *as long as they are made consistently with the instructions that I have given you*." The court again cautioned the jury that it was not to consider what might happen if it failed to reach a unanimous verdict on any count. The jury then returned a verdict of deadlocked on Count I, and guilty on Count II.

On appeal, Hawes argues that the recharge instructing the jury that it need not dispose of Count I before considering Count II was inconsistent with the original charge, and prevented the jury from fully considering whether Hawes was guilty of voluntary manslaughter before going on to consider whether he was guilty of felony murder. Hawes argues that the trial court should have recharged the jury that it had to reach verdicts on Count I before proceeding to Count II, and that the jury then would have found him guilty only of voluntary manslaughter.

In *Edge v. State*, we disapproved of sequential charges that instruct juries to consider voluntary manslaughter only after considering and finding a defendant not guilty of malice murder and felony murder, because to do so eliminates the jury's full consideration of the voluntary manslaughter charge in cases where it concludes that a felony murder occurred.[14] We instructed that courts should instruct juries so as to ensure adequate consideration of charges for both mur-

---

[14] 261 Ga. at 867.

der and manslaughter.[15] Specifically, we instructed that a jury should be charged that if it finds provocation and passion with respect to the killing, it cannot find felony murder, but may find voluntary manslaughter.[16]

In this case, the trial court charged the jury expressly that if it found provocation and passion with respect to the killing, it could not find felony murder but could find voluntary manslaughter. This was entirely consistent with *Edge* and case law interpreting that opinion.[17] When it recharged the jury that it could consider Count II, charging felony murder, before disposing of Count I, charging malice murder and voluntary manslaughter, the trial court (1) reasonably believed the jury was deadlocked on Count I, and (2) expressly stated that the jury's consideration of the felony murder charge had to be consistent with the court's other instructions. Necessarily, this included the court's earlier instruction that the jury could not find Hawes guilty of felony murder if it believed the killing was mitigated by provocation and passion. We believe that jurors of ordinary capacity and understanding, hearing the trial court's recharge and its reference to the earlier instructions, would have understood this and deliberated accordingly.[18] Thus, we find that there was no error when the trial court, finding the jury deadlocked as to Count I, recharged the jury that it could go on to consider Count II, so long as it did so in a manner consistent with the court's other instructions — which included the instruction that if the jury found provocation and passion, then it could not find felony murder.[19]

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Janet S. Willy,* for appellant.

*Harry N. Gordon, District Attorney, Gerald W. Brown, Assistant District Attorney, Michael J. Bowers, Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.

---

[15] Id.

[16] Id., n. 2.

[17] See id.; *Jones v. State,* 265 Ga. 203, 205 (455 SE2d 34) (1995).

[18] See *Ayers v. State,* 214 Ga. 156, 163 (103 SE2d 574) (1958).

[19] While we are satisfied that *Edge* was complied with in this case, in order to ensure such compliance in future cases, trial courts would do well, when recharging a jury deadlocked as to a count charging malice murder that they may go on to consider a count charging felony murder, to repeat an instruction that the jury cannot find felony murder if it finds the existence of provocation and passion.

## S96A0684. LATTIMORE v. THE STATE.
(470 SE2d 673)

HUNSTEIN, Justice.

Kitwana Lattimore, a/k/a Kojack, was indicted jointly with Steven Earls on charges of murder and criminal attempt to commit armed robbery. Prior to the present trial, Lattimore has been tried three times for these crimes, with two such trials ending in mistrials, and the third ending in a conviction which was subsequently overturned by this Court in *Lattimore v. State*, 265 Ga. 102 (454 SE2d 474) (1995). The jury in this trial found Lattimore guilty of the charged crimes. He appeals from the denial of his motion for a new trial.[1] Because the evidence supports the verdict and the trial court did not err in its charge to the jury, we affirm.

1. Harold Phillip Haggard was shot during a robbery attempt and died shortly thereafter. Earls, who is serving a life sentence for these crimes, testified at trial that he and Lattimore planned and committed the attempted armed robbery together. Other evidence adduced at trial corroborated Earls' testimony.[2] Earls also testified that Lattimore was the one who carried and used the pistol. Although Lattimore initially told the police that he was not present at the scene, he testified at trial that he was with Earls but asserted he did not know that Earls was planning to rob Haggard and was surprised when the shooting occurred.

The evidence was sufficient to authorize the jury to find Lattimore guilty of the charged crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Lattimore contends the trial court erred in its charge to the jury on "persons concerned in the commission of a crime."[3] Our re-

---

[1] The crimes occurred on October 30, 1992. Lattimore was indicted by the Clarke County grand jury in its October 1992 term. He was found guilty on June 26, 1995, and was sentenced that day to life imprisonment for murder and a concurrent term of ten years for the criminal attempt to commit armed robbery. His motion for new trial was filed on July 17, 1995 and denied on November 21, 1995. A notice of appeal was filed on December 19, 1995 and the case was docketed in this Court on January 18, 1996. This appeal was submitted for decision without oral argument.

[2] The other evidence adduced at this trial was substantially similar to that presented at Lattimore's third trial and is set forth in more detail in *Lattimore*, supra at (1).

[3] The trial court charged the jury as follows:

I charge you that if you find that the State has shown beyond a reasonable doubt that two or more persons formed a common intent and purpose to go to the place of business of another and commit an armed robbery and if in the furtherance of such common intent and purpose to commit an armed robbery, such persons went to the place of business of the person where it is contemplated that the armed robbery would be committed, and if in pursuance of such common intent and purpose to commit an armed robbery one of those persons present intentionally aiding and abetting in such effort to commit an armed robbery and acting with unlawful intention to kill, that is with malice, shot and killed the person sought to be robbed, then in that event you, the jury, would be permitted to find the act of the one shooting

view of the charge reveals that the trial court's instruction comported in every regard with our holding in *Lattimore,* supra at (3). We find no merit in this enumeration.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Adrienne R. McFall,* for appellant.

*Harry N. Gordon, District Attorney, Michael J. Bowers, Attorney General, Christopher S. Brasher, Assistant Attorney General,* for appellee.

S96A0202. ATLANTA GAS LIGHT COMPANY v. GEORGIA TEXTILE MANUFACTURERS ASSOCIATION, INC. et al.
S96A0204. GEORGIA POWER COMPANY v. GEORGIA TEXTILE MANUFACTURERS ASSOCIATION, INC. et al.
S96A0205. GEORGIA PUBLIC SERVICE COMMISSION v. GEORGIA TEXTILE MANUFACTURERS ASSOCIATION, INC. et al.

(470 SE2d 230)

BENHAM, Chief Justice.

These appeals involve the decision of the Georgia Public Service Commission ("PSC") to deny a motion for discovery made by an intervenor in a rate case pending before the PSC. After the intervenor Georgia Textile Manufacturers Association ("GTMA") appealed the PSC's decision to the Superior Court of Fulton County, Atlanta Gas Light Company ("AGL"), the utility which sought the rate increase, withdrew its rate case from the PSC's consideration. The superior court recognized that AGL had dismissed the underlying rate case, but exercised its discretionary jurisdiction to hear and decide the discovery issue which it deemed an issue capable of repetition yet evading review. The court determined the issue would evade review since a rate case must be decided within six months from notice of a proposed change and it was unlikely that a judicial appeal of a discovery motion could be completed prior to the conclusion of the administrative proceeding.

1. An appeal is moot where it affirmatively appears that a deci-

---

and killing the other is attributable to and considered as the act of all present intentionally aiding and abetting in the effort to commit armed robbery, and you would be authorized to find each equally guilty of murder under the law. Whether or not such events occurred or were proven in this case is a matter for you, the jury, to determine.

sion would not benefit the complaining party. *Nat. Council of Jewish Women v. Cobb County*, 247 Ga. 198, 199 (275 SE2d 315) (1981). That some future benefit may be derived by the intervenor from an adjudication on an abstract question, i.e., one which is not based upon *existing* facts or rights, does not require a court to retain and decide the case. Id. The alleged error complained of by the intervenor is capable of repetition since, contrary to the trial court's determination that rate cases must be decided within six months, OCGA § 46-2-25 (b) and (c) state only that the effective rate suspension period is six months from the date rates are filed. Because no reason appears as to why this issue would evade review in future cases, judicial review is not mandated. *Chastain v. Baker*, 255 Ga. 432, 433 (339 SE2d 241) (1986). Accordingly, we reverse the superior court's determination to the contrary and remand with direction to the trial court to dismiss the case.

2. Because of our decision in Division 1, it is unnecessary to consider the remaining enumerations of error.

*Judgments reversed and remanded with direction. Benham, C. J., Fletcher, P. J., Sears, Hunstein, Carley, Hines, JJ., and Judge Clarence F. Seeliger concur. Thompson, J., disqualified.*

DECIDED MAY 6, 1996 —
RECONSIDERATION DENIED MAY 31, 1996.

*Long, Aldridge & Norman, Albert G. Norman, Jr., Gordon D. Giffin, L. Craig Dowdy, William E. Rice,* for Atlanta Gas Light Company.

*Troutman Sanders, Kevin C. Greene, Robert P. Williams, Susan P. Wilkerson,* for Georgia Power Company.

*Michael J. Bowers, Attorney General, Brenda H. Cole, Deputy Attorney General, John E. Hennelly, Thomas K. Bond, Assistant Attorneys General,* for Public Service Commission.

*Peyton S. Hawes,* for Georgia Textile Manufacturers Association.

S95G1507. SOUTHWIRE COMPANY v. GEORGE.
(470 SE2d 865)

THOMPSON, Justice.

We granted certiorari to the Court of Appeals in *George v. Southwire Co.*, 217 Ga. App. 586 (458 SE2d 362) (1995), and posed the following query:

Under the Workers' Compensation Act, is psychic trauma compensable when, while not precipitated by a physical in-

jury, it arose out of an accident in which a compensable physical injury contributes to the continuation of the psychic trauma?

While in the scope of his employment as a truck driver for Southwire Company, Denver George suffered injuries to his knee, hip, and chest when his tractor-trailer hit a passenger vehicle broadside after the other driver ran a stop sign. The driver of the other vehicle was thrown from the impact, and a female passenger was killed instantly. George observed the body of the decedent collide with the grill of his truck. He was placed in the same hospital emergency room with the other driver whose lung had collapsed, whose face was mangled, and who was gurgling and hollering for the deceased passenger. George became so upset that he had to be removed from the room.

Approximately two months later, George was released to return to full duty work by his treating orthopedist. He continued, however, to be treated by a psychiatrist who deposed that shortly after his knee injury claimant "began having recurrent nightmares, insomnia, flashbacks of the accident, and recurrent irritability and crying episodes, and could not get the picture of these people [sic] who were killed in the accident out of his mind." The psychiatrist concluded that George suffered post-traumatic stress disorder which may have been brought on or intensified by his knee injury.[1] This condition necessitated continuing psychiatric treatment and resulted in his inability to perform work as a truck driver.

The ALJ denied benefits to the claimant for psychiatric disability resulting from psychic trauma attendant to a compensable automobile accident, finding: "Although there is a definite need for psychological treatment . . . and his psychological problems have resulted in a disability from work, I find that his psychological problems were not precipitated by specific physical trauma to his knee, and that they were caused by the events of the accident which [he] witnessed." George was awarded temporary total disability benefits for the two months that he was physically unable to work, but no benefits thereafter, "even though he is disabled from working at Southwire or as a truck driver due to psychiatric problems . . . [because] [t]hese psychiatric problems resulting in disability therefrom do not arise from Mr. George's physical injury, but from the events he witnessed at the accident." The award was adopted by the full board and affirmed on

---

[1] "Posttraumatic Stress Disorder" is described in the Diagnostic & Statistical Manual of Mental Disorders (4th ed. 1994) as "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury. . . ." At 424. It is manifested by "persistent symptoms of anxiety . . . that were not present before the trauma." Id. at 425.

appeal to the superior court.

The Court of Appeals granted discretionary review and reversed, holding that: "George's mental disability was brought on by a compensable accident in which he was physically injured. Although this physical injury is not the cause of his mental disability, it is part of the reason for its continuation." *George v. Southwire Co.*, supra at 588.

While this Court has not previously had occasion to examine the question of compensability for mental disability under the Workers' Compensation Act, it has long been the rule in this state that a psychological injury or disease is compensable if it arises " 'naturally and unavoidably' . . . from some discernible physical occurrence." *Hanson Buick v. Chatham*, 163 Ga. App. 127, 129 (292 SE2d 428) (1982). See also *Indemnity Ins. Co. v. Loftis*, 103 Ga. App. 749 (1) (120 SE2d 655) (1961) (a mental disability is compensable if brought on by an accident and physical injury); *Brady v. Royal Mfg. Co.*, 117 Ga. App. 312 (160 SE2d 424) (1968) (psychic disability must have its origin in injury); *Sawyer v. Pacific Indem. Co.*, 141 Ga. App. 298 (233 SE2d 227) (1977) (psychic disability resulting from physical injury is compensable); *Williams v. ARA Environmental Svcs.*, 175 Ga. App. 661 (334 SE2d 192) (1985) (psychic disability resulting from purely psychological injury is not compensable); *Howard v. Superior Contractors*, 180 Ga. App. 68 (348 SE2d 563) (1986) (post-traumatic stress syndrome arising from a physical injury is compensable); *W. W. Fowler Oil Co. v. Hamby*, 192 Ga. App. 422 (385 SE2d 106) (1989) (psychic trauma must arise naturally and unavoidably from some discernible, physical injury).

The claimant herein suffered a discernible physical "injury" as that term is defined in OCGA § 34-9-1 (4). In *George v. Southwire Co.*, supra, the Court of Appeals concluded that a mental disability is compensable under the Act where it was brought on by a compensable accident in which the claimant was physically injured, and the physical injury contributed to the continuation of the psychic trauma. We find this ruling and the precedent upon which it is based to be sound and consistent with the beneficent objective of the Act, which is to provide financial assistance for an injury arising out of and in the course of employment. See generally *Travelers Ins. Co. v. Southern Elec.*, 209 Ga. App. 718 (1) (434 SE2d 507) (1993). Accordingly, we hold that a claimant is entitled to benefits under the Workers' Compensation Act for mental disability and psychic treatment which, while not necessarily precipitated by a physical injury, arose out of an accident in which a compensable physical injury was sustained, and that injury contributes to the continuation of the psychic trauma. The physical injury need not be the precipitating cause of the psychic trauma; it is compensable if the physical injury contributes to the

continuation of the psychic trauma.

To the extent that the ALJ imposed a requirement that claimant's physical injury must be the precipitating cause of his psychological condition, an incorrect legal standard was applied. "[W]here an award is entered under an erroneous legal theory, it may be set aside, and the case remanded to the board for further findings." *Indemnity Ins. Co. v. Loftis*, 103 Ga. App., supra at 751. Accordingly, the Court of Appeals was correct in ruling that the award must be set aside under OCGA § 34-9-105 (c) (5). But in its further conclusion that, "[u]nder these circumstances, [George should be compensated] for psychic trauma precipitated by psychic stimuli," *George*, supra at 588, the Court of Appeals substituted itself as a factfinding body. Neither the superior court nor the appellate court has authority to do so. *South Ga. Timber Co. v. Petty*, 218 Ga. App. 497, 498 (462 SE2d 176) (1995). The case is remanded to the Court of Appeals with direction that the Board determine compensability for claimant's mental disability and attendant medical expenses under the standard set out herein.

*Judgment affirmed and case remanded with direction. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who concur specially.*

FLETCHER, Presiding Justice, concurring specially.

We granted certiorari to clarify the proper standard for determining when psychic injury is compensable under the Workers' Compensation Act. Language in previous Court of Appeals cases has suggested, as the ALJ held in this case, that psychic trauma is compensable only if it arises directly from a compensable physical injury.[2] This standard essentially requires a proximate cause link between the physical and psychic injuries. The Court of Appeals in this case and in others, however, has held that a lesser causation standard is appropriate, and that psychic trauma is compensable when it arises out of an accident in which a compensable injury occurred and the compensable physical injury contributes to or aggravates the psychic trauma.[3] I believe this latter standard is more in keeping with the purpose of the Act to provide financial assistance for injuries arising during the course of employment.[4] Therefore, I would disapprove the cases that suggest a proximate causation requirement.

---

[2] See, e.g., *Hanson Buick v. Chatham*, 163 Ga. App. 127, 129 (292 SE2d 428) (1982) (psychic injury compensable only if it arises "naturally and unavoidably from some discernible occurrence"); *Indemnity Ins. Co. v. Loftis*, 103 Ga. App. 749, 752 (120 SE2d 655) (1961) (psychic disability compensable "if arising from the physical injury").

[3] See, e.g., *George v. Southwire Co.*, 217 Ga. App. 586 (458 SE2d 362) (1995); *Howard v. Superior Contractors*, 180 Ga. App. 68 (348 SE2d 563) (1986).

[4] *Slaten v. Travelers Ins. Co.*, 197 Ga. 1, 2 (28 SE2d 280) (1943).

Because the claimant's psychiatrist testified that the post-traumatic stress disorder was intensified and prolonged by the knee injury,[5] we need not reach the question of whether psychic trauma is compensable when preceded by no physical trauma.

SEARS, Justice, concurring specially.

The majority holds that "a claimant is entitled to benefits under the Workers' Compensation Act for mental disability and psychic treatment which, while not necessarily precipitated by a physical injury, arose out of an accident in which a compensable physical injury was sustained, and that injury contributes to the continuation of the psychic trauma," and remands the case for a determination whether George's claim is compensable under that standard.[6] Although I concur in the remand to determine the compensability of George's claim, I would adopt a different standard by which to make that determination. It is time for this Court to join the majority of courts that have freed the right to recover for a legitimate mental injury from the arbitrary requirement that that injury be accompanied by a physical injury. Chief Justice Benham persuasively championed just such a position in dissent while a judge on the Court of Appeals.[7] This Court should follow those leads in this case and adopt a rule permitting compensation under Georgia's Workers' Compensation Act for mental injuries resulting from mental causes or stimuli, regardless of whether there are accompanying physical injuries.

1. Our Workers' Compensation Act protects employees from "injury by accident arising out of and in the course of the employment."[8] It cannot reasonably be disputed that the term "injury" is broad enough to cover both physical and mental injuries. The definition of injury is as follows:

> [A]n act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm; . . . hurt, damage, or loss sustained; . . . INJURY, HURT, DAMAGE, HARM, AND MISCHIEF mean in common the act or result of inflicting on a person or thing something that causes loss, pain, distress, or impairment. INJURY is the most comprehensive, applying to an act or result involving an impairment or destruction of right, health, freedom, soundness, or loss of something of value . . . [mental or emotional upset to the

---

[5] *George v. Southwire Co.*, 217 Ga. App. at 587.

[6] Majority opinion at 741.

[7] *Williams v. ARA Environmental Svcs.*, 175 Ga. App. 661, 664-668 (334 SE2d 192) (1985).

[8] OCGA § 34-9-1 (4).

body is just as truly an injury to the body as a bone fracture].[9]

In addition, in *Hennly v. Richardson*,[10] this Court held that "[t]he Worker's Compensation Act in Georgia is intended to have broad application so as to cover a wide variety of injuries and the pain and suffering incident to such injuries. *Southern Wire &c. v. Fowler*, 217 Ga. 727, 729 (124 SE2d 738) (1962)." Given the broad meaning of "injury," and given that the General Assembly could have easily limited compensation to physical or bodily injuries by modifying the word "injury" with either of those words, the term "injury" can only reasonably be interpreted under the plain meaning of the statute to include mental, as well as physical injuries. Indeed, Georgia cases precluding recovery for mental injuries caused by mental causes have not focused on the word "injury" but on the word "accident" to deny compensation in such cases.[11]

I conclude, however, that these cases have improperly limited the word "accident" to only those cases where there is a physical injury.[12] First, "accident" does not carry the certain meaning that a physical injury to a person has occurred.[13] That the term "accident" was not meant to limit the type of injury for which compensation could be sought, but merely to describe a type of event or occurrence or development that led to the injury, is demonstrated by the simple fact that the legislature used the term "injury" immediately preceding the word "accident," and thus must have intended "injury" to describe the result of the "accident" and, correspondingly, must not have intended the word "accident" to signify the type of injury necessary for recovery of compensation. Accordingly, although the word "accident" encompasses physical events, it does not require a physical impact on the person.

---

[9] Webster's Third New International Dictionary, Unabridged at 1164.

[10] 264 Ga. 355 (1) (444 SE2d 317) (1994).

[11] E.g., *Hanson Buick v. Chatham*, 163 Ga. App. 127, 131 (292 SE2d 428) (1982); *Brady v. Royal Mfg. Co.*, 117 Ga. 312, 314-315 (160 SE2d 424) (1968).

[12] See *W. W. Fowler Oil Co. v. Hamby*, 192 Ga. App. 422 (385 SE2d 106) (1989); *Hanson Buick*, 163 Ga. App. at 131.

[13] "Accident" has been defined in Webster's Third New International Dictionary, Unabridged at 11, as

an event or condition occurring by chance or arising from unknown or remote causes; lack of intention or necessity; an unforseen unplanned event or condition; a usu. sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result; an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but from the consequences of which he may be entitled to some legal relief.

Further, OCGA § 1-3-3 (2) states that the term accident "means an event which takes place without one's foresight or expectation or design."

A more problematic concern about the word "accident" is whether it means only physical events and occurrences or whether it also includes mental or emotional occurrences and events. I conclude that it should include the latter. For example, heart attacks that are induced by daily mental and emotional job stresses are physical injuries, but are not brought about by a physical occurrence or event. Such heart attacks, however, have been held to be accidental and compensable.[14] Because interpreting "accident" to require a physical, traumatic event leading to the "injury" (heart attack) would preclude compensation in such cases, the courts of this State have not required such an event for the heart attack to be compensable.[15] It thus would be inconsistent to require such a physical, traumatic event in cases of mental injury, for the term "accident" either encompasses mental and emotional stimuli or it does not; it cannot include them for one type of injury and not for another.

For similar reasons, I conclude that the word "accident" should not be interpreted to contain a limitation that the injury be caused by a single, traumatic physical or mental stimulus, but instead should be interpreted to include gradual physical and mental stimuli.[16]

Further, this broad interpretation of "accident" is consistent with prior interpretations of this Court and the Court of Appeals. For example, in *Helton v. Interstate Brands Corp.*,[17] the Court of Appeals stated that

> "The word 'accident,' as used in the act, includes every injury except diseases not naturally growing out of injuries arising out of and in the course of employment, [except] injuries caused by the wilful act of a third person directed against such employee for reasons personal to him, and [except] wilful misconduct on the part of the employee, and the act precludes action at common law or otherwise. [Cits.]" *Reid v. Lummus Cotton-Gin Co.*, 58 Ga. App. 184, 185 (197 SE 904) (1938).

And, as Chief Justice Benham recognized in *Williams v. ARA Environmental Svcs.*:

---

[14] *Travelers Ins. Co. v. Neal*, 124 Ga. App. 750, 751 (2) (186 SE2d 346) (1971); *City of Augusta v. Williams*, 137 Ga. App. 177, 178 (223 SE2d 227) (1976) ("[e]motionally initiated heart attacks constitute accidental injuries"); *Zippy Mart v. Fender*, 170 Ga. App. 617 (317 SE2d 575) (1984); *Reynolds Constr. Co. v. Reynolds*, 218 Ga. App. 23 (459 SE2d 612) (1995).

[15] *Neal*, 124 Ga. App. 750; *Williams*, 137 Ga. App. 177; *Zippy Mart*, 170 Ga. App. 617; *Reynolds*, 218 Ga. App. 23.

[16] See 1B Larson, The Law of Workmen's Compensation, § 42.23 (b) (1995).

[17] 155 Ga. App. 607, 608 (271 SE2d 739) (1980).

Even in a very early interpretation of the Workers' Compensation Act, the Supreme Court opined in *Lumbermen's Mut. Cas. Co. v. Griggs*, 190 Ga. 277 (9 SE2d 84) (1940), that the word "accident" was intended to have a broad meaning.

Likewise, this court has stated that "[a]n injury which arises out of and in the course of the employment, and which is not the result of the claimant's wilful misconduct or some other stated exception, is any injury 'by accident' under the terms of the act, although its immediate cause may be unknown [cit.], and although there was no physical impact or 'accident' in the ordinary non-technical sense of the word. [Cit.]" *Ideal Mut. Ins. Co. v. Ray*, 92 Ga. App. 273 (1) (88 SE2d 428) (1955). In heart attack cases, " '[a] physical impact is not a necessary prerequisite to an injury within the compensation act.' [Cit.]" (*Orkin Exterminating Co. v. Wright*, 92 Ga. App. 224, 225 (88 SE2d 205) (1955)); and on-the-job stress has been recognized as the determinative [causal] factor in both heart attack and heart disease cases. *City Council of Augusta v. Williams*, 137 Ga. App. 177 (223 SE2d 227) (1976); *Zippy Mart v. Fender*, 170 Ga. App. 617 (317 SE2d 575) (1984). Professor Larson's reasoning is in line with the Georgia heart attack cases when he states that "it is no longer realistic to draw a line between what is 'nervous' and what is 'physical' . . . Perhaps, in earlier years when much less was known about mental and nervous injuries and their relation to 'physical' symptoms and behavior, there was an excuse, on grounds of evidentiary difficulties, for ruling out recoveries based on such injuries, both in tort and in [Workers'] Compensation. But the excuse no longer exists." 1B Larson, § 42.23 (a), supra at 7-632.[18]

Considering the definitions of "injury" and "accident," and considering the direction given in the foregoing cases concerning the broad application to be given the Act in general and the word "accident" in particular, I conclude that there is no language in the Act that prevents this Court from holding that a mental injury occasioned by mental stimuli is compensable.

Further, to permit employees to recover for mental injuries from mental trauma is consistent with the purpose of the Act as expressed in OCGA § 34-9-23. That Code section provides as follows:

This chapter shall be liberally construed only for the

---

[18] 175 Ga. App. at 665-666.

purpose of bringing employers and employees within the provisions of this chapter and to provide protection for both. This chapter is intended to provide a complete and exclusive system and procedure for the resolution of disputes between employers and employees who are subject to this chapter concerning accidents and injuries arising out of and in the course of employment as defined by this chapter. The provisions of this chapter shall be construed and applied impartially to both employers and employees.

The Act thus directs that it should be liberally construed to provide compensation to employees so long as protection is also provided to employers. Both of these goals can easily be accomplished with regard to mental injuries brought on by mental trauma. I have already demonstrated that the terms of the Act, even using less than a liberal construction, are broad enough to provide protection to employees for such injuries, thus fulfilling part of the directive of § 34-9-23.

Can employers be adequately protected in such cases? Yes. First, by bringing employees within the Act for such injuries, employers are protected from tort actions for those injuries. Second, and perhaps more significantly, there is abundant precedent from across the country that should be adopted in Georgia and that will protect employers from spurious claims for mental injuries caused by mental stimuli. Chief Justice Benham set forth one such solution in *Williams*:

> The hallmark of our system of jurisprudence is its spirit of fairness and its ability to adjust to new situations. I can think of no greater need than the need to protect workers who form the backbone of our economic system. Therefore, we must view this matter with an eye toward progression rather than retrogression. The concern for abuse expressed in the excellent analysis in *Hanson Buick*[19] dissuades me from jerry-rigging a rule just to suit this particular case. We must develop a simple and easily understandable rule that is fair and appropriate but which does not lend itself to flagrant abuse. An overriding concern of the *Hanson Buick* case was the fear of malingerers being compensated for unfounded and manufactured psychological injuries. . . .
>
> What this dissent proposes is the adoption of the Wisconsin approach in *Swiss Colony v. Dept. of I.L.H.R.*, 72 Wis.2d 46 (240 NW2d 128) (1976), quoting from *School District v. I.L.H.R.*, 62 Wis.2d 370 (215 NW2d 373) (1974): "[I]n order for nontraumatically caused mental injury to be com-

---

[19] *Hanson Buick v. Chatham*, supra, 163 Ga. App. 127.

pensable in a [workers'] compensation case, the injury must
have resulted from a situation of greater dimensions than the
day-to-day mental stresses and tensions which all employees
must experience."

Although I find the Wisconsin approach illustrative of the type of
standard that can be used to curtail frivolous claims for mental inju-
ries that result from mental stimuli, I would adopt a variant of that
standard that has been adopted in Wyoming and Iowa. Under that
standard, an employee may be compensated for a mental-mental in-
jury if he "establishes that the mental injury 'was caused by work-
place stress of greater magnitude than the day-to-day mental stresses
experienced by other workers employed in the same or similar jobs,'
regardless of their employer."[20] As the Iowa Supreme Court noted,
there are three reasons for adopting the Wyoming standard. First,
"[b]y comparing the stresses endured by similarly situated employees,
the Wyoming standard provides the employees with compensation for
legitimate work related injuries while at the same time limits the em-
ployers' liability to injuries caused by its industry."[21] Second, the Wy-
oming standard avoids confusion that has arisen over the meaning of
the phrase "all employees" in the Wisconsin standard.[22] Third, states
that have extended experience with mental-mental claims "are in-
creasingly enacting statutes which require proof that the employee's
stress is greater than that of similarly situated employees."[23]

Requiring that an employee prove that his mental injury was
caused by stresses greater than those experienced by similarly situ-
ated employees would provide protection to employees for legitimate
work-related, mental injuries while at the same time ensuring that
employers are protected from frivolous claims for such injuries.[24]
OCGA § 34-9-23.

Finally, the present case provides easy proof of why the physical
injury requirement is but an arbitrary one that adds nothing to the
protection of employers. Here, George witnessed tragic and horrifying
events. He claims that he suffers a mental injury as a result. In com-
bating this claim of mental injury, of what avail is it to Southwire
that George suffered a knee injury? The physical injury provides no
proof that George is suffering a mental injury and provides no assur-

---

[20] *Dunlavey v. Economy Fire &c. Co.*, 526 NW2d 845 (Iowa 1995) (quoting *Graves v. Utah Power &c. Co.*, 713 P2d 187, 193 (Wyo. 1986)).

[21] Id. at 857.

[22] Id. at 857-858.

[23] Id. at 858.

[24] Further, to the extent that a mental injury may in a given case be classified as a disease, see OCGA § 34-9-1 (4), this rule would ensure that the "disease . . . results naturally and unavoidably from the accident," id.

ance that George is not falsifying that injury. George, in fact, can falsify his mental claim with his knee injury just as easily as he could if he had suffered no such injury. The requirement of a physical injury acts to distract from the relevant proof of mental injury and to create the potential for legitimate mental injuries to go uncompensated, while providing no countervailing benefit to employers. It is time to cast aside this requirement.

2. In sum, the language and purposes of our Workers' Compensation Act lead inescapably to the conclusion that employees should have protection for mental injuries caused by mental stimuli. In adopting such a rule, we would join the majority of states in this country who provide such protection.[25] As Chief Justice Benham eloquently stated in *Williams*: "The life of the law has been dependent upon proper adherence to precedent; however, the quality of the law's life is jeopardized when the precedents run contrary to experience, reason, and fundamental fairness."[26] As the precedents that preclude compensation for mental-mental claims run contrary to experience, reason, and fundamental fairness, I would overrule them, and adopt a rule permitting recovery in those cases under the standard set forth in this special concurrence.

I am authorized to state that Chief Justice Benham joins in this special concurrence.

DECIDED JUNE 3, 1996.

*Kenneth A. Smith*, for appellant.
*Charles H. Lumpkin, Jr., Drew, Eckl & Farnham, John G. Blackmon, Jr., Marion M. Handley*, for appellee.
*Hamilton, Westby, Marshall & Antonowich, Andrew J. Hamil-*

---

[25] See, e.g., *Dunlavey*, 526 NW2d at 845; *Robinson's Case*, 623 NE2d 478 (Mass. 1993); *Todd v. Goostree*, 493 SW2d 411 (Mo. App. 1973); *Brock v. Industrial Comm.*, 486 P2d 207 (Ariz. App. 1971); *Owens v. Nat. Health Labs.*, 648 SW2d 829 (Ark. App. 1983); *Fox v. Alascom*, 718 P2d 977 (Alas. 1986); *Wolfe v. Sibley, Lindsay & Curr Co.*, 330 NE2d 603 (N.Y. 1975); *Baker v. Workmen's Compensation Appeals Bd.*, 96 Cal. Rptr. 279 (Cal. App. 1971); *Battista v. Chrysler Corp.*, 517 A2d 295 (Del. Super. Ct. 1986); *Royal State Nat. Ins. Co. v. Labor &c. Appeal Bd.*, 487 P2d 278 (Haw. 1971); *Pathfinder Co. v. Industrial Comm.*, 343 NE2d 913 (Ill. 1976); *Hansen v. Von Duprin, Inc.*, 496 NE2d 1348 (Ind. App. 1986), rev'd on other grounds, 507 NE2d 573 (1987); *Sargent v. Bd. of Ed.*, 433 A2d 1209 (Md. App. 1981); *Brown & Root Constr. Co. v. Duckworth*, 475 S2d 813 (Miss. 1985); *Stokes v. First Nat. Bank*, 377 SE2d 922 (S.C. App. 1988), aff'd, 410 SE2d 248 (1991); *Jose v. Equifax, Inc.*, 556 SW2d 82 (Tenn. 1977); *Bailey v. American Gen. Ins. Co.*, 279 SW2d 315 (Tex. 1955); *Burlington Mills Corp. v. Hagood*, 13 SE2d 291 (Va. 1941); *Consolidated Freightways v. Drake*, 678 P2d 874 (Wyo. 1984); 1B Larson, The Law of Workmen's Compensation, § 42.23 (1995).

[26] *Williams*, 175 Ga. App. at 667-668.

*ton, Robert C. Buck,* amicus curiae.

## S96A0179. ELLISON v. THE STATE.
### (470 SE2d 872)

SEARS, Justice.

The appellant, Anthony Ellison, was convicted of the malice murder of Billy Hagin, of the possession of a firearm during the commission of a crime, of the possession of a firearm by a convicted felon, of three counts of obstruction of officers, and of two counts of simple battery.[1] We find no error, and affirm.

Stephanie Darnell testified that about four days before the altercation between Ellison and Hagin she moved in with Sammy Riordan, and that at that time Anthony Ellison and his wife, Tabitha Ellison, were living with Riordan. She added that on the day of the killing she, Junior Acrey, Billy Hagin, and Tabitha Ellison were present at Riordan's trailer when Anthony Ellison sped into the driveway in a car. Darnell testified that she was sitting on a porch in front of the trailer with Tabitha Ellison; that after Anthony got out of the car, he told Tabitha to get his gun; that when Tabitha asked why he wanted a gun, Anthony told her to get his "damn gun"; and that Tabitha then went in the trailer and got Anthony's gun. Darnell further stated that Hagin then walked around the corner of the trailer by the porch; that Anthony jumped off the porch with the gun and stuck the gun in Hagin's face; that Anthony told Hagin to "empty your pockets"; that Hagin reached one hand into a pocket and kept one hand by his face; and that Anthony then fired the gun into Hagin's face. Darnell added that Hagin did not have a gun in his hands and that she did not see one on his person. After the shot, Darnell ran into the trailer. She testified that she looked out a window and saw Ellison wiping the gun with a cloth, but that she did not continue to watch Ellison. She added, however, that he came inside about two minutes after the shooting, and told her that he had put the gun in Hagin's hand; that he had to shoot Hagin because Hagin was a "narc"; and that if she were asked what happened, she should say that Hagin was playing with the gun and it went off.

Gary Acrey also witnessed the shooting and testified essentially

---

[1] The crimes occurred on September 22, 1994. Ellison was indicted on November 3, 1994. The jury returned its verdict on May 12, 1995, and the trial court sentenced Ellison that same day. Ellison filed a motion for new trial on May 31, 1995, and the court reporter certified the transcript on August 31, 1995. The trial court denied the motion for new trial on September 21, 1995, and Ellison filed a notice of appeal on October 18. The appeal was docketed in this Court on October 27, 1995, and was orally argued on January 17, 1996.

to the same events as Darnell. He added, though, that he heard Anthony tell Hagin that "you snitched me out"; that Hagin denied doing so; and that when Anthony had the gun pointed at Hagin's face, Hagin raised up one of his hands and the gun went off, but that he could not tell whether Hagin's hand had hit the gun. Acrey also stated that Anthony then put the gun in Hagin's right hand and later told the people present that if they said anything, he would kill them.

Another witness, Nancy Edwards, testified that before the shooting she had told Anthony Ellison that Hagin had told her that Hagin "had played both sides" regarding drug transactions.

Ellison testified that when he pulled into the driveway of Riordan's trailer, Hagin reached into the car, took out Anthony's gun, began to twirl it around, and talked about buying it. Anthony added that he went in the trailer to get a drink and came back outside. He said that Hagin was still playing with the gun, that Hagin then looked down the barrel, and that the gun went off, striking Hagin in the head.

Hagin died of a single gunshot wound to the head. When police arrived about 20 minutes after the shooting, they found the weapon that caused Hagin's death in his right hand, and when the weapon was removed the hand stayed in the same position. The microanalyst from the GBI Crime Laboratory testified that the highest concentration of gunshot residue was on the victim's left hand, and a coroner who investigated the victim's death testified that the victim's wound was not typical of a suicide because of its location on the bridge of the nose. He further testified that the wound was not a contact wound, which is typical in suicide cases.

Dr. Joseph Burton, however, testified for the defense that nothing in the forensic evidence was inconsistent with Hagin having fired the gun; that he had never seen a hand remain in the position in which Hagin's hand was found after having a gun placed in it; that rigor mortis takes about one and one-half hours to set in the hands; and that the description of the gun in Hagin's hand was consistent with a phenomenon called cadaveric spasm, where the hand almost instantaneously closes and grips the object it was intensely gripping at death.

Having reviewed the evidence in a light most favorable to the verdict, we conclude that the evidence is sufficient to support the convictions.[2] Further, we find no error is presented by the issues raised in Ellison's four enumerations of error.[3] Accordingly, we affirm Ellison's

---

swered one of those questions and allegedly improperly placed his character into issue; and that the state violated his rights under *Brady v. Maryland,* 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), in several respects.